A-570-814
Remand
Slip Op. 20-146
**Public Document**
E&C/OV:  Team

***Vandewater International, Inc. v. United States*,**
**Court No. 18-00199, Slip Op. 20-146 (CIT October 16, 2020)**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.     SUMMARY

The Department of Commerce (Commerce) prepared these final results of

redetermination in accordance with the opinion and remand order of the U.S. Court of

International Trade (the Court) in *Vandewater International, Inc. v. United States*, Court No. 18-

00199, Slip Op. 20-146 (October 16, 2020) (*Remand Order*).  This remand concerns

Commerce's Final Scope Ruling,[1] in which we determined, pursuant to 19 CFR 351.225(d), that

steel branch outlets (outlets) imported by Vandewater International Inc. (Vandewater) fall within

the scope of the antidumping duty (AD) order on carbon steel butt-weld pipe fittings (BWPFs)

from the People's Republic of China (China).[2]  In the *Remand Order*, the Court held that

Commerce's determination that the scope language and the descriptions of the merchandise

contained in the sources under 19 CFR 351.225(k)(1) are dispositive as to the inclusion of the

outlets within the scope of the *China BWPFs Order* was unsupported by substantial evidence.[3]

Accordingly, the Court remanded the Final Scope Ruling and directed Commerce to conduct a

scope inquiry to evaluate the outlets using the criteria enumerated under 19 CFR 351.225(k)(2).

---

[1] *See* Memorandum, "Antidumping Duty Order on Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China:  Final Scope Ruling on Vandewater International Inc.'s Steel Branch Outlets," dated September 10, 2018 (Final Scope Ruling).
[2] *See Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China*, 57 FR 29702 (July 6, 1992) (*China BWPFs Order*).
[3] *See Remand Order* at 4-9.

In accordance with the *Remand Order*, on October 30, 2020, Commerce initiated this inquiry and reopened the record to provide interested parties an opportunity to submit comments and new factual information relevant to an analysis under the (k)(2) criteria.[4]  On April 19, 2021, Commerce released the Draft Redetermination to all interested parties and invited parties to comment.[5]  Commerce received comments on April 30, 2021, as discussed below.

In these final results of redetermination, in accordance with the *Remand Order*, we have addressed the comments submitted by interested parties on the draft results of redetermination and continue to find that Vandewater's outlets are within the scope of the *China BWPFs Order* pursuant to an analysis under the (k)(2) criteria on remand.

## II.    SCOPE OF THE *CHINA BWPFS ORDER*

The products covered by this order are BWPFs having an inside diameter of less than 14 inches, imported in either finished or unfinished form.  These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings).  BWPFs are currently classified under subheading 7307.93.30 of the Harmonized Tariff Schedule of the United States (HTSUS).  Although the HTSUS subheading is provided for convenience and customs purposes, the written description of the scope of the order is dispositive.

---

[4] *See* Commerce's Letter, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China:  Initiation of Scope Inquiry," dated October 30, 2020 (Commerce October 30, 2020 Letter).
[5] *See* Memorandum, "Draft Results of Remand Redetermination, *Vandewater International, Inc. v. United States*, Court No. 18-00199, Slip Op. 20-146," dated April 19, 2021 (Draft Redetermination).

## III.   PRODUCT DESCRIPTION

Vandewater's product is commonly known as a "steel branch outlet" or a "welded outlet."[6]  The outlets in question have two ends and are designed for fire sprinkler systems and other low-pressure piping systems.[7]  One end, called the "header" or "run" side, is designed to be placed against the mid-section of another pipe (*i.e.*, a "header" or "run" pipe), and it is contoured to match the curve of the mid-section of that header pipe.[8]  The contour allows the outlet to sit atop the header pipe like a saddle.[9]  This contoured end has a beveled edge that permits the fitting to be welded to the header pipe.[10]

The other end of the fitting, called the "branch" or "outlet" side, is either threaded or grooved.  Vandewater offers threaded outlets in sizes ranging from ½ inch to 2½ inches, and grooved steel branch outlets in sizes ranging from 1¼ inches to 8 inches.[11]  The threaded or grooved outlet is intended to connect to another component of the piping system, such as a sprinkler head, *e.g.*, by screwing the sprinkler head on to the threaded end of the outlet.[12]

## IV.   BACKGROUND

### A.  Vandewater's Scope Request and Commerce's Final Scope Ruling

In July 1992, Commerce published the *China BWPFs Order*.[13]  On May 17, 2018, Vandewater, an importer of outlets produced in China, requested that Commerce issue a scope

---

[6] *See* Vandewater's Letter, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China:  Request for Scope Ruling for Steel Branch Outlets," dated May 17, 2018 (Scope Ruling Request) at 3.
[7] *See* Scope Ruling Request at 3-4.
[8] *Id*. at 3.
[9] *Id*.
[10] *See* Scope Ruling Request at 4 (product image for Vandewater's threaded outlet), 5 (product image for Vandewater's grooved outlet), and 13 ("{T}he header side of a steel branch fitting is normally beveled at a 45-degree angle").
[11] *See* Scope Ruling Request at 3.
[12] *Id*. at 4.
[13] *See China BWPFs Order.*

ruling to determine whether the threaded or grooved outlets that it imports are subject to the *China BWPFs Order*.[14]  On June 12, 2018, Island Industries Inc. (Island), a producer of the domestic like product, submitted its opposition to Vandewater's scope request.[15]  On June 29, 2018, Vandewater submitted rebuttal comments to Island's opposition.[16]

On July 11, 2018, counsel for Vandewater met with Commerce and provided samples of its outlets.[17]  On July 12, 2018, Smith-Cooper International (SCI), a U.S. importer of outlets, submitted comments in support of Vandewater's scope request.[18]  On July 17, 2018, Anvil International, LLC (Anvil), a producer of the domestic like product, submitted its opposition to Vandewater's scope request.[19]  On July 25, 2018, counsel for Island and counsel for Anvil met with Commerce to review the samples submitted by Vandewater.[20]

On August 24, 2018, Commerce placed on the record the Petition and the International Trade Commission (ITC)'s determination in the 2016 sunset review of the *China BWPFs Order*.[21]  On September 5, 2018, Island, SCI, and Vandewater submitted comments regarding the documents placed on the record.[22]

---

[14] *See* Scope Ruling Request.
[15] *See* Island's Letter, "Opposition to Scope Ruling Requests of Vandewater International Inc. and SIGMA Corporation," dated June 12, 2018 (Island June 12, 2018 Comments).
[16] *See* Vandewater's Letter, "Rebuttal Factual Information Concerning Vandewater Scope Inquiry on Steel Branch Outlets," dated June 29, 2018.
[17] *See* Memorandum, "Vandewater Scope:  *Ex-Parte* Meeting with Requestor's Counsel," dated July 12, 2018.
[18] *See* SCI's Letter, "Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Comments," dated July 12, 2018.
[19] *See* Anvil's Letter, "Opposition to Scope Ruling Requests of SIGMA and Vandewater and Request for a Meeting," dated July 17, 2018 (Anvil Opposition Letter).
[20] *See* Memorandum, "Vandewater Scope:  Meeting with Counsel to Interested Parties," dated July 26, 2018.
[21] *See* U.S. Fittings Group's Letter, "Petition for the Imposition of Antidumping Duties:  In the Matter of Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China and from Thailand," dated May 22, 1991 (Petition); and Memorandum, "Placing Documents on the Record," dated August 24, 2018; *see also* Carbon Steel Butt-Weld Pipe Fittings from Brazil, China, Japan, Taiwan, and Thailand, Inv. Nos. 731-TA-308-310 and 520-521 (Fourth Review), USITC Pub. 4628 (August 2016) (USITC Fourth Review).
[22] *See* Island's Letter, "Comments on Documents Placed on Record," dated September 5, 2018; SCI's Letter, "Comments on Documents Placed on the Record," dated September 5, 2018; and Vandewater's Letter, "Vandewater Comments on Factual Information Placed on the Record by Commerce," dated September 5, 2018.

On September 10, 2018, Commerce issued its Final Scope Ruling.[23]  Commerce determined that Vandewater's outlets were covered by the scope of the *China BWPFs Order*, pursuant to 19 CFR 351.225(d) and (k)(1).[24]  Commerce examined the scope language and observed that the outlets "are made of carbon steel, have an inside diameter of less than fourteen inches, and are used to join sections in fire sprinkler piping systems where conditions require permanent, welded connections."[25]  Commerce concluded that the scope language can be reasonably interpreted to include the outlets (*i.e.*, products with a single welded connection).[26] Commerce explained that this conclusion is supported by the descriptions of the merchandise contained in the (k)(1) sources, which revealed that the distinguishing characteristic of subject merchandise is a beveled edge on at least one end that facilitates a permanent, welded connection.[27]

In its analysis, Commerce primarily relied upon the Petition, the USITC Fourth Review, and a prior scope ruling relating to the *China BWPFs Order* issued in 2009[28] as (k)(1) sources to support Commerce's interpretation of the scope language.[29]  Commerce also acknowledged another scope ruling issued in 1992 in connection with the antidumping duty order on BWPFs from Taiwan, hereinafter referred to as the "Sprink Scope Ruling."[30]  The Sprink Scope Ruling

---

[23] *See* Final Scope Ruling.
[24] *Id.* at 8-12.
[25] *Id.* at 9.
[26] *Id.*
[27] *Id.* at 9-10.
[28] *See* Memorandum, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China:  Placing Prior Scope Ruling on the Record," dated September 10, 2018.
[29] *See* Final Scope Ruling at 9-10.
[30] *See* Island June 12, 2018 Comments at Exhibit 2; *see also Antidumping Duty Order; Certain Carbon Steel Butt-Weld Pipe Fittings from Taiwan*, 51 FR 45152 (December 17, 1986) (*Taiwan BWPFs Order*); and Memorandum, "Recommendation Memo – Final scope Ruling on Request by Sprink, Inc. to Exclude Sprink-let Carbon Steel Butt-Weld Pipe Fittings from the Antidumping Duty order on Carbon Steel Butt-Weld Pipe Fittings from Taiwan," dated March 25, 1992 (Sprink Scope Ruling).

addressed a product "essentially physically identical" to Vandewater's outlets.[31]  In addressing

arguments from interested parties, Commerce explained that it was "not bound by the agency's

analysis in the Sprink Scope Ruling" because that ruling involved a different proceeding that had

a scope with slightly different language.[32]  However, at the same time, Commerce still viewed

the Sprink Scope Ruling as informative because it was a prior scope ruling that considered

whether outlets nearly identical to the outlets imported by Vandewater are "butt-weld pipe

fittings."[33]  Commerce noted in the Final Scope Ruling that, "as in that case, we have concluded

that the merchandise is covered by the scope of an antidumping duty order on 'butt-weld pipe

fittings' because the merchandise is permanently joined by welding."[34]  Therefore, Commerce

ensured that its interpretation of "butt-weld pipe fittings" for purposes of the *China BWPFs*

*Order* was consistent with Commerce's longstanding interpretation of that exact same term in

the Sprink Scope Ruling as it relates to the *Taiwan BWPFs Order*.

Because Commerce determined that the outlets are covered by the *China BWPFs Order*

based on an analysis of the scope language and the (k)(1) sources, Commerce determined that it

was not necessary to consider the criteria set forth in 19 CFR 351.225(k)(2).[35]  As a result of its

Final Scope Ruling, Commerce issued instructions to U.S. Customs and Border Protection (CBP)

in accordance with 19 CFR 351.225(l)(3).  Vandewater appealed the Final Scope Ruling to the

Court.

### B.  The Court's *Remand Order*

On October 16, 2020, the Court remanded Commerce's Final Scope Ruling, holding that

---

[31] *See* Final Scope Ruling at 11.
[32] *Id.*
[33] *Id.* at 5-6 (listing the Sprink Scope Ruling as a relevant prior scope ruling).
[34] *Id.* at 11.
[35] *Id*. at 3.

Commerce's scope determination was not supported by substantial evidence.[36]  The Court found

that it was unreasonable for Commerce to conclude that the sources identified in 19 CFR

351.225(k)(1) were dispositive regarding whether Vandewater's outlets were covered by the

scope of the *China BWPFs Order*.[37]  According to the Court, neither the language of the *China*

*BWPFs Order* nor the (k)(1) sources that Commerce relied upon resolve the question of whether

Vandewater's outlets are covered by the scope.  The Court stated the following regarding the

scope language:

> {Vandewater's} products have threaded or grooved ends on their non-weldable
> end.  It is therefore not plainly apparent from the language of the {*China BWPFs*
> *Order*} whether a steel branch outlet qualifies as a butt-weld fitting covered by the
> {*China BWPFs Order*} or not.  They may be covered:  they are made of carbon
> steel, have an inside diameter of less than fourteen inches, and are used to join
> sections in fire sprinkler piping systems where conditions require a permanent,
> welded connection.  They also may not be covered:  they have a non-weldable,
> threaded or grooved end, and according to Vandewater, the weldable end is never
> joined to the sprinkler system via a true "butt-weld."  The language of the {*China*
> *BWPFs Order*} simply does not resolve the issue of whether Vandewater's steel
> branch outlets are covered.[38]

As for the (k)(1) sources, the Court explained that, on the one hand, 28 years ago

Commerce determined that a nearly identical product was within the scope of the *Taiwan*

*BWPFs Order*,[39] which is an order on BWPFs with very similar scope language.[40]  On the other

hand, certain language in the ITC's most recent sunset review and the Petition contemplates that

in-scope fittings must have an end-to-end connection with beveling on the ends of both the

fitting and the adjoining pipe, which is not descriptive of Vandewater's outlets.[41]  The Court

---

[36] *See Remand Order* at 3-9.
[37] *Id.* at 5-8.
[38] *Id.* at 5.
[39] *See Taiwan BWPFs Order*.
[40] *See Remand Order* at 5-6; *see also* Sprink Scope Ruling.
[41] *See Remand Order* at 7-8; *see also* USITC Fourth Review at I-4; and Petition at 4.

concluded that Commerce's determination that the (k)(1) sources were dispositive was not reasonable because Commerce dismissed the Sprink Scope Ruling as non-binding and the other (k)(1) sources Commerce relied upon "do not really tell the court anything about the inclusion of steel branch outlets within the scope."[42]  As a result, the Court remanded the Final Scope Ruling to Commerce with instructions to conduct a scope inquiry and analyze the criteria under 19 CFR 351.225(k)(2).[43]

## C. Remand Proceedings

Pursuant to the *Remand Order*, on October 30, 2020, Commerce initiated this inquiry and reopened the record.[44]  We provided interested parties an opportunity to submit comments and new factual information related to an analysis under 19 CFR 351.225(k)(2).[45]

On November 9, 2020, Island, SCI, Sigma Corporation (SIGMA), and Vandewater submitted comments containing new factual information.[46]  Subsequently, on December 3, 2020, Island, SCI, SIGMA, and Vandewater submitted new factual information to rebut, clarify, or correct the information placed on the record on November 9, 2020.[47]

On April 19, 2021, Commerce released the Draft Redetermination to all interested parties

---

[42] *See Remand Order* at 8.

[43] *Id*. at 9.

[44] *See* Commerce October 30, 2020 Letter.

[45] *Id*. at 2.

[46] *See* Island's Letter, "(k)(2) Analysis of Vandewater 'Steel Branch Outlets,'" dated November 19, 2020 (Island Comments); SCI's Letter, "Comments and Documentation in Formal Scope Inquiry Pursuant to 19 C.F.R. 351.225(e) and (k)(2)," dated November 19, 2020 (SCI Comments); SIGMA's Letter, "SIGMA'S Additional Written Arguments and Supporting Documentation Regarding the "(k)(2)" Criteria," dated November 19, 2020 (SIGMA Comments); and Vandewater's Letter, "Comments of Vandewater International Inc. on (K)(2) Factors," dated November 19, 2020 (Vandewater Comments).

[47] *See* Island's Letter, "(k)(2) Rebuttal Analysis of Vandewater 'Steel Branch Outlets, '" dated December 3, 2020 (Island Rebuttal Comments); SCI's Letter, "Rebuttal Comments in Formal Scope Inquiry Pursuant to 19 C.F.R. 351.225(e) and (k)(2)," dated December 3, 2020 (SCI Rebuttal Comments); SIGMA's Letter, "SIGMA Rebuttal Comments for Commerce's "(k)(2)" Analysis," dated December 3, 2020 (SIGMA Rebuttal Comments); and Vandewater's Letter, "Slip Op. 20-146:  Rebuttal Comments of Vandewater International Inc. on (K)(2) Factors," dated December 3, 2020 (Vandewater Rebuttal Comments).

and invited parties to comment.[48]  On April 30, 2021, Island, SCI, SIGMA, and Vandewater each

filed comments on the Draft Redetermination.[49]

## V.    LEGAL FRAMEWORK

Commerce's regulations set out rules regarding the issuance of scope rulings, including

standards used in determining whether a product is within the scope of an order.  When a request

for a scope ruling is filed, Commerce examines the language of the scope of the order at issue

and the description of the product contained in the scope ruling request.[50]  Commerce may also

examine other information, including the description of the merchandise contained in the

petition, the initial investigation, and prior determinations of Commerce (including prior scope

rulings) and the ITC.[51]  If Commerce determines that these sources are dispositive, it will issue a

final scope ruling as to whether the product in question is covered by the scope of the order.[52]  A

determination pursuant to this analysis may take place with or without initiation of a formal

scope inquiry.[53]

Conversely, if Commerce determines the descriptions of the merchandise in the sources

described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider the following

five additional factors set forth in 19 CFR 351.225(k)(2):

(i)      The physical characteristics of the product;

---

[48] *See* Draft Redetermination.
[49] *See* Island's Letter, "Comments on Draft Remand Redetermination," dated April 30, 2021 (Island Draft Redetermination Comments); SCI's Letter, "SCI's Comments on the Department's Draft Remand Redetermination," dated April 30, 2021 (SCI Draft Redetermination Comments); SIGMA's Letter, "SIGMA's Comments on the Department's Draft Results of Redetermination Pursuant to Court Remand," dated April 30, 2021 (SIGMA Draft Redetermination Comments); and Vandewater's Letter, "Comments of Vandewater International Inc. on Draft Results of Redetermination Pursuant to Court Remand," dated April 30, 2021 (Vandewater Draft Redetermination Comments).
[50] *See Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010).
[51] *See* 19 CFR 351.225(k)(1).
[52] *See* 19 CFR 351.225(d).
[53] *See* 19 CFR 351.225(d) and (e).

(ii)      The expectations of the ultimate purchasers;

(iii)     The ultimate use of the product;

(iv)     The channels of trade in which the product is sold; and

(v)      The manner in which the product is advertised and displayed.

The determination as to which analytical framework is most appropriate in any given scope inquiry is made on a case-by-case basis after consideration of all record evidence before Commerce.

As explained above, the Court has directed Commerce to conduct a scope inquiry and analyze the criteria enumerated under 19 CFR 351.225(k)(2) to determine whether Vandewater's outlets are covered by the scope of the *China BWPFs Order*.

## VI.    INITIAL COMMENTS ON THE (K)(2) FACTORS

**Vandewater, SCI, and SIGMA Comments**

*Physical Characteristics of the Product*

Outlets have several distinct characteristics that distinguish them from BWPFs.  These characteristics relate to the ends of the outlets, their method of connection to the header pipe, the shape of the product, the underlying production process, and the applicable industry standard(s). Such considerations, which were each raised by one or more of the importers of outlets, are discussed in turn.

First, outlets always have one end that is contoured with a curved or "fishmouth" design, which allows the outlet to be attached directly to the curved side or face of a pipe, *i.e.*, to be attached in a perpendicular manner to another pipe, rather than through an end-to-end

connection.[54]  The curvature on an outlet facilitates attachment *only* to the face of run pipe.[55]  In contrast, the ends of BWPFs never have this curved, fishmouth shape because they are attached exclusively to the end of a pipe.[56]  A BWPF connects two pipes along the same plane,[57] and a BWPF always has a square end.[58]  Therefore, outlets are physically different from BWPFs because the welded end of the outlet is curved and does not allow for an end-to-end weld, which is a defining characteristic of BWPFs.[59]

Second, the method of connection for outlets and BWPFs is distinct.[60]  Outlets rest against the face of the pipe at a location that is not itself beveled.  The beveled end of the outlet tapers to a flat surface and does not come to a pointed shape.[61]  Thus, the connecting weld is a fillet weld, where the bead of the weld runs along the edge of the point of connection, but does not fully penetrate the connection and separate the pipes with welding material.[62]  In contrast, BWPFs attach to the end of pipe, and the ends of the BWPF and the connecting pipe are beveled to a pointed shape.[63]  Thus, the two points (*i.e.*, the two beveled edges) are placed together, and the weld "bead" rests in the channel created by the two bevels, fully penetrates the connection, and keeps the two adjoining pieces separate.[64]  The butt weld forms the bridge between the fitting and the pipe but never allows the fitting and pipe to contact each other.[65]  Additionally, this interpretation is supported by the ITC's statement that BWPFs are intended to be placed

---

[54] *See* Vandewater Comments at 7 and Tabs 3 and 4; *see also* SIGMA Comments at 6 and Exhibit 2 at 15.
[55] *See* Vandewater Comments at 7 and Tab 4.
[56] *See* SCI Comments at 5; *see also* Vandewater Comments at 5-7.
[57] *See* SCI Comments at 6.
[58] *Id*.
[59] *Id*.
[60] *See* Vandewater Comments at 4-10; *see also* SCI Comments at 5-7; and SIGMA Comments at 7 and 10-11.
[61] *See* SCI Comments at 8.
[62] *Id.*; *see also* Vandewater Comments at 8-9.
[63] *See* SCI Comments at 8.
[64] *Id*.
[65] *Id*.

against the *end* of a beveled pipe or other fitting.[66]  Outlets rest against the face of the pipe at a location that is not itself beveled.[67]

Third, the bevel angles are different between the products.  Outlets have a 45-degree bevel angle on the connecting end that attaches to the run pipe.[68]  BWPFs are beveled, typically at a 37 ½ degree angle, and the receiving component (whether it is a pipe, a valve, another BWPF, or a backing ring) also has a beveled end with a similar angle (generally within a tolerance of plus or minus 2 ½ degrees).[69]  Thus, when placed together, the beveled edges form a shallow channel, normally a combined 75 degrees, that accommodates the bead of the weld that fastens the two adjoining pieces.[70]

Fourth, outlets have a non-welded end that is a temporary connection, unlike BWPFs which do not have any ends featuring a temporary connection.[71]  Vandewater's outlets have grooved or threaded connections.  This characteristic clearly distinguishes outlets from merchandise covered by the *China BWPFs Order*, which does not cover "fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings)."[72]

Commerce's prior decisions suggest that the character and number of butt-weld end connections are key considerations in analyzing the scope of the *China BWPFs Order*.  In its scope decision in the context of the *Forged Steel Fittings Order*,[73] and in its Forged Steel

---

[66] *Id.* at 6 (citing USITC Fourth Review at 6).

[67] *See* SCI's Comments at 8.

[68] *See* Vandewater Comments at 9 (citing Scope Ruling Request at Exhibits 7, 20, and 21).

[69] *See* SCI Comments at 8-9; *see also* Vandewater Comments at 9, Tab 5 at 107, and Table 12.

[70] *See* Vandewater Comments at 8 (citing USITC Fourth Review at I-5).

[71] *See* SCI Comments at 11.

[72] *Id.* (citing *China BWPFs Order*); *see also* Vandewater Comments at 7-8.

[73] *See* SCI Comments at 13-14 and Exhibit 5 (citing Memorandum, "Forged Steel Fittings from China, Italy, and Taiwan:  Final Scope Determination Decision Memorandum," dated July 23, 2018 (Forged Steel Fittings Scope Determination)); *see also Forged Steel Fittings from Italy and the People's Republic of China:  Antidumping Duty Orders*, 83 FR 227 (November 26, 2018) (*Forged Steel Fittings Order*).

Fittings Scope Clarification Memorandum,[74] Commerce connected the scope analysis between

that investigation and the analysis associated with the *China BWPFs Order*. Commerce stated

that outlets must have butt welds on both ends to be considered butt-weld fittings for the

purposes of the exclusion from the *Forged Steel Fittings Order*. Although the Forged Steel

Fittings Scope Clarification Memorandum states that "{f}ittings and outlets with at least one, but

not all, butt welded end connection and an inside diameter of less than 14 inches are covered by

the scope of the {*China BWPFs Order*}, so long as the other requirements of the {*China BWPFs*

*Order*}scope are satisfied," this does not cover branch outlets, such as Vandewater's, which have

no butt-weld ends.[75] Products with zero butt-weld ends, like outlets, cannot reasonably be

considered butt-weld fittings.[76] Commerce agreed that "{o}utlets with a socket-weld or threaded

end connection, or with only one butt-weld end connection, are not considered a butt-weld fitting

…"[77] In addition, the industry that produces forged steel fittings recently told Commerce that

"the industry does not consider a welded outlet to be a butt-weld fitting …"[78]

Fifth, outlets and BWPFs follow separate industry standards that require different

physical characteristics. BWPFs always have a square end and bevel made to dimensions

specified in American National Standards Institute (ANSI) and American Society of Mechanical

Engineers (ASME) B16.9,[79] which is entitled "Factory-Made Wrought Buttwelding Fittings."[80]

---

[74] *See* SCI Comments at 12 (citing Memorandum, "Forged Steel Fittings from the People's Republic of China, Italy, and Taiwan:  Placing Carbon Steel Butt Weld Pipe Fitting Scope Ruling on the Record," dated September 19, 2018 (Forged Steel Fittings Scope Clarification Memorandum)).

[75] *Id*. at 14 and Exhibit 11.

[76] *Id.*

[77] *See* Vandewater Comments at 18 (citing Forged Steel Fittings Scope Determination at 7-9).

[78] *Id.* at 26 (citing Scope Ruling Request at Exhibit 16).

[79] ANSI and ASME are distinct organizations that develop industry standards for various products, including fittings.  *See* Vandewater Comments at Tab 1 (ASME B16.9 standard, "Foreword" discussing ANSI's and ASME's involvement in developing the B16.9 standard).  However, the parties refer to ANSI and ASME interchangeably in their submissions.  For ease of reference, these final results of redetermination refer to both ANSI/ASME in discussing certain industry standards.

[80] *See* SCI Comments at 15; *see also* SIGMA Comments at 6 and Exhibit 2 at 4.

13

This ANSI/ASME standard includes long radius reducing elbows, long radius returns, short radius elbows, short radius 180-degree returns, 3D elbows, straight tees and crosses, reducing outlet tees, reducing outlet crosses, lap joint stub ends, caps, and reducers.[81]  Branch outlets do not meet this ANSI/ASME standard, but instead meet Manufacturers Standardization Society (MSS) SP-97, which is entitled "Integrally Reinforced Forged Branch Outlet Fittings – Socket Welding, Threaded, and Butt-welding Ends."[82]  Moreover, while all BWPFs meet American Society for Testing and Materials (ASTM) and ANSI/ASME specifications, branch outlets do not meet ANSI/ASME specifications.[83]

Sixth, outlets and BWPFs are made using different manufacturing processes.[84]  Outlets are not BWPFs because they are made completely by machining and are not formed or forged.[85] Machining is the process of cutting away or otherwise removing excess material.[86]  The scope of the *China BWPFs Order* is expressly limited to fittings that are either "formed or forged" both of which have particular meanings within the industry and refer to the process of reshaping material without removing any material.[87]  BWPFs typically start with seamless pipe,[88] which is then formed into a particular shape over a mandrel.[89]  Most types of BWPFs are made from ASTM A234 grade seamless pipe.[90]  Although it is possible to make some BWPFs with welded pipe,

---

[81] *See* SCI Comments at 15 (citing Scope Ruling Request at 10).
[82] *Id.*
[83] *Id.*
[84] *Id.* at 17.
[85] *Id.* at 17 and Exhibit 6 at 2.
[86] *Id.* at 17 and Exhibit 6 at 6, 17-18.
[87] *Id.* at 17 and Exhibit 6 at 17-18.
[88] *See* Vandewater Comments at 11 and Exhibit 7 at 13.
[89] *Id.*
[90] *Id.*

seamless pipe is typically used to manufacture BWPFs because seamless pipe holds pressure better than welded pipes and is easier to bend on a mandrel without causing weakness.[91]

Seventh, outlets are straight in design, whereas BWPFs (except for caps) are not.[92]  For example, as shown in the Weldbend Corporation (Weldbend) catalog, elbows and return bends are curved along their length.  Straight tees and reducing tees have an irregular shape along the length of one side.[93]

Finally, outlets are classified under a different tariff subheading from BWPF.[94]  While an HTSUS classification is not dispositive of a scope analysis, it is not irrelevant.[95]  It is especially relevant here where the distinction is between HTSUS subheading 7307.93, for "Butt-welding fittings" (subject merchandise) and HTSUS subheading 7307.99, for "Other" (outlets).  The HTSUS classification, as confirmed by CBP rulings, recognizes physical differences between outlets and BWPFs.[96]  Additionally, neither Commerce nor the domestic industry appears to have made any effort, over many years, to add the applicable HTSUS subheadings for outlets to the scope of the *China BWPFs Order*.[97]

*Expectations of the Ultimate Purchasers*

Ultimate purchasers expect outlets to be different from BWPFs, as demonstrated by the different industry standards to which such products are sold/produced; installation costs; and pressure ratings and corresponding applications.[98]

Purchasers of Vandewater's outlets expect that the outlet will meet the MSS SP-97

---

[91] *Id.*
[92] *Id.* at 12
[93] *Id.*
[94] *Id.*
[95] *See* SCI Comments at 18.
[96] *Id.* at 18-19.
[97] *Id.* at 19.
[98] *Id.* at 20-23.

manufacturing standard.  The standard covers "Integrally Reinforced Forged Branch Outlet

Fittings  – Socket Welding, Threaded, and Butt-welding Ends."[99]  Paragraphs 6.1 and 6.1.3 of

MSS SP-97 explain that the essential characteristic of a covered outlet is the connection to the

run pipe, which must be contoured.[100]

Purchasers of BWPFs, on the other hand, "expect that the BWPFs will be forged, or

produced from seamless pipe or steel plate, with the starting material conforming to ASTM

A105, ASTM A106, and ASTM A285 standards, and for which the finished BWPFs conform to

the ANSI/ASME B16.9 standard."[101]  The product description in the Petition explicitly notes the

industry standards to which BWPF must conform, *i.e.*, ASTM A234-82a and ANSI/ASME

B16.9.  There is no table or description of outlets in ANSI/ASME B16.9 because such outlets are

not recognized as BWPFs by the piping industry.[102]

BWPFs have higher installation costs, in part as a result of the need to support higher

pressure applications.[103]  Purchasers expect branch outlets to have much lower installation costs

than BWPFs because only one end is welded and the weld is relatively weaker and less

expensive.[104]  In order to change a BWPF system, an installer must burn out the connection with

a cutting torch.[105]

BWPFs are intended to withstand comparatively high levels of pressure and are rated to

300 pounds per square inch (PSI) or higher.[106]  In contrast, because purchasers expect to use

---

[99] *See* Vandewater Comments at Tab 2.
[100] *Id.*
[101] *See* SIGMA Comments at 8 and Exhibit 1 at 25.
[102] *Id.* at 22; *see also* Vandewater Comments at 14 and Tab 1.
[103] *See* Vandewater Comments at 23 and Exhibit 9; SCI Rebuttal Comments at 25; and Vandewater Rebuttal Comments at 5.
[104] *See* SCI Comments at 20.
[105] *See* Vandewater Comments at 7.
[106] *See* SCI Comments at 22 and Exhibits 1, 9 and 17.

outlets in low-pressure sprinkler systems, the outlets in question are only certified to withstand pressure of 300 PSI or less.[107]

Outlets are custom engineered by the manufacturer for the sizes, pressures, and temperatures of the piping to which they are attached for the purpose of minimizing the cost of creating an outlet in a run of piping.[108]  BWPFs, in contrast, are standard fittings that match up with the size and schedule of the pipe to which they are attached.[109]

*Ultimate Use of the Product*

The ultimate uses of outlets are different from BWPFs.[110]  Vandewater's outlets are designed for fire sprinkler systems, which are low pressure and, thus, are rated at no more than 300 PSI.[111] These threaded or grooved outlets are used so that the sprinkler head can be changed quickly and easily.[112]  Such temporary connections do not provide the same strength as a butt-weld connection, which is why outlets are used in low pressure applications (*e.g.*, no more than 300 PSI) and not in conditions requiring permanent connection.[113]  In such settings, threaded and grooved connections, rather than welded permanent connections, are commonplace.[114]  No fire sprinkler fabricator uses BWPFs for branch connections to sprinkler heads, because a BWPF does not have the ability to accept a sprinkler head with threads.[115]

---

[107] *Id.* at 22 and Exhibit 1 and 17.
[108] *Id.* (citing Scope Ruling Request at 13 and Exhibit 7).
[109] *Id.*
[110] *Id.* at 24.
[111] *Id.* at 23 (citing Scope Ruling Request at 4); *see also* Vandewater Comments at 23 and Tab 12 ("Please note that certain types of steel branch outlets, with similar basic physical characteristics, are also used by the oil and gas industry.  However, the steel branch outlets that Vandewater imports, which are the subject of this scope ruling request, are used strictly for fire sprinklers").
[112] *See* SCI Comments at 25-26 (citing Scope Ruling Request at Exhibit 23); *see also* Vandewater Comments at 23 ("Steel branch outlets are listed by Underwriter Laboratories (UL) for fire protection systems and are listed in the UL accessory section as 'welded outlets, ' and are not referred to by UL as BWPFs")
[113] *See* Vandewater Comments at 7 and Exhibit 1 at 24 (citing Vandewater Scope Ruling Request at 38); *see also* SCI Comments at 23 and Exhibits 6 (at Exhibit 2).
[114] *See* SIGMA Comments at 7.
[115] *See* Vandewater Comments at 23.

In contrast, BWPFs are used for connections in high pressure, industrial settings, with permanent connections.[116]  BWPFs are used in a broader set of industrial settings, such as chemical synthesis, petroleum refining, electric power generation, construction, and shipbuilding.[117]  BWPFs are required in these industries because butt welds create permanent, strong bonds capable of safely containing highly pressurized or toxic substances.[118]

*Channels of Trade in Which the Product Is Sold*

Outlets are sold in different channels of trade than BWPFs.[119]  Fire sprinkler system welded outlets are distributed solely within the fire sprinkler industry, which specializes in installing large-scale industrial, commercial, and residential fire sprinkler systems.[120]  For instance, Vandewater sells to fabricators of sprinkler systems and contractors.[121]  Vandewater also sells to fire sprinkler supply distributors, which sell to smaller contractors/fabricators.[122]

Distributors/end users for BWPFs are in totally different lines of business.[123]  BWPFs are sold to master distributors and contractors in the industrial and mechanical pipe-valves-fittings (PVF) segment of the construction industry.[124]  These distributors and contractors service the oil, gas, steam, and chemical industries, and generally maintain inventory of steel pipe and the BWPFs that correspond with the steel pipe they supply to their customers.[125]  According to the staff report of the ITC's 1992 final injury determination in the less-than-fair-value investigation,

---

[116] *Id.* at 25.
[117] *See* SCI Comments at 24.
[118] *Id.*
[119] *Id.* at 26.
[120] *Id.* at 27 and Exhibit 1 at 25.
[121] *See* Vandewater Comments at 26.
[122] *See* SCI Comments at 27 (stating that SIGMA's outlets are distributed solely to contractors within the fire sprinkler system industry) and Exhibit 1 at 25.
[123] *See* Vandewater Comments at 26.
[124] *Id.*
[125] *See* SCI Comments at 26; *see also* SIGMA Comments at 27.

"domestic manufacturers and importers sell virtually all their finished fittings to distributors, who then resell to end users."[126]

U.S. manufacturers that participated in the scope proceedings on outlets, *i.e.*, Island and Anvil, were not mentioned by the ITC as domestic producers of BWPFs in the original investigation or in any of the sunset reviews.[127] This is because they are not U.S. manufacturers of BWPFs, but manufacturers of branch outlets, a distinct market segment.[128]

*Manner in Which the Product Is Advertised and Displayed*

Outlets are not advertised or displayed together with BWPFs.[129] Vandewater's promotional brochures specifically describe its outlets as being intended for "fire protection & other low-pressure piping systems."[130] Vandewater's promotional brochures do not refer to any of these products as "butt-weld pipe fittings."[131] Likewise, SIGMA's promotional brochures describe the company's fire sprinkler system weld outlets as intended "for fire protection & other low-pressure piping systems."[132]

An exhibition document for the American Fire Sprinkler Association (AFSA) convention in October 2019 lists past participants for AFSA conventions. No producer of BWPFs is on the list because BWPFs are not advertised in trade shows that are targeted at the fire sprinkler industry.[133]

---

[126] *See* SCI Comments at 28 (citing Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand, Inv. Nos. 731-TA-520 and 521 (Final), Publication 2528, June 1992 (USITC Final Investigation) at I-18).
[127] *Id.* at 26.
[128] *Id.*
[129] *Id.* at 28.
[130] *See* Vandewater Comments at 27.
[131] *Id.* at 27 and Tab 12.
[132] *See* SIGMA Comments at 9 and Exhibit 1 at 65.
[133] *See* Vandewater Comments at 27 and Tab 15.

In its own scope proceeding, in response to comments from Island, SCI noted that, beginning in November 2017, it mistakenly described some outlet types as a "Threaded Butt-weld Outlet" or a "Grooved Butt-weld Outlet" on import records.[134]  SCI has corrected this mistake and at no time did it change the classification of its product from HTSUS subheading 7307.99.[135]  Prior product descriptions without the term "butt-weld" had been in place for over a decade, and these descriptions were restored to their original and correct form more than a month before Island's submission in the scope proceeding.[136]  Since then, SCI's relevant import documentation has used the correct description, which is also consistent with SCI's website.[137]

The Chief Executive Officer (CEO) of Island, Mr. Sanders, was deposed regarding Island's claims that Vandewater's threaded and grooved outlets are a type of BWPF.[138]  Mr. Sanders was asked whether he could "recall or identify any document, such as an email or another piece of correspondence, with a customer or a competitor or employee, and prior to your planning for this lawsuit, when you described a grooved outlet or a threaded outlet as a butt-weld pipe fitting?"[139]  Mr. Sanders replied "No."[140]

None of the commercial images of BWPFs provided by the ITC resemble Vandewater's threaded or grooved outlets.[141]  None of the commercial illustrations of BWPFs in the Petition resemble branch outlets.[142]  None of these example products have the fishmouth end or the threaded or grooved ends present on Vandewater's outlets.[143]  The Ladish catalog cited in the

---

[134] *See* SCI Comments at 27 and Exhibit 6 at 37.
[135] *Id.* at 27 Exhibit 6 at 37.
[136] *Id.* at 27-28.
[137] *Id.* at 28 and Exhibit 9 at 2.
[138] *See* Vandewater Comments at 21-22 and Tab 11.
[139] *Id.* at Tab 11(the Sanders deposition).
[140] *Id.*
[141] *See* SCI Comments at 28 and Exhibit 6 at 24-25 (citing USITC Fourth Review at I-5).
[142] *See* Vandewater Rebuttal Comments at 7 (citing Petition at Appendix B).
[143] *Id.* at 28 and Exhibits 6 at 4, and 9 at 4.

Petition does illustrate some products that are not BWPFs together on the same page with the BWPFs (*i.e.*, saddles).[144]  However, outlets are not present in this display and even the non-butt-weld products contained therein do not resemble branch outlets.[145]

Island distributes a variety of fire sprinkler system weld outlet types but does not describe them as having a "butt-weld" portion or as constituting "butt-weld fittings."[146]  Island does distribute a butt-weld outlet that is configured on one end with a single-plane, circular, beveled opening.  Island correctly describes this end as a "butt-weld" end, and correctly refers to this product as a "butt-weld" outlet.[147]  Although this product shares the same "fishmouth" opening on one end, as with all of Island's other fire sprinkler system weld outlets, it is only this product that is described as having a butt-weld end or categorized as a butt-weld outlet.[148]  It is because of the beveled/square end that it is a "butt-weld" outlet and, accordingly, assigned the product code "BW."[149]

Island also distributes type 40 & 10 and Type 50 & 80 weld outlets.  Advertisements for these products explicitly identify these "carbon steel branch outlets" and "weld outlets" as being sold "For Fire Protection and Low Pressure Piping Systems."[150]  Although some of these advertisements recognize that Island's weld outlets can be used for other purposes (*e.g.*, building services, power plant services), they also contain more detailed discussion of use for fire

---

[144] *See* SCI Comments at 29.
[145] *Id.* at 28 and Exhibit 6 at 5 and 15, and Exhibit 9 at 4.
[146] *Id.* at 29-30 (citing Island's Letter, "Carbon Steel Butt-Weld Pipe Fittings from China Handouts at July 25, 2018 Department Meeting," dated July 25, 2018).
[147] *Id.* at 28 and Exhibit 17 at 7 and Attachment 4.
[148] *Id.* at 28 and Exhibit 17 at 7.
[149] *See* SIGMA Comments at 11 and Exhibit 3B ("As stated in the advertisement, 'BW' reflects 'Bevel for Welding, ' which is likewise consistent with the physical characteristics of a BWPF").
[150] *Id.* at 9 and Exhibit 3B.

sprinkler systems.[151]  Further, these advertisements contain no reference to the ANSI/ASME B16.9 standard.[152]

**Island's Comments**

*Physical Characteristics of the Product*

Vandewater offers two types of steel branch outlets:  threaded and grooved.  Various names are used to describe these products, including steel branch outlets, threaded or grooved pipe outlets, and welded outlets.[153]  Vandewater's outlets have the same physical characteristics and welding requirements as products subject to the *China BWPFs Order*:  (1) they are formed or forged pipe fittings made of carbon steel; (2) they have an inside diameter of less than 14 inches; (3) they feature a "beveled edge" that demands that the fitting be welded to a pipe via a shallow channel that accommodates the "bead" of the weld; and (4) they are used to join sections in piping systems where conditions require permanent, welded connections.[154]  The ITC stressed that the beveled edges of these fittings is what distinguishes them from other types of pipe fittings, which rely on different types of fastening methods, such as threaded, grooved, or bolted fittings.[155]  In short, Vandewater's outlets have all of the same relevant physical characteristics and welding requirements as products covered by the *China BWPFs Order*.[156]

*Expectations of the Ultimate Purchasers*

The expectations of the ultimate purchasers of outlets are consistent with those of the purchasers of other merchandise subject to the *China BWPFs Order*.  The ITC has recognized a

---

[151] *Id.*
[152] *Id.*
[153] *See* Island Comments at 5.
[154] *Id.* at 6.
[155] *Id.* at 5-6.
[156] *Id.* at 6.

large number of uses for in-scope fittings, explaining that the products "are welded into permanent, fixed piping systems that convey gases or liquids in plumbing, heating, refrigeration, air conditioning, *automatic fire sprinklers*, electric conduit, irrigation, and process-piping systems …{and} structural applications."[157]

Products sold and marketed in the United States as "butt-weld pipe fittings" or fittings with butt-welded ends come in many shapes and configurations and have numerous and varied uses.[158]  These products include caps, lap joint stub ends, and saddles.  Purchaser expectations for welded outlets fall within the wide range of expectations associated with the above-referenced products.[159]

Moreover, public litigation records establish that Chinese manufacturers and distributors of welded outlets with threaded or grooved ends recognize that these products are BWPFs.  For example, in 2017, SCI and Jinan Meide, SCI's Chinese manufacturer, took the position that SCI could invoke the exemption carved out for BWPFs from the then-pending AD investigation of forged steel fittings from China, because their welded outlets were BWPFs.[160]  Accordingly, Jinan Meide and SCI changed the description of their welded outlets with threaded and grooved ends to 'butt-weld outlets' in import paperwork, as well as in SCI's statement concerning the applicability of antidumping or countervailing duties,[161] in which the welded outlets were described as "threaded butt-welded outlets" and "grooved butt-welded outlets."[162]

---

[157] *Id.* at 7 (citing USITC Fourth Review at 6 (emphasis added)).
[158] *Id.* at 7 and Exhibits 1-4B.
[159] *Id.*
[160] *Id.* at 8 and Exhibit 6.
[161] *Id.* at 8 ("SCI maintained Anti-Dumping Duty Stationary so that it would have a ready response in the event that CBP questioned it about whether an ADD order applied to a product") and Exhibit 7.
[162] *Id.* at 8 and Exhibits 7 and 8 (noting that "{i}n further communications between SCI and Jinan Meide, SCI acknowledged that the merchandise covered by the Sprink Scope Ruling was 'almost the same as' SCI cooplets, which is virtually identical to Vandewater's outlets").

In sum, the Petition and the ITC's description of the products covered by the *China BWPFs Order*, the advertising materials published by outlet distributors and producers, as well as their own commercial documents, show that expectations surrounding BWPFs encompasses a broad range of products including outlets.[163]  Such products include pipe fittings with only one beveled end, as well as fittings used in fire sprinkler systems.[164]  Ultimate purchasers' expectations may vary depending on the particular type of, and intended use for, the BWPFs they need.  However, they will invariably expect that any such product is made of formed or forged carbon steel, will have an inside diameter of less than 14 inches, will be permanently welded into a piping system via a beveled butt-welded end, and will connect to other components, such as pipes, fittings, flanges and sprinklers.[165]

*Ultimate Use of the Product*

Because products covered by the *China BWPFs Order* come in so many shapes and configurations, they have many ultimate uses, as noted above.[166]  However, such products are often used in fire sprinkler systems.[167]  The ITC highlighted this application, noting that BWPFs "are welded into permanent, fixed piping systems that convey gases or liquids in plumbing, heating, refrigeration, air-conditioning, *automatic fire sprinklers*, electrical conduit, irrigation, and process-piping systems."[168]  Vandewater's outlets are used in one of these explicitly-named contexts – *i.e.*, they are permanently welded into automatic fire sprinkler systems.[169]

---

[163] *Id.* at 8.
[164] *Id.*
[165] *Id.* at 9.
[166] *Id.*
[167] *Id.*
[168] *Id.* (citing USITC Fourth Review at I-6 and 6) (emphasis added).
[169] *Id.*

*Channels of Trade in Which the Product Is Sold*

Like the products covered by the *China BWPFs Order*, Vandewater's outlets are sold through distributors.

*Manner in Which the Product Is Advertised and Displayed*

Like any other BWPFs, outlets are advertised and displayed via online catalogs on company websites or by affiliated/third-party online sources.[170]  Such advertisements typically contain size, weight, and other technical specifications for the product, such as pressure rating and source materials.[171]

**Vandewater, SCI, and SIGMA Rebuttal**

*Physical Characteristics of the Product*

Rather than providing a comprehensive comparison of the physical characteristics of Vandewater's outlets and BWPFs, pursuant to (k)(2), Island instead attempts to repackage its (k)(1) arguments by cherry-picking from the investigation of the ITC.[172]  The fact that Commerce has already conducted a (k)(1) analysis, and that the Court ordered Commerce to conduct a (k)(2) analysis, makes clear that the scope of the *China BWPFs Order* is ambiguous and that a recitation of the language of the scope is irrelevant in response to the *Remand Order*.[173]  Island has, tellingly, omitted essential language that directly undermines the conclusion that Island urges Commerce to reach.[174]

As noted in the importers' initial submissions, there are many physical differences

---

[170] *Id.*
[171] *Id.* at 10 and Exhibits 3 and 5.
[172] *See* Vandewater Rebuttal Comments at 2; *see also* SCI Rebuttal Comments at 12-18; SIGMA Rebuttal Comments at 4-6.
[173] *See* SIGMA Rebuttal Comments at 3.
[174] *Id.*

between Vandewater's outlets and BWPFs, including:  different manufacturing specifications; whether the product is produced from welded pipe or seamless pipe; the existence of a contoured end; the existence of a threaded or grooved end connection; whether the product is straight or angular in design; whether the product is welded to the end or to the side of a pipe; whether the product has different bevel angles; and whether the connection is made with a fillet weld.[175]

Contrary to Island's assertions, Vandewater's outlets cannot be BWPFs, which, pursuant to the scope language, "require permanent, welded connections."[176]  One end of the branch outlet is fillet welded to the side of a pipe, and the other end of the branch outlet has the temporary, non-welded, threaded or grooved connection to allow attachment of a sprinkler head or branch pipe.[177]  In contrast, a BWPF never has a threaded end or grooved end because it is designed to make a permanent connection by welding all connectable ends to a pipe or another fitting.[178]

Island asserts that Vandewater's outlets "feature a 'beveled edge' that demands that the fitting be welded to a pipe via the shallow channel that accommodates the 'bead' of the weld, which, in the ITC's view, is the essence of a 'butt-weld pipe fitting.'"[179]  However, "such language contemplates beveling on both parts of the assembled pipe …"[180]  Thus, as the Court unequivocally concluded, "Vandewater's branch outlets are welded to header pipe, which is not, apparently, beveled at the weld.  The quoted sunset review language is, therefore, not descriptive of the actual physical characteristics of Vandewater's steel branch outlets."[181]  Agreeing with Island here would be tantamount to knowingly contradicting the Court's holding.[182]

---

[175] *See* Vandewater Rebuttal Comments at 2-3.
[176] *See* SCI Rebuttal Comments at 14-15.
[177] *Id.*
[178] *Id.* at 15; *see also* Vandewater Rebuttal Comments at 3.
[179] *See* SIGMA Rebuttal Comments at 4 (citing USITC Fourth Review at 6).
[180] *Id.* (citing *Remand Order* at 7).
[181] *Id.* (citing *Remand Order* at 8).
[182] *Id.*

Island also points to the Ladish catalog contained in the Petition and notes that it features pictures of BWPF that include saddles.[183]  These saddle fittings are not BWPFs by reason of the "fishmouth" opening on one side; they are BWPFs by reason of the other side of the fittings (*i.e.*, the beveled branch end).[184]

In addition to the Sperko affidavit,[185] the Neil Shyman affidavit provided by Vandewater echoes several of the differences in physical characteristics between Vandewater's outlets and BWPFs.[186]  These differences include:  sprinkler heads cannot be attached to a BWPF while welded branch outlets can and are; welded branch outlets always carry Underwriters Laboratory (UL) / Factory Mutual (FM) approvals while BWPFs do not; threaded welded branch outlets are forged using grade A-105 steel and grooved welded branch outlets generally use grade A-53 steel, while BWPFs generally use grade A-224 steel; and welded branch outlets have a maximum pressure rating of 300 PSI, while BWPF generally are rated to handle pressures up to and exceeding 10,000 PSI.[187]  Mr. Shyman's points are confirmed by the ITC in its original 1986 preliminary injury investigation where the ITC stated, "{t}he welded connections used in butt-weld pipe fittings provide a better seal than threaded, grooved, or bolted fittings can give under pressure."[188]  All of these distinctions strongly point to the conclusion that Vandewater's outlets

---

[183] *Id.* (citing Island Comments at 7).
[184] *Id.*
[185] *See* Vandewater Comments at Exhibit 7 (noting that Walter Sperko is the President of Sperko Engineering Services, Inc., which provides engineering consulting services).
[186] *See* Vandewater Rebuttal Comments at 3 and Attachment A (noting that "Mr. Neil Shyman was Vice President and General Manager of Neill Supply from May 1968 to January 2011.  Neill Supply is a fabricator and supplier of fire sprinkler and industrial piping and sells Vandewater's steel branch outlets").
[187] *Id.*
[188] *Id.* at 4 (citing *Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand, Inv. Nos. 731-TA-520 and 521 (Preliminary), Publication 2401*, July 1991 (USITC Preliminary Investigation)).

27

have different physical characteristics and are not part of the same class or kind of merchandise as BWPFs.[189]

*Expectations of the Ultimate Purchasers*

Contrary to Island's assertions, the expectations of the ultimate purchasers of BWPF differ from the expectations of the ultimate purchasers with respect to Vandewater's outlets.[190] Purchasers of Vandewater's outlets are all fabricators of fire sprinkler systems and expect the outlets to:  have interchangeable connections between the outlet and the sprinkler head; be manufactured with ASTM A-105 grade forging bars; be sold based on the run (header) size, the branch size, and the pressure rating (300 PSI).[191]  None of these purchasers use BWPFs for branch connections to sprinkler heads,[192] and BWPF purchasers cannot substitute steel branch outlets in their own applications.[193]

Purchasers of BWPFs are from a wide variety of industrial backgrounds (particularly manufacturers of piping systems used to convey oil, gas, steam, or chemicals).[194]  Because BWPFs require a higher PSI rating (up to and beyond 10,000 PSI) and a permanent connection, they also have higher installation costs,[195] are typically made from ASTM A-234 grade seamless pipe,[196] and are sold in nominal pipe sizes with specific pipe schedules which allow for the seamless flow within the pipe.[197]

---

[189] *Id.*
[190] *Id.* at 5.
[191] *Id.* at 5-6.
[192] *Id.*
[193] *Id.*
[194] *Id.*
[195] *Id.*
[196] *Id.*
[197] *Id.*

The Shyman affidavit also states that, Mr. Shyman, in his experience, has never sold BWPFs for fire sprinkler systems and has never seen BWPFs used in fire sprinkler systems.[198] He also states that he has never sold welded outlets to mechanical contractors and has never seen welded outlets used in those systems.[199]  Further, he states that the expectation of the ultimate purchasers of Vandewater's outlets was that they would be used in fire sprinkler systems, and that these customers would never use BWPFs for fire sprinkler systems.[200]

Island's reliance on the ITC language, stating that BWPFs "are welded into permanent, fixed piping systems that convey gases or liquids," including "automatic fire sprinklers," misdirects Commerce from the fundamental question at issue in this scope proceeding:  whether Vandewater's outlets fall within the scope of the *China BWPFs Order*.[201]  Although some products used in fire sprinkler systems may fall under the scope of the *China BWPFs Order*, Vandewater's outlets clearly do not.[202]

Island asserts that products sold and marketed in the United States as BWPFs, or with "butt-welded" ends, come in many shapes and configurations and have numerous and varied uses.[203]  However, none of Island's exhibits show a single example of a threaded or grooved outlet with a butt-weld.[204]  Moreover, Island confuses the issue by pointing to one particular type of outlet, known as a "butt-weld outlet," but Commerce has no need to consider whether a "butt-weld outlet" is a type of butt-weld pipe fitting, because Vandewater's scope request does not cover butt-weld outlets.[205]  Instead, Vandewater's request covers only low-pressure threaded and

---

[198] *Id.* at 6-7 and Attachment A.
[199] *Id.*
[200] *Id.*
[201] *Id.* at 6; *see also* SIGMA Rebuttal Comments at 6 (citing Island Comments at 7-9).
[202] *See* SIGMA Rebuttal Comments at 6.
[203] *See* Vandewater Rebuttal Comments at 7 (citing Island Comments at 7).
[204] *Id.*
[205] *Id.*

grooved steel branch outlets, neither of which is designed to accommodate any type of a butt-weld.[206]

Additionally, Island incorrectly asserts that customers have a wide range of expectations, given the diversity of products covered by the scope, including "caps, lap joint stub ends, and saddles," which it argues have characteristics comparable to welded outlets.[207]  For proof, Island points to Ladish's catalog.[208]  This is misleading.  The Ladish catalog to which Island points is not limited to BWPFs.[209]  The catalog segment cited by Island is entitled "Seamless Welding Fittings," but does not state (or imply) that all products in that catalog are butt-weld fittings.[210]  Vandewater agrees that caps and lap joint stub ends are indeed BWPFs.[211]  Vandewater does not agree, however, that a saddle is a butt-weld pipe fitting.[212]  Therefore, the range of products covered by the scope, and the corresponding expectations associated with these products, are not as broad as Island suggests.

Finally, Island argues that "public litigation records establish that manufacturers and distributors of Chinese welded outlets with threaded or grooved ends also recognize that these products are BWPF."[213]  The documents that Island cites, however, are documents of SCI or Jinan Meide, which Vandewater understands was SCI's supplier of outlets.[214]  None of the

---

[206] *Id.* at 7-8.
[207] *Id.* at 8 (citing Island Comments at 7-8).
[208] *Id.* (citing Island Comments at Exhibit 3).
[209] *Id.*
[210] *Id.*
[211] *Id.*
[212] *Id.* (noting that the caps and lap joint stub ends shown in the catalog:  (1) all meet B16.9 and ASTM A-234 specifications, based on the notation in upper left and upper right corners, respectively, of the specification sheets; and (2) show a beveled end, beveled only on the non-flanged side for a lap joint stub end, that resembles the characteristic 37.5 degree angle; in contrast, the Ladish catalog sheet showing a saddle does not have a reference to standard B16.9, and the illustration and engineering drawing cross-section of the saddle also does not show a beveled end).
[213] *Id.*
[214] *Id.* at 9

litigation documents cited by Island pertain to Vandewater, or to Vandewater's supplier of outlets, much less any "ultimate purchasers" of outlets.[215]  Neither Vandewater, its supplier, nor any purchasers of Vandewater's outlets have ever claimed or implied that Vandewater's outlets are BWPF.[216]  Therefore, the documents cited by Island are irrelevant to this scope proceeding.

The discussion above demonstrates stark differences in expectations between ultimate purchasers of outlets versus purchasers of BWPFs.  These differences support a conclusion that the two products are different classes or kinds of merchandise.

*Ultimate Use of the Product*

There are several differences in the ultimate uses of outlets and BWPFs.[217]  BWPFs are used to connect pipe sections where connections require permanent, welded connections.[218]  In contrast, Vandewater's outlets are used only in fire sprinkler systems.[219]  To the best of Vandewater's knowledge, no fire sprinkler fabricator uses any BWPFs for the branch connection, because a BWPF does not have the ability to accept a sprinkler head.[220]  BWPFs are used primarily in industries such as chemicals, oil refining, energy generation, construction, and shipbuilding.[221]

Vandewater's outlets could not be used in a BWPF application because the branch side of the welded outlet is designed specifically for use with a threaded sprinkler head.[222]  Mr. Shyman stated that "in my entire time working at Neill Supply I have never seen butt-welded fittings used in fire protection systems nor have any customers ever told me they were going to be used in fire

---

[215] *Id.* ("Vandewater does not have personal knowledge to explain what {sic} SCI's position as to those documents")
[216] *Id.*
[217] *Id.*
[218] *Id.*
[219] *Id.*
[220] *Id.* at 9-10.
[221] *Id.* at 10.
[222] *Id.*

protection sprinkler systems."[223]   For the same reason, Island's comments regarding ultimate use

are wrong.  BWPFs are simply not used in fire sprinkler systems to connect to a sprinkler head,

because a BWPF does not have the ability to accept a sprinkler with threads.[224]

*Channels of Trade in Which the Product is Sold*

Outlets and BWPFs are sold through completely different distribution channels.[225]

BWPFs are sold primarily through distributors to a variety of end-users, whereas outlets are sold

to a particular market segment.[226]

Vandewater sells the outlets in question to fabricators of sprinkler systems, who in turn

sell to fire sprinkler system installation contractors.[227]  Vandewater also sells to fire sprinkler

supply distributors, which sell to smaller contractors that fabricate smaller sprinkler systems.[228]

The Shyman affidavit summarized the distinctions in channels of trade as follows:

> While employed by Neill Supply in a sales capacity, I would make sales calls in the
> morning on fire protection sprinkler contractors, and an afternoon call on a
> mechanical contractor.  I would offer welded branch outlets to the fire protection
> sprinkler contractor, but not mention BWPF, because BWPF are not used for fire
> protection systems.  Likewise, I would sell BWPF to the mechanical contractor, but
> would not mention welded branch outlets because butt-weld fittings are not used in
> for {sic} fire protection sprinkler systems.[229]

Thus, Island's sole statement regarding channels of trade – which is that both BWPF and

Vandewater's outlets are both sold through "distributors" – simply glosses over the real

differences between the channels of distribution for BWPF and steel branch outlets.

---

[223] *Id.* at 10 and Attachment A.
[224] *Id.* at 10.
[225] *Id.*
[226] *Id.* at 10 and Attachment A.
[227] *Id.* at 11.
[228] *Id.*
[229] *Id.* at 11 and Attachment A.

*Manner in Which the Product is Advertised and Displayed.*

In its affirmative comments, Vandewater explained that the advertising of outlets differs significantly from the advertising of BWPFs.  As an example, Vandewater attached to its affirmative comments the list of exhibitors for the AFSA convention in October 2019.  No producer of BWPFs was on the AFSA exhibitor list, because BWPFs are not advertised in trade shows that are targeted at the fire sprinkler industry.  Rather, BWPFs are advertised and sold to mechanical contractors.  In Vandewater's ten-plus years of attendance at National Fire Protection Association conventions, Vandewater personnel never observed any BWPF exhibitor.

Island's only discussion of this factor is its statement that both outlets and BWPFs are advertised and displayed via online catalogs in company websites or affiliated or third-party online sources.  The fact that some entities advertise a broad array of products does nothing to undermine the fact that the parties who use outlets and BWPF participate in entirely different trade shows, and the advertising literature reflects those differences.

**Island's Rebuttal**

*Physical Characteristics of the Product*

As demonstrated below, each one of the alleged distinctions between outlets and BWPFs raised by the importers is either non-existent or inconsequential for purposes of a (k)(2) analysis.[230]  For purposes of a (k)(2) analysis, Commerce need only demonstrate that the general physical characteristics of the products under consideration are "sufficiently similar" to in-scope merchandise to conclude that the two are of the same class or kind.[231]

---

[230] *See* Island Rebuttal Comments at 5.
[231] *Id.* (citing *Wirth v. United States*, 5 F. Supp. 2d 968, 981 (CIT 1998) (*Wirth*)).

The importers argue that a BWPF "never" has a contour on either end, that it "always has a square end,"[232] and that outlets are welded to a hole cut in the wall or side of the pipe, not the end of the pipe.[233]  The importers argue that, in contrast, a BWPF "is always welded to the end of a pipe, another butt-weld fitting, or a butt-weld valve,"[234] and is designed for "end-to-end connection."[235]  However, saddles are covered by the scope and they do not have these characteristics.[236]

The importers further argue that "all connectable end {sic} of the butt-weld pipe fitting are welded to the end of a pipe, another butt-weld fitting, or a butt-weld valve,"[237] and that the ends of a BWPF are "always for welding" and do not have physical characteristics allowing a temporary connection.[238]  However, lap joint stub ends have a beveled edge on one end which allows for a welded, permanent connection, while on the other end, it has a stub end, which cannot be welded to a pipe and is instead designed to be bolted to a piping system.[239]  Therefore, outlets and other BWPFs are similar in that they both can have an end configured for a temporary fastening method (such as grooved, threaded, or bolted), while also being permanently connected to a piping system through at least one welded connection.[240]

The importers argue that outlets are "straight in design" and that, in contrast, BWPFs, "except for caps," are not straight along their length.[241]  However, caps are unambiguously

---

[232] *Id.* at 5-6 (citing Vandewater Comments at 5 and SCI Comments at 5-6).
[233] *Id.* at 6 (citing Vandewater Comments at 7 and SIGMA Comments at 5).
[234] *Id.* (citing Vandewater Comments at 6).
[235] *Id.* (citing SCI Comments at 5).
[236] *Id.* at 6 and Exhibits 2 and 3.
[237] *Id.* at 8 (citing Vandewater Comments at 7).
[238] *Id.* (citing SCI Comments at 6 and 11-12).
[239] *Id.* at 10.
[240] *Id.* at 12.
[241] *Id.* at 13 (citing Vandewater Comments at 12).

covered by the scope of the *China BWPFs Order*, and, therefore, this is not a characteristics that distinguishes outlets from BWPFs.[242]

The importers argue that the angle of the bevel on an outlet is "normally" 45 degrees, while the bevel angle on a BWPF is 37.5 degrees.[243]  The importers also claim that outlets rely on a fillet weld, which is an incomplete joint penetration with "no channel" in which the outlet rests directly against the pipe, while the butt weld used with BWPFs is a full penetration weld in which the outlet and the pipe do not make contact.[244]

With respect to the bevel angle, neither the *China BWPFs Order*, the Petition, the ITC reports, nor the sunset reviews mention any requirements relating to the angle of the bevels.[245] Rather, all these sources require is for the beveled edge of the fitting to "form a shallow channel that accommodates the 'bead' of the weld that fastens the two adjoining pieces."[246]  With respect to the purportedly incomplete weld penetration for outlets, the evidence provided by the importers undermines their own argument.[247]  Vandewater provided the Sperko affidavit which states:

> The end of a branch fitting where it attaches to the run pipe is beveled at 45°.  The header pipe to which it is welded is not beveled.  This 45-degree angle groove (*i.e.*, channel) allows welding of a full penetration or partial penetration groove weld reinforced by a fillet weld.[248]

This statement demonstrates that outlets do form a channel to accommodate the bead of a weld, and that the weld can be considered a full penetration weld.[249]

---

[242] *Id.* at 6, 13, and Exhibits 2 and 3 (citing Petition at 4; and USITC Preliminary Investigation at A-5).
[243] *Id.* at 14 (citing Vandewater Comments at 8; and SCI Comments at 8).
[244] *Id.* at 16 (citing Vandewater Comments at 9; SCI Comments at 8; and SIGMA Comments at 5).
[245] *Id.* at 15 (citing the *China BWPFs Order*; the Petition; USITC Preliminary Investigation at A-5; and USITC Final Investigation at I-5).
[246] *Id.* (citing USITC Fourth Review at 6; and Petition at 4).
[247] *Id.* at 16-17.
[248] *Id.* at Exhibit 8.
[249] *Id.* at 17.

There is nothing on the record supporting the importer's restrictive definition of "butt-weld."  For example, the American Weld Society handbook, cited by SCI in its comments, notes that "butt-weld" is "a non-standard term."[250]  Furthermore, Island's CEO may have never called an outlet a BWPF, but SCI certainly has.[251]  Similarly, Anvil, which has since merged with importer SCI, has previously stated that SCI's outlets were BWPF.[252]  Other market players, such as Aleum USA, also have identified outlets as butt-weld products.[253]  Thus, the record shows that outlets are "butt-weld" products.

The importers argue that outlets and BWPFs are manufactured to different industry standards.[254]  In particular, they submit that outlets are manufactured using MSS SP-97, while BWPFs meet ANSI/ASME B16.9,[255] and they point to other differences in applicable industry standards.[256]  First, the *China BWPFs Order* is silent as to industry standards, which indicates that they are not relevant for purposes of determining the scope of the order.[257]  The ANSI/ASME standard could have been included but was not, and the Court of Appeals for the Federal Circuit (CAFC) has stated that the "absence of a reference to a particular product in the petition does not necessarily indicate that the product is not subject to an order."[258]

It is not true that "all of the manufacturing methods" to produce outlets differ from those used to manufacture BPWFs.[259]  The ITC's description of the manufacturing process of BWPFs includes the following:  "The manufacture of BWPFs typically begins with seamless carbon steel

---

[250] *Id.* at 27 (citing SCI Comments at 9 and Exhibit 6).
[251] *Id.* at 28 and Exhibits 7 and 16.
[252] *Id.* (citing Anvil Opposition Letter).
[253] *Id.* at 28 and Exhibit 10.
[254] *Id.* at 20 (citing Vandewater Comments at 10-11).
[255] *Id.* (citing SCI Comments at 15; and SIGMA Comments at 6).
[256] *Id.* (citing Vandewater Comments at 2-5; SCI Comments at 15-16; and SIGMA Comments at 8, 23, and 25).
[257] *Id.*
[258] *Id.* at 21 (citing *Nitta Industries Corp. v. United States*, 997 F.2d 1459, 1464 (Fed. Cir. 1993)).
[259] *Id.* at 23.

pipe *although some types of fittings*, such as caps, are formed from carbon steel plate, billet, or *bar stock and machined* (bored) or punched *to shape* and size in a press."[260]  Many of these processes are typical of outlet production.  Therefore, it is not true that outlet manufacturing methods differ from the methods for producing BWPFs.  Indeed, some BWPF may be made from bar stock and machined.[261]

Additionally, the ITC's description of the manufacturing processes to produce BWPFs illustrates the wide variety of manufacturing processes, and the language impliedly or expressly indicates that there are other methods not listed in the report (*e.g.*, by using words like "typically," "most of the domestic industry," "depending on the type of fitting to be made, one process may be preferred to the other," "the finishing steps involved in the production of BWPF may include one or more of the following steps …," "some manufacturers use semi-automated machinery that …," "the manufacturing process may be continuous," "the Chinese and Thai industries tend to be based on the hot-process …").[262]  These types of statements demonstrate that there is not one single manufacturing process for BWPFs that is distinct from the process used to fabricate outlets.[263]

Additionally, the *China BWPFs Order* covers "formed or forged" fittings and, based on the descriptions provided, Vandewater's threaded outlets are forged.[264]  Furthermore, Vandewater acknowledges that some BWPFs are manufactured with welded pipe, just like the

---

[260] *Id.* (citing ITC Final Investigation at I-7) (emphasis added).
[261] *Id.*
[262] *Id.* at 24 (citing ITC Final Investigation at I-7 through I-10).
[263] *Id.*
[264] *Id.* at 23 and 32.

grooved outlets.[265]  Therefore, there are various similarities between the manufacturing processes of outlets and BWPF.[266]

Lastly, the classification of outlets and other BWPF under different HTSUS subheadings is irrelevant.[267]  The fact that a threaded outlet is classified under HTSUS subheading 7307.92.3010, because such subheading more specifically describes a threaded outlet, does not mean that the item would not also potentially fall under HTSUS subheading 7307.93, which is less specific to the product.[268]  In any case, HTSUS classification does not determine whether merchandise is covered by an order.[269]

*Expectations of the Ultimate Purchasers*

The core expectation of purchasers of BWPFs, as well as of outlets, is connecting the fitting to a piping system through a welded, permanent connection, regardless of whether one of the ends is amenable to a temporary connection by grooved, bolted, or threaded fastening methods.[270]  Furthermore, the Court has repeatedly held that "if two products can be used in at least some of their applications for similar, if not identical purposes, Commerce may conclude that purchasers of the products have similar expectations."[271]  Outlets and BWPFs share similar purchaser expectations.

The importers argue that ultimate purchasers expect outlets and other BWPFs to be manufactured with different specifications.[272]  However, their specific arguments conflict with one another.  Vandewater argues that ultimate purchasers of outlets expect that threaded outlets

---

[265] *Id.* at 23.
[266] *Id.*
[267] *Id.* at 28-30.
[268] *Id.* at 29.
[269] *Id.* at 30.
[270] *Id.* at 31.
[271] *Id.* at 32 (citing *Olympia Industrial, Inc. v. U.S.*, Court No. 04-00647, 23 (CIT 2006) at 29-30).
[272] *Id.*

are made from ASTM A105-grade forging bars.[273]  SIGMA, in contrast, argues that ultimate purchasers of outlets expect that the outlets are made from ASTM A572 and ASTM A29 bar stock.[274]  Vandewater argues that purchasers of most types of BWPFs generally expect those products to be made from ASTM A234-grade seamless pipe.[275]  SCI and SIGMA argue that purchasers of most types of BWPFs generally expect those products to be made from ASTM A105, ASTM A106, and ASTM A285 seamless pipe or steel plate.[276]  The importers' argument overstates, or at least misstates, the expectations of the ultimate customers.[277]  In Island's experience, the ultimate purchasers' expectations will generally focus on meeting the minimum requirements of third party listings and approvals, *i.e.*, safety/testing ratings, applicable to the intended application.[278]

The importers claim that outlets are not sold according to the corresponding size or schedule of the pipe,[279] and that BWPFs are sold in nominal pipe sizes with specific pipe schedules which allows a seamless flow within the pipe.[280]  This alleged distinction is simply not true; outlets and BWPFs are both advertised and sold in nominal pipe size.[281]  For example, a 2" or 4" outlet refers to nominal pipe sizes that will connect to corresponding nominal pipe diameters of 2" and 4".[282]  In fact, SCI's outlets are manufactured to "match up" with standard nominal pipe sizes and schedules.[283]  Consequently, the expectations of the ultimate purchasers

---

[273] *Id.* (citing Vandewater Comments at 23).
[274] *Id.* (citing SIGMA Comments at 7-8).
[275] *Id.* (citing Vandewater Comments at 23).
[276] *Id.* (citing SIGMA Comments at 7-8).
[277] *Id.* at 32-33.
[278] *Id.* at 33.
[279] *Id.* at 34 (citing Vandewater Comments at 24 and SCI Comments at 22).
[280] *Id.*
[281] *Id.*
[282] *Id.* at 35 and Exhibits 12 and 13.
[283] *Id.*

of outlets and BPWFs are similar because they expect both to be manufactured in sizes which match up with standard nominal pipe sizes and schedules.[284]

The importers argue that no fabricators of fire sprinkler systems use BWPFs for branch connections to sprinkler leads because a BWPF does not "have the ability to accept a sprinkler head with threads," or the flexibility to change the sprinkler head quickly and easily.[285]  In contrast, ultimate purchasers of BWPFs, which are in a wide variety of industries, particularly manufacturers of piping systems used to convey oil, gas, steam, or chemicals, would not buy outlets for such applications because of their low-pressure grading and the lesser strength of the connection.[286]  SCI and SIGMA also claim that, because outlets and BWPFs meet different industry standards, they are used in different applications.[287]  However, the *China BWPFs Order* includes a sweeping range of products with differing applications, and the expectations of ultimate purchasers will vary depending on what type of BWPF they need.[288]  That said, the core expectation of purchasers of BWPFs, as well as of outlets, is that of connecting the fitting to a piping system through a welded, permanent connection, regardless of whether one of its ends is amenable to a temporary connection by grooved, bolted or threaded fastening methods.[289] Additionally, and more specifically, one of the expectations that ultimate purchasers of BWPFs have is the use of BWPFs for "automatic fire sprinklers" applications.[290]  Because ultimate purchasers of both outlets and BWPFs may expect to use them for fire sprinkler applications, the

---

[284] *Id.*
[285] *Id.* at 30 (citing Vandewater Comments at 22).
[286] *Id.*
[287] *Id.* (citing SCI Comments at 21-22; and SIGMA Comments at 7-8).
[288] *Id.* at 31.
[289] *Id.* (citing *China BWPFs Order*).
[290] *Id.* (citing USITC Forth Review).

expectations of ultimate purchasers of outlets are similar to those of ultimate purchasers of other types of BWPFs.[291]

Importantly, outlets are perceived to be BWPFs by the largest manufacturer and master distributor of outlets in the United States, Anvil.[292]  At the onset of the underlying scope segment, Anvil stated on the record that the importer's outlets are BWPFs that fall within the scope of the *China BWPFs Orders*, and it expressed agreement with Island's arguments.[293]

*The Ultimate Use of the Product*

Connecting the fitting to a piping system through a welded, permanent connection is the main use of both outlets and BPWFs.[294]

The importers argue that outlets are all used "solely" for fabrication of low pressure commercial or residential fire sprinkler systems applications, while BWPFs are used for other applications that require permanent, welded connections for higher pressure conveyance of oil, gas, steam, and chemicals.[295]  Those generalizations are inaccurate.  Both outlets and BWPFs are used in fire sprinkler systems.[296]  For example, weld tees can be used for the fire sprinkler market, although outlets are typically preferred due to cost of installation considerations.[297]  Additionally, outlets are not used exclusively in the fire sprinkler system field.[298]

Although the importers suggest a narrow set of uses for outlets, such characterizations are not accurate.[299]  Certain outlets sizes (½", ¾" and 1") are expected to be used for connecting to a

---

[291] *Id.* at 31-32.
[292] *Id.* at 33.
[293] *Id.* at Exhibits 5 and 11.
[294] *Id.* at 35 (citing USITC Fourth Review at 6).
[295] *Id.* (citing Vandewater Comments at 24-25; SCI Comments at 22-23; and SIGMA Comments at 7).
[296] *Id.* (citing USITC Fourth Review at 6).
[297] *Id.*
[298] *Id.* at 36.
[299] *Id.* at 35.

sprinkler head, and other outlets sizes (1¼", 1½", and 2") are used to connect to other pipes.[300] Additionally, grooved outlets in all sizes are for pipe connections only.[301] This demonstrates that both outlets and BWPFs may be used to connect the fitting to a pipe.[302] As this discussion indicates, the uses of outlets are similar to those of BWPFs.

*Channels of Trade in Which the Product is Sold*

The importers argue that outlets are sold solely within the fire sprinkler system industry, whereas BWPFs are sold to master distributors and contractors in the industrial and mechanical PVF segment of the construction industry.[303] Vandewater argues that it sells its outlets to fire sprinkler supply distributors or to fabricators of sprinklers systems.[304] In contrast, BWPFs are sold to master distributors and contractors that serve the oil, gas, steam, and chemical industries and BWPF purchasers generally maintain inventory of steel pipe and BWPFs that go with the steel pipe they supply to their customers.[305]

These distinctions are not accurate. The importers all sell widely to master distributors, fabricators, and some contractors.[306] Some of those master distributors also sell into the industrial and mechanical PVF segment.[307] For example, Vandewater sells its outlets to Ferguson Enterprises (Ferguson), the largest pipe valve and fitting distributor in the United States, which in turn sells both outlets and other BWPFs on its website.[308] While Ferguson sells BWPFs, it is also by far the single largest distributor of outlets for fire sprinkler systems.[309] This

---

[300] *Id.*
[301] *Id.*
[302] *Id.* at 36.
[303] *Id.*
[304] *Id.* (citing Vandewater Comments at 26).
[305] *Id.* at 37 (citing Vandewater Comments at 26; SCI Comments at 26; and SIGMA Comments at 8).
[306] *Id.*
[307] *Id.*
[308] *Id.* and Exhibit 14.
[309] *Id.*

demonstrates that both outlets and other BWPFs share similar channels of trade because they are both sold to master distributors, fabricators, and contractors.

*Manner in Which the Product is Advertised and Displayed*

Outlets and other BWPFs are displayed in a similar manner.  The importers claim that outlets "are not advertised or displayed for any of the applications for BWPF,"[310] they are described as intended for fire sprinkler systems and other low-pressure piping systems, and promotional brochures do not refer to any of Vandewater's products as BWPFs.[311]

Regardless of the importers' advertising choices, other fire sprinkler system industry players describe outlets as having "butt-welding ends that comply with national and international standards."[312]  Industry players often do not mention the term "butt-weld" in their advertisements – even for clearly covered BWPFs – as it is a non-standard term.[313]  The fact that advertising materials related to outlets do not include a reference to BWPFs does not mean that outlets are not BWPFs.  Instead, as noted above, "butt-weld" is simply a non-standard term that is, accordingly, not always used in the industry marketing materials.[314]

Similarly, Island advertises its outlets for numerous applications, including plant services, building services, mining, oil field services, and pollution control services.[315]  As a result, both outlets and BWPFs are advertised for applications in the same or similar industries.

SIGMA claims that even Island advertises its outlets as sold for fire sprinkler and low-pressure piping systems, while advertising BWPFs for use in boilers and describing them as

---

[310] *Id.* at 38 (citing Vandewater Comments at 27; SCI Comments at 29; and SIGMA Comments at 9).
[311] *Id.*
[312] *Id.* and Exhibits 10 and 15.
[313] *Id.*
[314] *Id.*
[315] *Id.*

designed to provide unobstructed, full flow characteristics.[316]  This is not true.  Island's grooved outlets (Type 40 & 10 Weld Outlets) and other Island outlets (Type 40 & 80 Seamless Weld Outlets) are advertised for a wide variety of end uses also applicable to BWPFs, including plant services, building services, fire sprinkler systems, mining services, pollution controls services, oil field services, and power plant services.[317]

SCI separately claims that Island does not describe its outlets as BWPFs.[318]  This is because butt-weld is not a standard term.[319]  In fact, Weldbend and Hackney Ladish, the petitioners in the original investigation, usually do not use the term "butt-weld," and instead call their products "Seamless Weld Fittings."[320]

SCI claims that outlets are marketed by size and pipe run size, with size referring to the pipe diameter of the sprinkler head or branch outlet, and pipe run size referring to the diameter of the run pipe to which the fishmouth end of the outlet attaches.[321]  SCI claims that, conversely, BWPFs are not advertised and displayed using pipe run size.  Again, this is not true.  Both outlets and BWPFs are advertised and sold in nominal pipe size.

Vandewater claims that BWPFs are not advertised in trade shows that are targeted at the fire sprinkler industry.[322]  This argument also lacks merit.  Attendance or lack thereof at one type of trade show cannot possibly be proof that BWPFs are not advertised or targeted to the fire sprinkler industry.[323]

---

[316] *Id.* at 39 (citing SIGMA Comments at 10).
[317] *Id.*
[318] *Id.* (citing SCI Comments at 29).
[319] *Id.* at 40.
[320] *Id.* (citing Petition at Attachment A).
[321] *Id.*
[322] *Id.* (citing Vandewater Comments at 27).
[323] *Id.*

44

## VII.   ANALYSIS

Pursuant to the Court's *Remand Order*, we have analyzed the parties' comments and supporting information[324] for our evaluation of the (k)(2) factors.  For the reasons discussed below, we find that these factors support a finding that Vandewater's outlets are covered by the scope of the *China BWPFs Order*.

*Physical Characteristics of the Product*

We find that the physical characteristics of outlets and BWPFs subject to the *China BWPFs Order* are similar.  The scope of the *China BWPFs Order* provides, in relevant part, that "the products covered by this order are carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form" and "{t}hese formed or forged fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings)."[325]  This language indicates that subject merchandise must be formed or forged, made of carbon steel, and have a diameter of less than 14 inches.  As discussed further below, we also find that, to be an in-scope "butt-weld pipe fitting{}," the merchandise must be designed to have at least one end with a beveled edge, whether contoured or not, for permanent attachment to at least one pipe or fitting and may have a temporary connection on another end.

The record demonstrates that Vandewater's outlets meet these criteria.  As stated by Vandewater, Vandewater offers CEREICO brand threaded steel branch outlets in sizes ranging

---

[324] We note that this information contains data from a variety of sources, including sources enumerated under (k)(1). Although the Court determined that the (k)(1) sources do not, themselves, dispositively resolve the question of whether Vandewater's outlets are covered by the scope of the *China BWPFs Order*, information in such sources is nonetheless relevant to our analysis of the (k)(2) factors.
[325] *See China BWPFs Order*.

from ½ inch to 2½ inches; Vandewater also offers CEREICO brand grooved steel branch outlets in sizes ranging from 1¼ inch to 8 inches.[326]  The outlets are made of carbon steel.[327]  Like other types of BWPF, Vandewater's "threaded branch outlets are manufactured from *forged steel bars*, and its grooved branch outlets are machined from *welded pipe*."[328]  The branch or outlet side is "*formed* with a threaded or grooved end."[329]  Further, Vandewater states that the product is permanently attached to at least one pipe in a fire sprinkler or other low-pressure piping system.[330]

Thus, the record demonstrates that Vandewater's outlets are consistent with BWPFs in terms of manufacturing method (*i.e.*, formed/forged), material (*i.e.*, carbon steel forged steel bars or welded pipe), and size requirements (*i.e.*, less than 14 inches in inside diameter).  Like all BWPFs, the outlets feature a beveled edge for permanent attachment to a pipe or fitting.[331]

The importers construe the requisite physical characteristics for BWPFs in an overly narrow manner to highlight purported differences between in-scope merchandise and Vandewater's product.  However, for many of the attributes identified by the importers as critical to the definition of a BWPF, we find that there is an insufficient basis to conclude that the term "butt-weld pipe fitting{}" in the scope requires such attributes.

The importers assert that in-scope merchandise does not have contoured edges and does not connect to the middle of a pipe.  We disagree, because the record demonstrates that

---

[326] *See* Scope Ruling Request at 4.
[327] *Id.* at Exhibit 1.
[328] *Id.* at 4 (emphasis added).
[329] *Id.* at 3 and 12 (emphasis added).
[330] *Id.* at 15.
[331] *See* Petition at 4 and Appendix B ("{t}he edges of finished {BWPFs} are beveled, so that when a fitting is placed against the end of a pipe (the ends of which have also been beveled), a shallow channel is created to accommodate the 'bead' of the weld which joins the fitting to the pipe"); s*ee also* the USITC Fourth Review at I-4 ("{t}he beveled edges of {BWPF} distinguish them from other types of pipe fittings, such as threaded, grooved, or bolted fittings, which rely on different types of fastening methods")

merchandise with these characteristics can be covered by the scope. Specifically, the record evidence establishes that products with a contoured edge that are designed to connect to the mid-section of a pipe can be BWPFs.[332] In its product specification sheets, Aleum USA, a U.S.-based distributor of outlets, describes its female threaded outlet and grooved outlet as having "{b}utt welding ends."[333] Like Vandewater's outlets, Aleum USA's outlets have one threaded or grooved end and a contoured edge on the other end that is connected to the middle of another pipe. Additionally, Vandewater has described the contoured edge of its outlets as a feature that allows the outlets to sit on the mid-section of the header pipe like a saddle.[334] The exhibits accompanying the Petition included a product catalog from a U.S. producer of the domestic like product with illustrations of basic shapes of BWPFs (under the heading "seamless welded fittings") and among them is a product that is referred to as a saddle, which, like Vandewater's outlets, has a contoured edge and is connected to the midsection of a pipe.[335] Saddles (whether full or partial), by design, are meant to fit to a hole cut into the side of a pipe, and do not rely on an end-to-end connection for their contoured end.[336] Further, the current version of the same U.S. producer's product catalog continues to include saddles as a type of "seamless welded fitting," and the product is displayed side-by-side with a full range of other BWPFs.[337] Similarly, the product catalog for a major U.S. distributor of pipes and fittings also includes a

---

[332] See Island Comments at Exhibit 4A and 4B; see also Island Rebuttal Comments at 6.

[333] See Island Comments at Exhibits 4A (Aleum USA's specification sheet for a female threaded outlet) and 4B (Aleum USA's specification sheet for a grooved outlet).

[334] See Scope Ruling Request at 3.

[335] See Petition at 4 ("Butt-weld fittings come in several basic shapes: 'elbows', 'tees', 'caps', and 'reducers'… Illustrations of the various types of butt-weld fittings are attached at Appendix B") and Appendix B (including an illustration of "saddles" as a type of BWPF). Although Vandewater asserts that saddles are not BWPF, and that it was merely coincidence that the image of a saddle was included among BWPFs in the petition, we disagree. The catalog page in the Petition displays numerous products that are unambiguously BWPFs, including products shown before and after saddles, e.g., elbows. Additionally, we note that the subsection of the image containing the saddle illustration also contains an image of a cap, which is clearly an in-scope BWPF.

[336] Id.

[337] See Island Comments at Exhibit 3.

saddle as one of the various "standard butt weld fitting types."[338]  At least one of the importers

agrees that saddles are a type of BWPF.[339]  The product catalog from another U.S. producer of

the domestic like product includes an illustration of a "vesselet," another product with a

contoured edge that is connected to the side of a header pipe, and the illustration refers to the

contoured end as a "butt-weld" and the accompanying description states that the vesselet features

a "{t}rue butt-weld installation in header."[340]  Therefore, the contoured edge that connects

Vandewater's outlets to the midsection of the header or run pipe is not a physical characteristic

that distinguishes the outlets from BWPFs that are subject to the scope of the *China BWPFs*

*Order*, such as saddles.

We also disagree that a particular bevel angle is required.  The bevel angle of a subject

BWPF is not specified in the *China BWPFs Order*.  The Petition and prior ITC determinations

state that the beveled edges of BWPFs distinguish BWPFs from other pipe fittings.[341]  However,

none of these sources indicate that the edge must be beveled at a particular angle for the fitting to

be considered a BWPF.  Thus, we disagree with the importers that all BWPFs must have a bevel

angle of 37.5 degrees with a tolerance of plus or minus 2.5 degrees.  A pipe fitting possesses the

requisite beveled edge if it is capable of creating a shallow channel to accommodate the bead of

the weld that fastens the two adjoining pieces, as described in the Petition and prior ITC

determinations.[342]  Regardless of the bevel angle, Vandewater's outlets are equally able to

---

[338] *Id.* at Exhibit 5.
[339] *See* SIGMA Rebuttal Comments at 4-5 ("These 'saddle' fittings were not butt-weld fittings by reason of the 'fish mouth' opening on one side.  Rather, these 'saddle' fittings were butt-weld fittings by reason of the other side of the fittings (*i.e.*, the beveled branch end)").
[340] *See* Vandewater Comments at Tab 14 (Bonney Forge catalog at 23).
[341] *See* Petition at 4; *see also* USITC Investigation Final at I-5; and USITC Fourth Review at I-4.
[342] *Id.*

support a permanent, welded connection.[343]  The importers rely heavily on beveling specifications established in certain industry standards (in particular, the ANSI/ASME B16.9 standard referenced in the Petition).  However, as explained below, we disagree that the scope requires subject merchandise to conform to ANSI/ASME B16.9 or any other specific industry standard.  Additionally, the ITC report at the time of the investigation explicitly noted that not all shipments of BWPFs from China – the precise product for which the petitioner sought relief – met the ASME standard.[344]

Relatedly, the importers claim that a combined bevel angle (of approximately 75 degrees), resulting from the welding of two ends featuring a bevel angle of 37.5 degrees (plus or minus 2.5 degrees), is required.  Beyond the fact that no specific bevel angle is required, as explained above, we also find such a requirement to be inappropriate, because it is based on physical characteristics of the recipient pipe, rather than on the physical characteristics of the outlets in question.[345]  Accepting the importers' argument would essentially introduce an end-use requirement for subject merchandise (*i.e.*, the BWPF can only be used with a sub-set of recipient pipes, limited to those with beveled edges of a particular angle) and the scope does not establish any such restriction.[346]

Regarding the shape of outlets, the importers argue that outlets are straight in design

---

[343] *See* Island Rebuttal Comments at 15-17 and Exhibit 9 (citing USITC Fourth Review); and Vandewater Comments at Exhibit 7 (Report of Walter Sperko) ("This 45-degree angle groove allows welding of a full-penetration or partial penetration groove weld reinforced by a fillet weld").

[344] *See* USITC Investigation Final at I-10 through I-11.

[345] We recognize that the Petition and an ITC report cited by the importers imply that end-to-end connections and beveling on the recipient pipe are important characteristics of BWPFs.[345]  However, given the conflicting evidence on the record with respect to these points, as discussed above, we disagree with the importers that the statements cited from these documents are dispositive as to this issue.  Our (k)(2) analysis of the physical characteristics shows that BWPFs, like outlets, can be permanently attached to a non-beveled opening on the side of the adjoining pipe.

[346] *See* King Supply Co. v. United States, 674 F.3d 1343, 1348-49 (*King Supply*) (holding that "end-use restrictions do not apply to {antidumping duty} orders unless the {antidumping duty} order at issue includes clear exclusionary language" and that "{t}he requisite clear exclusionary language must leave no reasonable doubt that certain products were intended to be outside the scope of the AD order based solely on the end use of those products").

while BWPFs are not straight but curved or irregularly shaped.  However, the importers

acknowledge that caps are straight in design and are nonetheless in-scope merchandise.[347]

Additionally, we find lap joint stub ends to be straight in design, despite Vandewater's

characterization of the stub end as conveying an "irregular" shape simply because of the lip at

the base of the fitting.[348]  The body of a lap joint stub end has no bend or curvature along its

length, and only has a deviation from the straight cylindrical shape at the ends (*i.e.*, the "stub"

located at the base and the bevel located at the top).[349]  Mere shaping on the end of a fitting

cannot imbue the fitting with an "irregular" shape, as BWPFs of many types, including

Vandewater's outlets, have beveling at the end(s).  Thus, the straight design of Vandewater's

outlets is not a physical characteristic that is distinguishable from subject merchandise.

The importers' assertions regarding differences in physical characteristics presuppose

that subject merchandise must meet a particular industry standard (ANSI/ASME B16.9).  This

line of argument is based on a statement in the Petition that BWPFs are made to ASTM and

ANSI/ASME standards, accompanied by a footnote that references ASTM A234-82a for

materials and ANSI/ASME B16.9 for dimensions.[350]  However, the scope does not include a

requirement that subject merchandise must conform to that standard.  A mere reference to an

industry standard in the petition, without more, does not mean that subject merchandise *must*

meet the specifications of that industry standard.  Evidence on the record shows that BWPFs may

be made to conform to specifications other than those referenced in the footnote in the

---

[347] *See* Vandewater Comments at 12.
[348] *Id*. at 13.
[349] *See* Island Rebuttal Comments at Exhibit 2 at 82-83 (lap joint stub ends dimensions).
[350] *See* Petition at 4.

Petition.[351]  Therefore, including a requirement that all BWPFs subject to the *China BWPFs*

*Order* must conform to ASTM A234-82a and ANSI/ASME B16.9 would introduce a restriction

that is not found in the scope language and would unduly restrict the coverage of the scope.

Moreover, as noted above, one of the importers agrees that certain products that are not

necessarily designed to conform to ANSI/ASME B16.9 (*i.e.*, saddles) are a type of BWPF

covered by the scope.[352]

In any case, while the importers emphasize the distinct industry standards – asserting that

ANSI/ASME B16.9 covers BWPFs, while MSS SP-97 covers the outlets in question – the MSS

SP-97 standard for "Integrally Reinforced Forged Branch Outlet Fittings" demonstrates that

outlets conforming to that standard may possess physical characteristics similar to other in-scope

BWPFs.  For example, section 1.2 in MSS SP-97 provides that branch outlet fittings

manufactured to the standard are "designed to make a fully reinforced branch connection in

accordance with applicable piping requirements, when attached, at an opening in a run pipe by

means of a full penetration weld."[353]  Additionally, section 6.5 in MSS SP-97 states that "{t}he

contour weld bevel angle on the longitudinal section of the fittings shall be a minimum of 35

degrees,"[354] which is consistent with the essential characteristic of the beveled edge of in-scope

BWPFs (*i.e.*, creates a shallow channel to accommodate the bead of the weld).  Thus, we find no

reason to conclude that products conforming to MSS SP-97 cannot also be BWPFs.  In fact, as

shown above, products covered by MSS SP-97 explicitly have many of the same characteristics

---

[351] *See* Island Rebuttal Comments at Exhibit 2 (certain elbows, reducing outlet tees, reducers, lap joint stub ends, and caps are made to "ASA B36.10" and "are not covered in ASA B16.9").

[352] *See* SIGMA Rebuttal Comments at 4-5 ("These 'saddle' fittings were not butt-weld fittings by reason of the 'fish mouth' opening on one side.  Rather, these 'saddle' fittings were butt-weld fittings by reason of the other side of the fittings (*i.e.*, the beveled branch end)").

[353] *See* Vandewater Comments at Tab 2 at 1 (emphasis added).

[354] *Id.* at Tab 2 at 3 (emphasis added).

that the importers attribute to BWPFs, *e.g.*, full penetration welds and similar bevel angles. Moreover, MSS SP-97 is described as a "non-exclusive standard"[355] and, in fact, several aspects of the standard incorporate by reference the standards established by ASTM and ANSI/ASME.[356]

The importers assert that BWPFs cannot have an end with a temporary connection because the scope of the *China BWPFs Order* notes that such fittings are used in conditions that "require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings)."  However, not all ends must have a beveled edge to facilitate a permanent connection to be in-scope merchandise; one unambiguously in-scope fitting type – lap joint stub ends – has a beveled edge for a permanent connection on one end and the other end is temporarily bolted in place with the use of a flange.[357]  The lap joint stub ends example shows that the essential characteristic that distinguishes in-scope BWPFs from other pipe fittings is a beveled edge on at least one end that facilitates a permanent, welded connection.  Like the lap joint stub ends, Vandewater's outlets have a beveled edge for a permanent connection on one end (*i.e.*, the end that is welded to the midsection of another pipe) and one of the non-permanent fastening methods mentioned in the scope language on the other end (*i.e.*, the threaded or grooved end to which a sprinkler head or other pipe fitting is attached). Thus, Vandewater's outlets have the requisite beveled edge on one end that imparts subject merchandise with the defining characteristic of BWPFs.

Additionally, we find that outlets are produced in a manner consistent with certain other,

---

[355] *Id.*
[356] *See, e.g.*, *id.* at 2 (MSS SP-97, sections 5.1 and 5.2 for material), 3 (MSS SP-97, section 6 for design and dimension), and Appendix C (list and description of the referenced ASTM and ANSI/ASME standards).
[357] *See* Petition at Appendix B.

in-scope BWPFs.  Specifically, we find that there is clear overlap between outlets and other BWPFs in terms of the starting materials and processing necessary to produce BWPFs.

With respect to starting materials, the importers' argument that outlets and BWPFs are manufactured from different starting material is not supported by the record.  The importers' assert that BWPFs are typically made from "*seamless pipe*" or "*welded pipe …*"[358] or "*seamless or welded pipe and tube.*"[359]  The ITC stated that, additionally, "some types of fittings, such as caps, are formed from carbon steel plate, billet, or bar stock."[360]  Accordingly, there is a range of starting materials from which BWPFs are made.  Vandewater states that its "grooved steel outlets are made from *welded pipe,*" and its "threaded steel branch outlets are made from *steel bars.*"[361]  Thus, Vandewater's outlets are produced from starting materials used to produce other in-scope merchandise.

Similarly, the production process for outlets and other BWPFs is similar.  The ITC explained that BWPFs are produced through a process that involves "forming (or forging)" and then machining.[362]  The importers note that threaded outlets are forged from steel bars with a hot forging die process with threads machined in, and that grooved outlets are manufactured from welded pipe with the grooves machined into the pipe, while the fishmouth end is formed with a high-speed cutting torch.[363]  Thus, just as with other BWPFs, outlets undergo a forming or forging process to achieve their shape, and then undergo a machining process for the threading/grooving/beveling.

---

[358] *See* Vandewater Comments at 11.
[359] *See* SCI Comments at 17.
[360] *See* USITC Investigation Final at I-7.
[361] *See* Vandewater Comments at 11.
[362] *See* USITC Fourth Review at I-6.
[363] *Id.*

Finally, the importers argue that Vandewater's outlets and BWPFs are imported under different HTSUS subheadings in accordance with prior CBP rulings, further evincing differences in physical characteristics.[364]  However, the fact that Vandewater's outlets are not imported under HTSUS subheading 7307.93.30 is not determinative because the HTSUS subheadings listed in the scope are not dispositive.[365]  While Commerce "may consider the decisions of Customs, it is not obligated to follow, nor is it bound by, the classification determinations of Customs."[366]  We note that a prior CBP ruling is on the record, which we have considered. However, we find that, in light of our broader analysis regarding physical characteristics of in-scope merchandise – including the characteristics of Vandewater's outlets in particular – CBP's ruling does not warrant arriving at a different conclusion here.[367]  Accordingly, the mere fact that Vandewater's outlets are imported under a different subheading within the same chapter and heading of the HTSUS as the subheading listed in the scope does not necessarily require Commerce to conclude that the outlets have physical characteristics that are distinguishable from subject merchandise.

---

[364] *See* Scope Ruling Request at 6 ("All of the parts that are subject to this request are properly classifiable under either HTSUS item 7307.92.3010 for threaded fittings,… or 7307.99.5045 for grooved fittings …"); *see also* Vandewater Comments at 12 ("Also, it should be noted that steel branch outlets are not properly classified under HTSUS {sub}heading 7307.93 (for 'Butt welding fittings'), but instead are properly classified under HTSUS {sub}heading 7307.99 ('Other')").

[365] *See Smith Corona Corp. v. United States*, 915 F.2d 683, 687 (Fed. Cir. 1990) (stating that reference to an HTSUS number "is not dispositive" of the scope of an AD/CVD order); and *Order*, 57 FR at 29702 ("Although the {HTSUS} subheadings are provided for convenience and customs purposes, our written description of the scope of this proceeding is dispositive").

[366] *See Wirth*, 5 F. Supp. 2d at 973 ("Commerce, not Customs, has authority to clarify the scope of AD/CVD orders and findings").

[367] *See* SCI Rebuttal Comments at Exhibit 5 ("The product to be imported is a forged nonalloy steel threaded weld outlet pipe fitting made to ASTM Specification A 105, the Standard Specification for Carbon Steel Forgings for Piping Applications.  The fitting is contoured on one end to provide a precise fit at the opening in the run pipe and threaded on the other end to provide a threaded outlet branch connection.  The applicable subheading for the forged steel threaded weld outlet fitting will be 7307.99.5045…").

*Expectations of the Ultimate Purchasers*

We find that the ultimate purchaser's expectations regarding the uses of outlets and other BWPFs are similar.  The importers identify four main expectations of ultimate purchasers that purportedly differ across the products:  (1) compliance with a particular industry standard; (2) custom vs. standard sizing; (3) whether the product can be used in fire sprinkler systems; and (4) installation costs.

First, the importers argue that, because outlets and BWPFs are produced to different industry standards, they are associated with different expectations.  As detailed in the physical characteristics section, above, we disagree that conforming to a different industry standard, *i.e.*, MSS SP-97, indicates that a product cannot also be a BWPF that is covered by the scope.[368]

Additionally, with respect to the production process, we find that there is insufficient evidence to conclude that purchasers expect that the products are made from different starting materials or that BWPFs are formed/forged while outlets are not.  For instance, as noted above, the record demonstrates that both outlets and other BWPFs may be made with welded pipe or may be made from steel bars.[369]  The starting materials for outlets can conform to standards applicable to BWPFs more generally; for instance, the importers report that the materials for both outlets and other BWPFs may meet ASTM A105.[370]  The record also demonstrates that outlets, like other BWPFs, are forged or formed.[371]

---

[368] *See* Vandewater Comments at Tab 1 and 2.

[369] *Id.* at 11; *see also* SCI Comments at 17; and Vandewater Rebuttal Comments at 3.

[370] *See* Vandewater Rebuttal Comments at 5 ("… outlets are made from *ASTM A-105* grade *forging bars*, whereas most {BWPF} are made from *ASTM A-234* grade *seamless pipe*") (emphasis added); SIGMA Comments at 8 ("The starting materials for {BWPF} conform to *ASTM A105*, *ASTM A106*, and *ASTM A285* standards …") (emphasis added); and Vandewater Comments at Tab 14 (Bonney Forge catalog at 4, 6-8) (showing various outlets with an A-105 specification).

[371] *See* USITC Fourth Review at I-6; *see also* SCI Comments at 17 (noting that some steel branch outlets are shaped through a die *forging process*, either a closed-die forging, or an open-die forging; further noting that, for lower

Second, the importers argue that outlets are custom engineered, whereas BWPFs are standardized to match up with the size and schedule of the pipe to which they are attached.  The record does not support this distinction.  Outlets are not necessarily made to custom specifications and, just as with other BWPFs, are sold based on similar sizing criteria.[372]  For instance, SCI's and Vandewater's catalogs shows outlets sold based on nominal pipe sizes.[373]

Third, the importers argue that ultimate purchasers expect different pressure capabilities with outlets and BWPFs.  Specifically, they assert that purchasers only expect to use outlets in low-pressure sprinkler systems (*e.g.*, 300 PSI or less), whereas purchasers of BWPFs expect the products to withstand high levels of pressure (*e.g.*, greater than 300 PSI).  Although certain types of BWPFs may be designed to handle high-pressure systems, fire protection sprinkler systems are a contemplated application of BWPFs.[374]  This is the intended application for Vandewater's product.  Therefore, we find that outlets and other BWPFs are, similarly, expected to be welded into permanent, fixed piping systems for gases or liquids in plumbing, heating, refrigeration, air conditioning, and fire sprinklers systems.  These usages will, of course, have different requirements and expectations regarding pressure rating and related features, but there is nothing requiring a particular PSI rating to qualify as a BWPF.  Indeed, Vandewater itself acknowledges that "{s}ome sprinkler systems may, however, use butt-weld pipe fittings for the run pipes, to which the branch connections are attached."[375]  Therefore, it is simply incorrect that BWPFs are

---

pressure applications, branch outlets may also be *machined* from seamless or welded pipe and tube); and Vandewater Rebuttal Comments at 3 and 6.

[372] *See* Vandewater Comments at 3 ("The key dimensions for {BWPF} are the *nominal pipe size* (as an example, two inch is a pipe size) and the schedule (as an example, schedule 40).  By contrast, the key dimensions for branch outlets are the *header pipe size range* (example, 2 inches), *outlet pipe nominal size* (example, two inch threaded), and schedule (example, 300 psi)" (emphasis added)).

[373] *See* Island Rebuttal Comments at 35 and Exhibits 12 and 13; and Scope Ruling Request at Exhibits 1 and 2 (showing a header and outlet size concordance).

[374] *See* USITC Fourth Review at 6.

[375] *See* Vandewater Comments at 23.

used exclusively in high-pressure settings, while outlets are used in distinct, low-pressure piping systems.

Fourth, the importers argue that BWPFs have higher installation costs than outlets because of the effort, skill, and expense required.[376]  However, Vandewater has also argued the opposite, noting that "… installation of a butt-weld pipe fitting can be performed by most pipe welders and requires no special knowledge or expertise.  By contrast, installation of integrally reinforced steel branch outlets is performed to Pipe Fabrication Institute Standard ES-49 which requires much more specialized procedure and background knowledge than installation of BWPFs."[377]  Similarly, SCI asserted that "{p}urchasers expect branch outlets to have much lower installation costs than butt-weld fittings, because … only one end is welded at all."[378]  However, this is plainly incorrect, because caps and lap joint stub ends only require welding on one end despite unambiguously being BWPFs.

Considering these conflicting arguments from the importers, and the similarities between outlets and BWPFs (*i.e.* beveled ends for welded connections in piping systems), we find that there is no significant difference in expectations for the products.

Both outlets and BWPFs are used in fire sprinkler systems (among other types of piping systems), are subject to similar, and in some cases overlapping, industry standards, and are sold according to standard sizes.  We also find that the record does not reveal that customers would have a significantly different expectation regarding the installation costs for outlets and BWPFs.  For these reasons, we find that purchaser expectations for the products are similar.

---

[376] *Id.* at 7 and 23; *see also* SCI Comments at 20; SCI Rebuttal Comments at 25; and Vandewater Rebuttal Comments at 5.
[377] *See* Vandewater Scope Ruling Request at 15.
[378] *See* SCI Comments at 20.

*Ultimate Use of the Product*

We find that the uses of Vandewater's outlets and other BWPFs are similar. Vandewater's outlets are designed to be permanently welded to a fire sprinkler system, which is a recognized application for BWPFs that are subject to the scope of the *China BWPFs Order*.[379] Furthermore, even though Vandewater emphasized that its outlets are designed for fire sprinkler systems, Vandewater acknowledges that other outlets with physical characteristics that are similar to its outlets are used in a range of applications, including those applications that the importers identify as fundamental BWPF uses, *e.g.*, piping connections used in the oil and gas industry.[380]

The importers argue that the design and ultimate use of Vandewater's outlets are specific to fire sprinkler systems.[381]  As stated above, however, BWPFs are similarly used in fire sprinkler systems.[382]  The fact that Vandewater's outlets are designed for a specific use within a sprinkler system, *i.e.*, connecting the piping system to a sprinkler head, whereas another BWPF might be used to connect two pipes in the system, does not mean that the products do not have

---

[379] *See* USITC Fourth Review at 6 ("Butt weld pipe fittings are used to connect pipe sections where conditions require permanent, welded connections....  Carbon steel BWPF are utilized in residential, commercial, and industrial pipe systems in chemical synthesis, petroleum refining, electric-power generation, construction, and shipbuilding. Butt-weld pipe fittings join pipes in straight lines and change or divide the flow of fluids (oil, water, natural gas or other gasses {sic}, or steam).  They are welded into permanent, fixed piping systems that convey gases or liquids in plumbing, heating, refrigeration, air-conditioning, automatic fire sprinklers, electric conduit, irrigation, and process-piping systems.  Butt-weld pipe fittings are also found in structural applications for construction, where pipes and fittings are used as support members").

[380] *See* Vandewater Comments at 22 ("Please note that certain types of steel branch outlets, with similar basic physical characteristics, are also used by the oil and gas industry …").

[381] *See* Vandewater Comments at 23 ("Steel branch outlets are not designed with sufficient strength to be used for most butt-weld pipe fitting applications … purchasers of Vandewater's steel branch outlets expect the flexibility of having interchangeable connections between the outlet and the sprinkler head, specifically a thread or groove, so that the sprinkler head can be changed quickly and easily").

[382] *See* USITC Fourth Review at 6; *see also* Island Rebuttal Comments at 35 ("For example, weld tees can be used for the fire sprinkler market, although Outlets are typically preferred due to cost of installation considerations"); and SIGMA Comments at 10 ("It is also important to recognize that a fire protection outlet *can* be a butt weld pipe fitting – but *only* if it contains at least one requisite beveled end that enables the 'bead' necessary for a butt weld to be formed").

similar uses.  Such use variation is found throughout the range of BWPFs.  For instance, a cap is clearly a BWPF that is used to seal the end of a pipe[383] and cannot be used to connect two pipes, while an elbow (another BWPF) can.  A reducer may be welded on both ends, while a lap joint stub end is not.  Simply because outlets have a limited and particular use within a piping system does not mean that the outlets do not have a use that is similar to other types of BWPFs (*i.e.*, permanently welded into a piping system that conveys gases or liquids).  Here, outlets and other BWPFs are permanently welded into automatic fire sprinkler systems.

The importers argue that Commerce should not construe a passage in an ITC report describing BWPFs as "welded into permanent, fixed piping systems that convey gases or liquids in plumbing, heating, refrigeration, air-conditioning, *automatic fire sprinklers*, electric conduit, irrigation, and process-piping systems"[384] to mean that BWPFs are ever connected to sprinkler heads.  Even if it is the case that the outlets and other BWPFs do not have identical or complete overlap of functions, the fact remains that the uses of outlets and other BWPFs are similar because, as explained above, both are permanently welded into automatic fire sprinkler systems to change or divide the flow of water.

With respect to the importers' arguments regarding exchangeability of the sprinkler head (via a threaded connection on the branch/outlet side) and the minimum pressure rating, we disagree that these considerations warrant a finding that the product uses are distinct.  As noted above, there is no minimum pressure rating in the scope.  Additionally, the scope covers products with a non-welded side, such as lap joint stub ends, which rely on a bolted end and a butt-welded end.  Thus, products with at least one non-welded side (and their concomitant pressure rating)

---

[383] *See* USITC Fourth Review at 6.
[384] *Id.* at 6 (emphasis added).

still fall within the scope of the *China BWPFs Order*.  For the reasons stated, we find that the ultimate uses of outlets and other BWPFs are similar.

*Channels of Trade in Which the Product is Sold*

We find that the channels of trade for outlets and other BWPFs are similar.  They are both sold through distributors and to fabricators and contractors.

The importers argue that Vandewater's outlets are sold in a different channel of trade because outlets are distributed solely within the fire sprinkler system industry, while BWPFs are sold to a more varied set of industries through large distributors.  Vandewater asserts that it sells to fabricators of sprinkler systems who then sell to fire protection installation contractors and fire sprinkler supply distributors (who then sell to smaller contractors that fabricate smaller sprinkler systems and do their own welding).

The fact that Vandewater sells to a particular class of customers does not mean that the products – outlets and other BWPFs – are sold in different channels of trade more generally.  The record demonstrates that both outlets and BWPF share similar channels of trade because they are both sold to master distributors, fabricators, and contractors.[385]  The Vandewater-supplied Shyman affidavit states that outlets and BWPFs are both sold to distributors.[386]  Additionally, the record includes examples of companies and catalogs that sell both outlets and BWPFs, indicating that there is significant overlap in the channels of trade.[387]

*Manner in Which the Product is Advertised and Displayed*

We find that outlets and other BWPFs are advertised in a similar manner, *i.e.*, via online

---

[385] *See* Island Rebuttal Comments at 37.
[386] *See* Vandewater Rebuttal Comments at Attachment A.
[387] *See* Petition at Appendix B; *see also* Island Rebuttal Comments at Exhibits 10, 14 and 15.

catalogs in company websites or affiliated or third-party online sources.[388]  These sources

identify the size, weight, and other technical specifications of the merchandise, including

pressure resistance, materials used, and industry standard.[389]

The importers assert that outlets are not displayed as, or together with, BWPFs and are

advertised specifically for fire protection systems.  We disagree.  First, the "Fire Sprinkler Pipe

Fabrication" section of the Aleum USA catalog shows outlets with a branch side that is threaded

or grooved along with "butt welding ends."[390]  Second, product catalogs on the record show

outlets and similar products and other BWPFs advertised side by side.[391]  For instance, the

Petition shows "elbows," "reducers," "lap joint stub ends," "saddles," and "multiple outlet

fittings" in the same product catalog; the Shin Tech catalog advertises two outlet products – one

with a beveled edge that allows for a permanent connection only on the branch end, and one with

such edges on both the branch *and* contoured ends – in a similar manner.[392]  Additionally, the

importers' own product literature advertises outlets for fire protection and other "Low Pressure

Piping Systems."[393]

The importers also argue that Island's own products demonstrate that outlets and BWPFs

are advertised differently,[394] and even Island's CEO was not aware of any time that an outlet was

described as a BWPF.[395]  However, we find that the record supports Island's proffered

---

[388] *Id.*
[389] *See* Island Rebuttal Comments at 34-35 and Exhibits 2, 3, 5, 6, 10, 12 and 13; Vandewater Comments at 24; and SCI Comments at 22.
[390] *See* Island Rebuttal Comments at 28 and Exhibit 10.
[391] *See* Petition at Appendix B; and Island Rebuttal Comments at Exhibit 15 (showing an outlet with a butt-weld branch end on the same page as an outlet with a threaded branch end).
[392] *Id.* at Exhibit 15.
[393] *Id.* at 38 (citing Vandewater Comments at 27 and Tab 12; SCI Comments at 29; and SIGMA Comments at 9).
[394] *See* SIGMA Comments at 10-11 and Exhibit 1.
[395] *See* Vandewater Comments at 21-22 and Tab 11.

explanation:  the term "butt-weld" itself is not a standard term nor commonly used, and, therefore, Island does not use it in its advertising.[396]

For the reasons discussed above, we find that outlets and other BWPFs are advertised in a similar manner.

*Suspension of Liquidation and Cash Deposit Requirements*

After issuing the Final Scope Ruling, Commerce instructed Customs to "{c}ontinue to suspend liquidation of entries of carbon steel butt-weld pipe fittings from the People's Republic of China, including Vandewater International Inc.'s steel branch outlets imported by Vandewater International Inc …"[397]  No party challenged Commerce's instructions to CBP before the Court, and the Court did not otherwise invalidate the instructions in the *Remand Order*.  As discussed below, should the Court affirm this remand redetermination in a subsequent decision, Commerce intends to issue instructions to CBP consistent with 19 CFR 351.225(l) and section 516A(c) and (e) of the Act.

## VIII.   COMMENTS ON DRAFT RESULTS OF REDETERMINATION

Interested parties provided comments regarding the sources relied on in our analysis, our substantive analysis of the (k)(2) factors, and the suspension of liquidation and cash deposit requirements for Vandewater's entries.  We address these comments in turn.

## Comment 1:   Commerce's Treatment of the (k)(1) Sources

In the Draft Redetermination, Commerce analyzed information provided by interested parties relating to each of the five (k)(2) factors.  Among the various sources relied upon,

---

[396] *See* Island Rebuttal Comments at 38-40.  The record shows that a U.S. distributor has identified this type of merchandise as "butt-weld" in its products catalog; similarly, one of the importers (SCI) had itself identified the product as "butt-weld" in import records (despite its current claim that the description was an error).  *See* Island Comments at 8; *see also* SCI Rebuttal Comments at 28-32.
[397] *See* SCI Comments *Id.* at Exhibit 14.

Commerce also considered information contained in the sources enumerated in 19 CFR

351.225(k)(1).

*Vandewater's Comments*

- The Draft Redetermination is unreasonable because it ignores the direction of the

  Court.[398]  The Court remanded Commerce's scope ruling to Commerce with instructions

  for it to perform a full (k)(2) analysis because the question surrounding  Vandewater's

  outlets was not resolved by the (k)(1) sources.  However, as it concedes in a footnote,

  Commerce cites the (k)(1) sources and insists that "information in such sources is

  nonetheless relevant to our analysis of the (k)(2) factors."[399]

*SIGMA's Comments*

- In its (k)(2) analysis here, Commerce improperly relied on (k)(1) criteria, and

  mischaracterized and disregarded key record evidence.[400]

- Statements by the Court and the CAFC make clear that (k)(1) and (k)(2) analyses are

  separate.[401]  The structure of the regulation likewise clearly separates (k)(1) and (k)(2)

  and requires Commerce to analyze these sources discretely.[402]

- If the (k)(1) sources are not dispositive, they cannot be "relevant" to a (k)(2) analysis.

  Indeed, in the *Remand Order*, the Court stated that the (k)(1) sources are "not descriptive

  of the actual physical characteristics of Vandewater's steel branch outlets" and "do not

---

[398] *See* Vandewater Draft Redetermination Comments at 1-2.
[399] *Id.* (citing Draft Redetermination at 44).
[400] *See* SIGMA Draft Redetermination Comments at 2 (citing Draft Redetermination at 2 and 62).
[401] *Id.* (citing *Laminated Woven Sacks Comm. v. United States*, 34 CIT 906, 910, 716 F. Supp. 2d 1316, 1322 (2010) (*Woven Sacks*) (stating that, where it proceeds to a (k)(2) analysis, Commerce "applies the five factors codified" in (k)(2)); and *Toys "R" Us, Inc. v. United States*, 32 CIT 814, 819 (2008) ("finding that consideration of (k)(2) factors under a (k)(1) analysis was improper") (*Toys "R" Us*)).
[402] *Id.* (citing *Eregli Demir Ve Çelik Fabrikalari T.A.S. v. United States*, 415 F. Supp. 3d 1216, 1230 (CIT 2019) (identifying the "text, structure, history, and purpose of a regulation" as "tools" for interpreting an agency regulation) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019))).

really tell the court anything about the inclusion of steel branch outlets within the scope of the Order."[403]  Thus, in its final remand redetermination, Commerce should focus only on the (k)(2) criteria.[404]

**Commerce Position:**  Vandewater and SIGMA assert that Commerce improperly considered the (k)(1) sources in the Draft Redetermination and contend that this is contrary to the Court's *Remand Order*.  We disagree.

The Court found that the sources listed in 19 CFR 351.225(k)(1) were not dispositive as to the scope status of Vandewater's outlets.[405]  This finding, however, does not indicate that the (k)(1) sources are irrelevant for the purpose of a (k)(2) analysis.  The regulation refers to the (k)(2) factors as "additional" substantive criteria to consider in the scope analysis; it does not create a restriction on the source of information to be considered in such an analysis.

Here, the (k)(1) sources provide factual information that is directly relevant to our consideration of the (k)(2) criteria.  For instance, the ITC determination discussed the physical characteristics and uses of subject merchandise.[406]  That this information appears in a source enumerated by 19 CFR 351.225(k)(1) does not mean that Commerce must ignore the information for the purpose of a (k)(2) analysis.  The importers appear to acknowledge this, as they cite the ITC Report and the Petition dozens of times throughout their initial comments relating to how Commerce should perform its Court-mandated (k)(2) analysis.[407]

---

[403] *Id.* at 3-4 (citing *Remand Order* at 8).

[404] *Id.* at 4.

[405] *See Remand Order* at 8.

[406] *See* USITC Fourth Review at 6 (discussing uses of BWPFs in piping systems); and USITC Investigation Final at I-10 through I-11 (describing physical characteristics of subject merchandise, and noting that not all imported merchandise from China was in compliance with the applicable standard).

[407] *See, e.g.*, Vandewater Comments at 24 ("… the ITC described the uses of butt-weld pipe fittings as follows …"); Vandewater Rebuttal Comments at 4 ("The above points by Mr. Shyman are confirmed by the ITC in its original 1986 preliminary injury investigation"); SIGMA Comments at 10 ("… this is evident in the catalogs provided with

The cases cited by the importers do not warrant a different approach.  For instance, in *Woven Sacks*, the Court simply stated that, where Commerce proceeds to a (k)(2) analysis, it must apply the five (k)(2) factors.[408]  That is precisely what we have done here, and the case imposes no limitation on the sources from which Commerce may draw in conducting a (k)(2) analysis.  Similarly, in *Toys "R" Us*, the Court found that consideration of (k)(2) factors under a (k)(1) analysis was improper."[409]  Again, this case does not stand for the opposite proposition that a (k)(2) analysis cannot rely on sources enumerated in (k)(1).  The Courts have previously sustained Commerce's scope determinations which were based on an evaluation of the (k)(2) criteria that relied, in part, on information from (k)(1) sources.[410]

Accordingly, Commerce has, as directed by the Court and in compliance with the regulation, considered the (k)(2) factors.  As we explained in the Draft Redetermination, although the (k)(1) sources are not dispositive regarding the scope status of Vandewater's product, we relied on facts contained in the (k)(1) sources insofar as they are relevant to our analysis of the (k)(2) criteria.

**Comment 2:   Commerce's Analysis of the (k)(2) Criteria**

Pursuant to the Court's *Remand Order*, we evaluated the five (k)(2) criteria to determine whether Vandewater outlets are covered by the scope of the *China BWPFs Order*.  As part of this evaluation, we analyzed interested parties' comments and supporting information, and we

---

the original petition in 1991"); and SIGMA Rebuttal Comments at 4 ("SIGMA does not contest that the ITC stated as much, and indeed, cited to the same language … in its comments").

[408] *See Woven Sacks*, 716 F. Supp. 2d at 1322.

[409] *See Toys "R" Us*, 32 CIT at 819.

[410] *See, e.g.*, *Sango Int'l L.P. v. United States*, 567 F.3d 1356, 1364-65 (Fed. Cir. 2009) (sustaining Commerce's determination in a (k)(2) scope analysis in which Commerce relied on the ITC report and underlying petition); and *Power Train Components, Inc. v. United States*, 911 F. Supp. 2d 1338, 1347 (CIT 2013) (sustaining Commerce's determination in a (k)(2) scope analysis in which Commerce cited to the ITC report and underlying petition).

issued a Draft Redetermination, where we determined that Vandewater's outlets are properly considered BWPFs.

*Island's Comments*

- Commerce's determination that Vandewater's outlets fall within the scope of the *China BWPFs Order* is supported by substantial evidence and is in accordance with law.[411]

- It is well established that, for purposes of a (k)(2) analysis, for a product to be covered by the scope of an order, all the law requires is for the product to be "sufficiently similar" to the products covered by the order.[412]

- In its Draft Redetermination, Commerce undertook a comprehensive analysis of the five factors set forth in 19 CFR 351.225(k)(2). Commerce considered and discussed, in great detail, the comments and supporting information submitted by all interested parties in their initial and rebuttal comments.[413]

- For each of the (k)(2) factors, Commerce explained why Vandewater's outlets met the relevant criterion, based on the language of the *China BWPFs Order*, and showed how Vandewater's outlets were similar to other in-scope BWPFs.[414]

- Commerce also explained why it disagreed with the importers' assertions and arguments and grounded its position in record information.[415]

- Therefore, Commerce complied with the *Remand Order* and reached a reasonable determination "given the circumstances presented by the whole record."[416]  Island agrees

---

[411] *See* Island Draft Redetermination Comments at 3.
[412] *Id.* (citing *Wirth*, 5 F. Supp. 2d at 981).
[413] *Id.* at 4 (citing *Remand Order* at 3).
[414] *Id.*
[415] *Id.* (citing Draft Redetermination at 10-62).
[416] *Id.* (citing *Remand Order* at 3).

with Commerce's conclusion that Vandewater's outlets fall within the scope of the *China BWPFs Order*.[417]

*Vandewater's Comments*

- There are fundamental differences between BWPFs and Vandewater's outlets:  different design; different function; and different usage by different customers.  Commerce was asked to address these considerations on remand but did not do so in the Draft Redetermination.[418]

- The Draft Redetermination's analysis of physical characteristics is incorrect.[419]

  o Different industry standards exist for BWPFs and welded outlets.  These standards reflect bright-line distinctions within the fittings industry.[420]  Commerce's contentions concerning industry standards are not supported by substantial evidence.[421]

  o The branch end of an outlet is threaded or grooved in order to accommodate a sprinkler head, while BWPFs have no branch end whatsoever.[422]  Additionally, nothing on the branch side of an outlet can be welded.[423]

  o Unlike BWPFs, there is no forging or forming required to turn a pipe, bar or forging into an outlet fitting.[424]

  o One end of an outlet is threaded or grooved, which is a temporary connection.[425]

---

[417] *Id.* (citing Island Comments; and Island Rebuttal Comments).
[418] *See* Vandewater Draft Redetermination Comments at 1-2.
[419] *Id.* at 2-37.
[420] *Id.* at 3.
[421] *Id.* at 23-26.
[422] *Id.* at 4-5.
[423] *Id.* at 5-8.
[424] *Id.* at 27-29.
[425] *Id.* at 26-27.

- o Neither end of an outlet is butt-welded. Additionally, a particular angle is required for a butt-weld, and outlets are not connected through a weld of such an angle.[426]

- o The shape of BWPFs are different from outlets.[427]

- o Threaded welded outlets are considered forged steel pipe fittings, rather than BWPFs, by the industry in question.[428]

- o The physical characteristics of Vandewater's outlets differ sufficiently from BWPFs such that they are imported under different HTSUS subheadings.[429]

- The expectations of the ultimate purchasers suggest outlets are not BWPFs.[430]

- o Ultimate purchasers of Vandewater's outlets are all fabricators of fire sprinkler systems. No fire sprinkler fabricator uses any BWPFs for branch connections to sprinkler leads because a BWPF does not have the ability to accept a sprinkler head with threads.[431]

- o The Draft Redetermination states that "fire protection sprinkler systems are a contemplated application of BWPFs."[432]  In reaching this conclusion, the Draft Redetermination does not mention the declaration of Neil Shyman, who has nearly 43 years of experience as a fabricator and supplier of fire sprinkler and industrial piping.[433]

- o Commerce's analysis ignores the point that sprinkler systems would never use BWPFs to connect to a sprinkler head – like a welded outlet does – because fabricators and

---

[426] *Id.* at 19-22.
[427] *Id.* at 23.
[428] *Id.* at 8-11.
[429] *Id.* at 30-31.
[430] *Id.* at 31-33.
[431] *Id.* at 31 (citing Vandewater Comments at 22-23; and Vandewater Rebuttal Comments at 5).
[432] *Id.* (citing Draft Redetermination at 55).
[433] *Id.* at 32 (citing Vandewater Rebuttal Comments at 3 and Attachment A (Shyman Declaration at 17 and 20)).

users of sprinkler systems do not want permanent connections, which are an inherent feature of butt-welding.[434]

- o The possibility that some fire sprinkler systems might use BWPFs for the run pipes does not undermine Vandewater's point regarding the starkly different customer expectations for outlets.[435]

- The ultimate use of the products suggest outlets are not BWPFs.[436]

- o Commerce asserts that the uses of Vandewater's outlets and BWPFs are similar, in part, because "Vandewater's outlets are designed to be permanently welded to a fire sprinkler system, which is a recognized application for BWPFs that are subject to the scope of the *China BWPFs Order*."[437] However, a BWPF is never suitable for connecting to a sprinkler head, precisely because the sprinkler head must be attached in a manner such that it can be changed, and not permanently affixed via a butt-weld.[438]

- The channels of trade in which the products are sold support finding outlets and BWPFs to be distinct.[439]

- o According to the Draft Redetermination, "{t}he record demonstrates that both outlets and BWPF share similar channels of trade because they are both sold to master distributors, fabricators, and contractors."[440] The only "record evidence" in support

---

[434] *Id.* at 32-33 (citing Draft Redetermination at 55-56).
[435] *Id.* at 33.
[436] *Id.* at 33-34.
[437] *Id.* at 33 (citing Draft Redetermination at 57).
[438] *Id.* at 33 (citing Vandewater Rebuttal Comments at Attachment A (Shyman Declaration at 22); and Vandewater Comments at Exhibit 7 (Report of Walter Sperko at 15)).
[439] *Id.* at 34-35.
[440] *Id.* at 34 (citing Draft Redetermination at 59).

of this assertion are Island's own comments.[441]  This does not constitute substantial

evidence in support of a conclusion that Vandewater's outlets are sold to master

distributors.[442]

o   Vandewater's outlets simply are not sold in the same channels of trade as BWPFs,

and there is no record evidence to the contrary.[443]

•   The manner in which the product is advertised and displayed supports finding

Vandewater's outlets to be out of scope.[444]

o   Advertising for Vandewater's outlets, which are used in the fire sprinkler industry,

differs significantly from the advertising of BWPFs.[445]  For example, at the AFSA

convention in October 2019,[446] no producer of BWPFs was on the exhibitor list

because BWPFs are not advertised in trade shows that are targeted at the fire sprinkler

industry.[447]

o   By contrast, the Shyman affidavit states that BWPFs are advertised and sold to

mechanical contractors.[448]

o   Commerce's analysis of this factor is unsupported by record evidence.  Commerce

cites to two pages of what it characterizes as a "Fire Sprinkler Pipe Fabrication"

section of the Aleum USA catalog.[449]  No information is given as to the source from

which these two pages were extracted.  Regardless, the two pages of materials from

---

[441] *Id.* (citing Draft Redetermination at 59; and Island Rebuttal Comments at 37).
[442] *Id.* at 35.
[443] *Id.*
[444] *Id.* at 35-37.
[445] *Id.* at 35 (citing Vandewater Comments at 25-26; and Vandewater Rebuttal Comments at 11).
[446] *Id.* at 35-36 (citing Vandewater Comments at 25-26 and Tab 15; and Vandewater Rebuttal Comments at 11).
[447] *Id.* at 36.
[448] *Id.* (citing Vandewater Rebuttal Comments at Attachment A).
[449] *Id.* (citing Draft Redetermination at 60; and Island Rebuttal Comments at Exhibit 10).

Aleum USA that constitute Island's Exhibit 10 do not show any BWPFs.[450]  Rather, the document simply states that the products have "Butt welding ends complying with a {sic} national or international standards."[451]

o  The Draft Redetermination also cites a "catalog" from "Shin Tech" to support the same point.[452]  However, the "catalog" consists of four pages, and it says nothing about BWPFs.

o  In short, the Draft Redetermination points to no evidence to support its conclusion that Vandewater's outlets and BWPFs are advertised in the same place or manner.[453]

*SCI's Comments*

•  Commerce's Draft Redetermination is not supported by substantial evidence.[454] Commerce must consider the complete record, including the evidence that contradicts or undermines its conclusions.[455]

•  Commerce failed to properly analyze the physical characteristics of the product.[456]

o  A contoured edge that connects to the midsection of a pipe is not a butt-weld.[457]  The Aleum USA catalog cited by Commerce, which identifies an outlet as having "butt welding ends," does not reflect the industry's understanding more broadly.  It is important to note that "butt-weld" is not a standard industry term.  Moreover, references to saddles (which have a contoured edge like an outlet) in other sources,

---

[450] *Id.* (citing Island Rebuttal Comments at Exhibit 10).
[451] *Id.* at 37 (citing Island Rebuttal Comments at Exhibit 10).
[452] *Id.* (citing Draft Redetermination at 60; and Island Rebuttal Comments at Exhibit 15).
[453] *Id.* at 37.
[454] *See* SCI Draft Redetermination Comments at 2-34.
[455] *Id.* (citing *TMB 440AE, Inc. v. United States*, No. 18-00095, 2020 CIT LEXIS 46 at *21 (CIT April 6, 2020)).
[456] *Id.* at 4-17.
[457] *Id.* at 4-9.

such as the Ladish catalog, are inapposite because saddles can have a single butt-weld side (on the branch end).[458]

- o BWPFs must attach on a parallel plane to the recipient pipe,[459] and have a beveled edge of a particular angle.[460]

- o Commerce fails to give proper weight to industry standards, which were identified in the petition.[461]

- o BWPFs rely on permanent welded connections.[462]

- o Commerce improperly characterizes the inputs and processing required to produce BWPFs.[463]  The manufacture of BWPFs typically begins with seamless carbon steel pipe; Commerce improperly relies on exceptions to this rule in conducting its (k)(2) analysis.  The record is replete with evidence of branch outlets that do not employ a forming or forging process.[464]

- The record evidence concerning purchaser expectations does not indicate that expectations are the same for subject BWPFs and outlets.

  - o Commerce seems to recognize the correct industry standard for outlets (*i.e.*, MSS SP-97) but then goes on to find that "conforming to {this} standard … does not indicate that a product cannot also be a BWPF."[465]  However, Commerce does not indicate what industry standards are applicable to subject BWPFs, and ignores the language in the Petition which provides that the applicable standards are ASTM A234-82a for

---

[458] *Id.* at 4-7.
[459] *Id.* at 7.
[460] *Id.* at 9-12.
[461] *Id.* at 12-14.
[462] *Id.* at 15-16.
[463] *Id.* at 16-17.
[464] *Id.*
[465] *Id.* (citing Draft Redetermination at 50).

materials and ANSI B16.9 for dimensions, which outlets do not satisfy.[466]  Commerce simply notes that certain standards, such as for materials, can apply to both outlets and BWPFs more generally (*e.g.*, ASTM A105).[467]

o   Outlets cannot be certified to meet the high-pressure (300 PSI) applications for which BWPFs are used.[468]

o   Purchasers will expect different sizing dimensions between outlets and BWPFs.[469]  For outlets, size refers to the pipe diameter of the sprinkler head or outlet, and pipe run size refers to the diameter of the run pipe to which the fishmouth end of the outlet attaches.[470]  By contrast, BWPFs are not advertised and displayed using "pipe run size."[471]

o   Commerce's findings that BWPFs and outlets are both used in fire sprinkler systems is not commensurate with a finding that the products are used for the same purposes within this application.[472]  Whereas an outlet is used to connect a sprinkler head or branch pipe and a piping system, a BWPF is used to connect pipes within the piping system.[473]

o   Neither SCI nor the other importers have argued that the installation costs of BWPFs are lower than those of outlets.[474]  Rather, both the number and strength of welds involved in installing a BWPF make it more expensive than installation for an outlet.[475]

---

[466] *Id.* (citing the Petition at 4).
[467] *Id.* (citing Draft Redetermination at 54).
[468] *Id.* (citing SCI Comments at 22).
[469] *Id.* at 19.
[470] *Id.* at 18-19.
[471] *Id.* at 19 (citing SCI Comments at 29; and Vandewater Rebuttal Comments at 5-6).
[472] *Id.*
[473] *Id.*
[474] *Id.* at 20 (citing Draft Redetermination at 56).
[475] *Id.* (citing SCI Comments at 20).

Additionally, Vandewater's statement that no special knowledge or expertise is required to install a BWPF is not equivalent to saying that installing a BWPF is less expensive than installing an outlet.[476]

- Commerce's determination with respect to the ultimate use of the products is not based on substantial evidence on the record.[477]

  o First, Commerce seems to ignore the fundamental differences in uses between BWPFs and outlets.[478]  Whereas BWPFs are used in numerous applications involving pressures/substances that require a permanent connection (*e.g.*, chemical synthesis, petroleum refining, electric power generation, construction, and shipbuilding), Vandewater's outlets are used in one low-pressure application – fire sprinkler systems.[479]  If any end of a fitting uses a weaker connecting method than welding, such as threading or grooving, the strong-connection value of the BWPF is lost.[480]

  o Additionally, no fire sprinkler fabricator uses BWPFs for branch connections to sprinkler heads, because BWPFs do not have the ability to accept a sprinkler head with threads.[481]

  o Outlets are used specifically to form a temporary connection between a sprinkler head or branch pipe and a piping system.[482]  Commerce presents no evidence that BWPFs are used for this purpose.

- Commerce's determination that BWPFs and outlets are sold through the same channels of

---

[476] *Id.* (citing Draft Redetermination at 56).
[477] *Id.*
[478] *Id.*
[479] *Id.* at 20-21 (citing SCI Comments at 24; and Vandewater Comments at 24-26).
[480] *Id.* (citing SCI Rebuttal Comments at 11).
[481] *Id.* (citing Vandewater Comments at 24-25).
[482] *Id.* (citing SCI Comments at 23).

trade is unsupported by the record evidence.[483]

- o Commerce observes that, "{t}he record demonstrates that both outlets and BWPF share similar channels of trade because they are both sold to master distributors, fabricators, and contractors."[484]  However, Commerce does not cite record evidence in support of this determination.  Rather, Commerce relies on Island's unsupported assertion that the importers "sell widely to master distributors, fabricators, and some contractors."[485]

- o Although Commerce correctly observes that the record includes a statement that BWPFs and outlets are "both sold to distributors,"[486] the statement indicates that "distributors then resell these two categories of products to distinct market segments."[487]  Accordingly, BWPFs and outlets are viewed very differently by distributors and are sold in different channels of trade to different customers.[488]

- o The product catalogs cited by Commerce do not include both BWPFs and outlets.[489] Commerce cannot rely on these catalogs to reach the conclusion that "there is significant overlap in the channels of trade" between BWPFs and outlets.[490]

- • Commerce is incorrect that the record demonstrates that BWPFs and outlets are advertised or displayed together.[491]

- o Commerce relies on the Aleum USA catalog "{s}how{ing} outlets with a branch side that is threaded or grooved along with a comparable product with 'butt welding

---

[483] *Id.* at 22.
[484] *Id.* (citing Draft Redetermination at 58).
[485] *Id.* (citing Island Rebuttal Comments at 37).
[486] *Id.* (citing Draft Redetermination at 59).
[487] *Id.* (citing Vandewater Rebuttal Comments at Attachment A).
[488] *Id.* at 23.
[489] *Id.* at 24 (citing Draft Redetermination at 59).
[490] *Id.*
[491] *Id.*

ends."[492]   However, these specification sheets pertain to a "female threaded outlet" and a "grooved outlet," not a "BWPF."[493]

o   Commerce also relies on the Shin Tech catalog.[494]   Like the Aleum USA catalog, this also does not display BWPFs side-by-side with outlets.[495]   This catalog references "Cold Forging Fire Sprinkler Prefabrication Piping System" products and not BWPFs.[496]   Accordingly, these materials are not evidence that BWPFs and outlets are advertised or displayed together.[497]

o   Commerce observes that "{t}he importers' own product literature advertise outlets for fire protection and other 'Low Pressure Piping Systems.'"[498]   However, Commerce fails to articulate how this demonstrates that BWPFs and outlets are advertised or displayed together.[499]

*SIGMA's Comments*

•   Commerce's discussion of physical characteristics contains three crucial shortcomings that, taken together, invalidate its consideration of such characteristics.

o   First, Commerce's discussion of industry standards is misguided.[500]   Industry standards, by their very nature, exist to define distinct products; the idea that a product could

---

[492] *Id.* (citing Draft Redetermination at 60).
[493] *Id.* (citing Island Rebuttal Comments at Exhibit 10).
[494] *Id.* (citing Draft Redetermination at 60).
[495] *Id.* at 25.
[496] *Id.*
[497] *Id.*
[498] *Id.* (citing Draft Redetermination at 60).
[499] *Id.*
[500] *See* SIGMA Draft Redetermination Comments at 4.

conform to multiple industry standards would effectively render those standards meaningless.[501]

o In *King Supply*, the CAFC affirmed Commerce's decision in a scope inquiry and noted that Commerce "emphasized that, not only were King's products physically identical to the products described in the first sentence of the AD Order, but evidence also showed King's products met the same ASTM and ANSI industry standards as were referenced in the Petition."[502]  Based on this reasoning, if a product is produced according to ASTM A234-82a or ANSI B16.9, then it will fall within the scope of the *China BWPFs Order*.  Where a product is neither physically identical to the products described in the order, nor produced according to the same industry standards, it will not fall within the scope.

o The Draft Redetermination contains no discussion of the expert report of Walter Sperko – to which Vandewater, SIGMA, and SCI all cited in their comments.[503]  It is "well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders {Commerce's} determination unsupported by substantial evidence."[504]

---

[501] *Id.* (citing Draft Redetermination at 49-50; *Viraj Forgings Ltd. v. United States*, 283 F. Supp. 2d 1335, 1341 n.4 (2003) ("Standardization, in manufacturing, means establishing 'desirable criteria for the shape, size, quality and other aspects of a product'"); *BP Oil Supply Co. v. United States*, Ct. No. 04-00321, Slip Op. 14-48 at 16 (2014) ("The record demonstrates that there are clear differences in recognized industrial standards between many of the types of imported merchandise and the substitute merchandise"); *Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229, 1242 (CIT 2019) (noting that "threading is a common process in the industry with various standards for different types of thread joints"); and *Tai-Ao Aluminium (Taishan) Co. v. United States,* 391 F. Supp. 3d 1301, 1308 n.2 (CIT 2019) ("The Aluminum Association is the authority that maintains the standards for the U.S. aluminum industry with respect to aluminum alloy designations, the chemical composition for the alloys, and the approved tempering methods for the different alloys")).
[502] *Id.* at 5 (citing *King Supply*, 674 F.3d at 1347.
[503] *Id.* at 6 (citing SIGMA Comments at 5-6 and Exhibit 2; Vandewater Comments at 7-9, 11-15, and Exhibit 6; and SCI Comments at 22).
[504] *Id.* at 6-7 (citing *A.L. Patterson, Inc. v. United States,* 36 CIT 1132, 1136 (2012) (quoting *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (2000))).

o Commerce has mischaracterized a key point raised by SIGMA regarding a fundamental physical characteristic of outlets.[505]  Commerce concluded in the Draft Redetermination that products with a contoured edge (*i.e.*, a "fishmouth" design) "can be BWPF."[506]  It then stated that SIGMA "agrees that saddles are a type of BWPF."[507]  Yet SIGMA's explanation was that saddles can be BWPF "not … by reason of the 'fish mouth' opening on one side" but rather by reason of the other side of the fittings (*i.e.*, the beveled branch end)."[508]

- Commerce's analysis of purchaser expectations is unsupported by record evidence.

o Commerce dismisses the idea that different industry standards lead to different expectations.[509]  That conclusion is invalid; the courts have long recognized that conformity with industry standards is fundamental to the consumption and use of a given product.[510]

o Purchasers expect to use outlets in fire protection systems and use BWPFs for a variety of other uses, namely in "the oil, gas, steam, and chemical industries" as well as construction.[511]  Commerce disagreed with this fact, finding that "fire protection sprinkler systems are a contemplated application of BWPFs."[512]  Yet, it nevertheless stated that different "usages will, of course have different requirements and

---

[505] *Id.* at 7.
[506] *Id.* (citing Draft Redetermination at 10, 46-47).
[507] *Id.* (citing Draft Redetermination at 47).
[508] *Id.* (citing Draft Redetermination at 47; and SIGMA Comments at 9-10).
[509] *Id.* at 8 (citing Draft Redetermination at 54).
[510] *Id.* (citing *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1366 (Fed. Cir. 2012) (citing "expert evidence that compliance with such standards is a 'a commercial necessity'" that is "necessary, and expected by the marketplace"); and *Maher-App & Co. v. United States*, 57 C.C.P.A. 31, 35 (1969)).
[511] *Id.* (citing SIGMA Comments at 8).
[512] *Id.* (citing Draft Redetermination at 55).

expectations regarding pressure rating and related features...."[513]  This recognition supports the exact opposite of Commerce's conclusion.[514]

- With respect to ultimate use, Commerce's analysis is unpersuasive.

  o Commerce states that the "fact that Vandewater's outlets are designed for a specific use within a sprinkler system, *i.e.*, connecting the piping system to a sprinkler head, whereas another BWPF might be used to connect two pipes in the system, does not mean that the products do not have similar uses."[515]  Here again, Commerce's logic is unreasonable.  Despite Commerce's assertions of "similarity," the uses outlined by SIGMA, Vandewater, and SCI are clearly different from those for which BWPFs are produced.[516]

  o The courts have previously ruled against such equivocation.  For example, in the proceeding underlying *Torrington*, Commerce distinguished between five types of antifriction bearings, ultimately rescinding investigations of certain bearings.[517]  The petitioner appealed, asserting "that all bearings... have the same ultimate function, that is, 'to reduce friction between moving parts."[518]  In response, the Court deemed the "claim that all bearings reduce friction and therefore have the same ultimate use is a

---

[513] *Id.* (citing Draft Redetermination at 55).
[514] *Id.* at 8-9 (citing *Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172, 1181, 1190-91 (2004); and *Torrington Co. v. United States*, 714 F. Supp. 718, 726-27 (1990) (*Torrington*) ("The expectations of the ultimate purchasers of antifriction bearings differ depending on the needs of the customer and the ability of the particular bearing to perform a given task.  For example, a customer who needs bearings that can handle heavy loads, but who is not concerned with speed, would be interested in a plain bearing.  Conversely, a purchaser who expects a bearing to perform at high speeds, but with a light load, would find a ball bearing more useful … Customer expectations do vary depending on the needs of the customer and the ability of a particular bearing to perform a given task").
[515] *Id.* at 9 (citing Draft Redetermination at 57).
[516] *Id.* (citing SIGMA Comments at 7).
[517] *Id.* at 10 (citing *Torrington v. United States*, 745 F. Supp. 718, 719-20 ("The five types of bearings were (1) ball bearings; (2) spherical roller bearings; (3) cylindrical roller bearings; (4) needle roller bearings: and, (5) plain bearings.").
[518] *Id.* (citing *Torrington*, 745 F. Supp. at 726).

simplistic and unpersuasive argument.  Clearly, different bearings exist because they

have various uses.  The industry is a vast and diverse one, and the different types of

bearings serve the disparate needs of the modern mechanized world."[519]

o   The same can be said with respect to the comparison between Vandewater's outlets and

BWPFs.  These two products exist because they have distinct uses (with distinct

industrial standards).  To conclude that they are "similar" because they "connect pipes"

is, in the words of the Court, "simplistic and unpersuasive."[520]

- Commerce's analysis of the manner in which the product is advertised and displayed is

incorrect.

o   Although Commerce mentions in passing that industry standards and other

characteristics are included in these advertisements,[521] it neither discusses nor cites to

the crucial distinction raised by SIGMA in its comments.[522]  Island's advertisements

include specific, advertised characteristics – end use and industry standards – which

draw a clear dividing line between BWPFs on one hand, and outlets on the other.[523]

**Commerce Position:**  The importers raise a number of arguments regarding Commerce's

analysis of the (k)(2) criteria.  However, we continue to find that our analysis of the five criteria

supports finding Vandewater's outlets to be covered by the scope of the *China BWPFs Order*.

---

[519] *Id.* (citing *Legacy Classic Furniture Inc. v. United States*, 867 F. Supp. 2d 1321, 1327 (CIT 2012) ("The fact that seating furniture can {be}, and often is, located in the bedroom does not place it within the scope of the WBF Order. It is unreasonable to conclude that customers seeing a product marketed as a 'bench' or 'seating furniture' would primarily expect to use it as a bedroom chest.  Commerce apparently made its conclusion based on conjecture and not on evidence, or even logical inference from the evidence")).

[520] *Id.*

[521] *Id.* (citing Draft Redetermination at 59-60).

[522] *Id.* (citing Draft Redetermination at 60).

[523] *Id.* (citing SIGMA Comments at 9-10).

We discuss each criterion, in turn.

With respect to physical characteristics, we continue to find that an analysis of this criterion supports a finding that outlets are BWPFs. The importers identify purported flaws in our related discussion of: (1) industry standards; (2) the use of temporary vs. permanent connections; (3) the applicable weld angle/plane of attachment; (4) shape; (5) production process/materials; and (6) HTSUS classification.

First, although the importers assert that Commerce failed to give sufficient weight to an industry standard (*i.e.*, ANSI/ASME B16.9) in analyzing the physical characteristics of outlets, Commerce addressed industry standards extensively in the Draft Redetermination.[524] The importers, however, urge Commerce to restrict the scope on the basis of such a standard, and we feel it is inappropriate to do so. In support of this argument, SIGMA cites *King Supply*, in which the CAFC sustained Commerce's finding that "not only were King's products physically identical to the products described in the first sentence of the *AD Order*, *but evidence also showed King's products met the same ASTM and ANSI industry standards as were referenced in the Petition*."[525] This quotation does not warrant the interpretation favored by SIGMA. In *King Supply*, we determined that a product that fell within the scope language, *and also met industry standards* referenced in the petition, was within the scope of the order. That case does not stand for the proposition that the industry standard and the scope of the order are, or must be, coextensive. Thus, it does not address the question before Commerce here.

For Vandewater's outlets, the question is whether a product that is not among the product types enumerated in ANSI/ASME B16.9 can be covered by the scope. As explained above, the

---

[524] *See* Draft Redetermination at 49-51, 54.
[525] *See* SIGMA Draft Redetermination Comments at 5 (citing *King Supply*, 674 F.3d at 1347) (emphasis added by SIGMA)).

scope does not include a requirement that subject merchandise must conform to ANSI/ASME B16.9.  A mere reference to an industry standard in the Petition, without more, does not mean that subject merchandise *must* meet the specifications of that industry standard.[526]  Therefore, including a requirement that all BWPFs subject to the *China BWPFs Order* must conform to a particular industry standard, such as ANSI/ASME B16.9, would introduce a restriction that is not found in the scope language and would unduly restrict the coverage of the scope.

The importers claim that absence from ANSI/ASME B16.9 indicates that outlets are not covered.  However, we found that certain products that are not listed in the standard, such as saddles, share physical characteristics with in-scope merchandise and are covered by the *China BWPFs Order*.[527]  Additionally, evidence on the record shows that BWPFs may be made to conform to specifications other than the standards referenced in the footnote in the Petition.[528]  In fact, at numerous points throughout their briefing, the importers acknowledge that certain saddles may be covered by the scope.[529]  Thus, they appear to agree that a product is not required to meet ASME B16.9 specifications to be covered by the scope.

Additionally, as noted in the Draft Redetermination, "the ITC report at the time of the investigation explicitly noted that not all shipments of *BWPFs from China* – the precise product for which the petitioner sought relief – met the ASME standard."[530]  This observation is

---

[526] *See United Steel and Fasteners*, 947 F.3d at 800.
[527] *See* Draft Redetermination at 46-47, and 50.
[528] *See* Island Rebuttal Comments at Exhibit 2 (certain elbows, reducing outlet tees, reducers, lap joint stub ends, and caps are made to "ASA B36.10" and "are not covered in ASA B16.9").
[529] *See* SIGMA Rebuttal Comments at 4-5 ("These 'saddle' fittings were not butt-weld fittings by reason of the 'fish mouth' opening on one side.  Rather, these 'saddle' fittings were butt-weld fittings by reason of the other side of the fittings (*i.e.*, the beveled branch end)"); Vandewater Draft Redetermination Comments at 18 ("A saddle would have to have the bevel of the requisite geometry on its *branch end* to qualify for the BWPF taxonomy"); and SCI Draft Redetermination Comments at 10 (asserting that, "perhaps," saddles with a butt-weld end could be found to be within the scope of the order).  Although SIGMA argues that saddles are only BWPFs when the branch end is designed for a butt-weld connection, the points remains that SIGMA agrees that a product that is not listed in ASME B16.9, *i.e.*, a saddle, can be a BWPF.
[530] *See* Draft Redetermination at 48 (citing USITC Investigation Final at I-10 through I-11).

consistent with our interpretation that the scope and ANSI/ASME standards are not coextensive.

The importers also take issue with our discussion of the MSS SP-97 standard and assert that the implication of our analysis of the standard was unclear.[531]  However, Commerce was explicit about its conclusion.  We explained:

> Thus, we find no reason to conclude that products conforming to MSS SP-97 cannot also be BWPFs.  In fact, as shown above, products covered by MSS SP-97 explicitly have many of the same characteristics that the importers attribute to BWPFs, *e.g.*, full penetration welds and bevel angles of 37.5 degrees with a tolerance of plus or minus 2.5 degrees.  Moreover, MSS SP-97 is described as a "non-exclusive standard" and, in fact, several aspects of the standard incorporate by reference the standards established by ASTM and ANSI/ASME.[532]

Therefore, despite the importers' contention to the contrary, we disagree that the various industry standards reflect bright-line distinctions between outlets and other BWPFs for the purposes of analyzing the *China BWPFs Order* scope.[533]

Second, the importers again assert that the method of attaching outlets to pipes distinguishes them from BWPFs.  They assert that outlets have a branch end that features a temporary (*i.e.*, non-permanent) connection and attaches to a sprinkler head, whereas BWPFs have no temporary connection and no branch end whatsoever; they also assert that outlets have no ends featuring a butt-weld at all, *i.e.*, that the contoured end that joins along the axis of the header pipe does not constitute a butt-weld joint.  We addressed these arguments in detail in the Draft Redetermination.[534]  With respect to the temporary nature of the connection on the branch

---

[531] *See, e.g.*, Vandewater Draft Redetermination Comment at 25.
[532] *See* Draft Redetermination at 50-51.
[533] SCI asserts that Commerce's finding in this regard "is hardly commensurate with a finding that the industry standards between BWPFs and outlets are the same."  *See* SCI Draft Redetermination Comments at 18.  We agree. We did not, and do not, conclude that the ASME B16.9 and MSS SP-97 standards are the same.  Rather, we observe that there are a number of aspects of the standards that demonstrate common physical characteristics across the products covered by each.  Moreover, we noted that standards need not be treated as exclusive – which is, in fact, explicitly stated in the MSS SP-97 standard itself.
[534] *Id*. at 45-51.

end of the outlets, a lap joint stub end has a beveled edge on one end which allows for a welded, permanent connection, while on the other end, it is designed to be bolted to a piping system.[535] Thus, like outlets, one type of unambiguously in-scope BWPF – which is listed as a BWPF in the very industry standard repeatedly highlighted by the importers – contains a temporary non-welded connection on one end.[536] Thus, the record does not support the importers' position that all ends of a BWPF must have only permanent welded connections.

The importers also assert that BWPFs are never attached to sprinkler heads. This is entirely circular. The question here is whether Vandewater's outlets, which feature a sprinkler head attachment on one end, constitute a BWPF that is covered by the scope of the *China BWPFs Order*. For the reasons discussed here, and in the Draft Redetermination, we find that the shared physical characteristics of outlets and other BWPFs, including the materials, sizes, shapes, and edges, support finding outlets to be BWPFs. We find that a product may be a BWPF if it meets the physical characteristics laid out in the scope and, in addition, has one end that is threaded or grooved or otherwise designed to accommodate a non-permanent attachment. Thus, we find the purported limitation imposed by the importers, *i.e.*, that BWPFs must provide for *only* permanent, welded joints, to not be supported by the record.

With respect to the non-branch end of an outlet, the importers continue to assert that the contoured end is not a butt-weld connection and, thus, outlets have no butt-welded ends. This

---

[535] *See* Petition at Appendix B; and Vandewater Comments at 13. Vandewater itself notes that "{t}he flared end of a lap joint stub end is designed to be fastened to a pipe or another fitting via a flange, not a permanent butt weld." *See* Vandewater Draft Redetermination Comments at 19.

[536] In an apparent recognition of the challenge that lap joint stub ends pose to its position, Vandewater suggests that there is an open question as to whether lap joint stub ends are BWPFs, asserting "{t}his proceeding, of course, is not intended to resolve the question of whether a lap joint stub end is or is not included within the scope of the *China BWPFs Order*." Vandewater Draft Redetermination Comments at 27. This position directly contradicts its arguments, in the same submission, in which it contends that "{i}n this case, there are bright-line distinctions within the fittings industry, based on differing industry standards" – notwithstanding the fact that lap joint stub ends are explicitly covered by ASME B16.9. *Id*. at 3.

too was addressed fully in the Draft Redetermination.  We explained:

> Specifically, the record evidence establishes that products with a contoured edge that are designed to connect to the midsection of a pipe can be BWPFs.  In its product specification sheets, Aleum USA, a U.S.-based distributor of outlets, *describes its female threaded outlet and grooved outlet as having "butt welding ends."* … The product catalog from another U.S. producer of the domestic like product includes an illustration of a "vesselet," another product with a contoured edge that is connected to the side of a header pipe, and *the illustration refers to the contoured end as a "buttweld" and the accompanying description states that the vesselet features a "{t}rue butt-weld installation in header."*[537]

These sources demonstrate that contoured ends, such as the fishmouth shaped end (*e.g.*, on the bottom of an outlet or saddle), constitutes a butt-welded connection.  Vandewater appears to have entirely ignored the above-cited passage, asserting that "{n}either {Commerce} nor Island attempt to address the simple, indisputable fact that Vandewater's outlets contain *zero butt welds*."[538]  Contrary to Vandewater's claim, we examined the evidence on the record and determined that the two catalogs provided a reliable indication of what constitutes a butt-weld joint, which is fully consistent with Vandewater's suggestion that "{f}or (k)(2) purposes, the focus should be on what the pipe fittings industry believes the physical characteristic differences are."[539]  Ultimately, the importers ask us to ignore the product catalog of Aleum USA and Bonney Forge (the latter of which was placed on the record by Vandewater), and to place greater weight on the expert affidavit provided in support of Vandewater's scope request and an affidavit

---

[537] *See* Draft Redetermination at 46-47 (citing Island Comments at Exhibits 4A and 4B, and Vandewater Comments at Tab 14 (Bonney Forge catalog at 23)).
[538] *See* Vandewater Draft Redetermination Comments at 22 (emphasis in original).
[539] *Id*. at 3.  SCI also asserts that, in the context of its *Forged Steel Fittings Order*, Commerce "has already found that products like saddles, that do not have butt welds on both ends, are not butt weld fittings" and that "outlets have zero butt weld ends."  *See* SCI Draft Redetermination Comments at 8.  As discussed in the Draft Redetermination, our construction of an exclusion in a separate proceeding is not determinative here.  More importantly, we conclude that Vandewater's outlets do, in fact, feature a butt-welded connection to the run pipe.  Moreover, for the reasons discussed above, we disagree with SCI's assertion that products such as saddles and lap joint stub ends cannot be considered BWPFs.

placed on the record for the purpose of this litigation.[540]  We decline to do so, and we note that Commerce regularly considers whether documents are prepared in the ordinary course of business – or prepared specifically for the administrative proceeding – in determining the appropriate weight to accord to record evidence.[541]  Moreover, as discussed elsewhere in these final results, we find that portions of the affidavits support our conclusion regarding the scope status of Vandewater's outlets.[542]

Third, and also related to the connection between outlets and the recipient pipe, the importers assert that BWPFs must have a beveled edge of a particular angle and/or must attach to a pipe in a manner that creates an angle of a particular dimension.  As we explained in the Draft Redetermination, "{a} pipe fitting possesses the requisite beveled edge if it is capable of creating a shallow channel to accommodate the bead of the weld that fastens the two adjoining pieces, as described in the Petition and prior ITC determinations."[543]  Consistent with the discussion above, in which we explain that the scope of the *China BWPFs Order* is not coextensive with the ANSI/ASME standard cited by the importers, we similarly find that the particular bevel angles

---

[540] Throughout the importers' submissions, the importers repeatedly ask that Commerce credit the affidavit from Vandewater's witness over other record evidence.  *See, e.g.*, SIGMA Draft Redetermination Comments at 6; and Vandewater Draft Redetermination Comments at 3.  We also note that Vandewater asserts that the source of the Aleum USA exhibit is unknown.  Although the exhibit consists of two pages, which are excerpted from a larger document identified by Island as a product catalog, we find no basis to question the reliability of the exhibit.

[541] *See, e.g.*, *Certain Softwood Lumber Products from Canada:  Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017) (*Softwood Lumber*), and accompanying IDM at Comment 19 ("Although we consider all evidence on the record of a proceeding, in determining the weight to be accorded to a particular piece of evidence, we consider whether the evidence in question was prepared in the ordinary course of business, or for the express purpose of submission in the ongoing administrative proceeding").

[542] For instance, the Sperko affidavit provided by Vandewater is consistent with a finding that the contoured end of an outlet features a full penetration weld, *see, e.g.*, Vandewater Comments at Exhibit 7 (Report of Walter Sperko) ("This 45-degree angle groove allows welding of a *full-penetration* or partial penetration groove weld reinforced by a fillet weld") (emphasis added), and with a finding that outlets and other BWPFs are made from similar materials (noting that "{b}utt-weld pipe fittings most commonly are manufactured *using seamless pipe* as the raw material," and "for lower pressure applications, *branch outlets may also be machined from seamless or welded pipe* and tube," in addition to forgings and bar stock) (emphasis added).

[543] *See* Draft Redetermination at 48.

identified in the standard are not required for a product to be in-scope.  In fact, the ITC final report in the underlying investigation specifically observed that two domestic producers and multiple importers reported that Chinese BPWF producers often did not meet the applicable industry standards.[544]  Given that the Petition was explicitly designed to cover imports of BWPFs from China, there were clear reasons as to why the petitioner would not elect to make the scope coextensive with industry standards, in light of the fact that such standards were not consistently adhered to by producers of subject merchandise in the exporting country.

Fourth, Vandewater continues to assert that the shape of BWPFs is distinct from the shape of outlets, claiming that "welded outlets are straight in design, whereas virtually all BWPFs (*i.e.*, all BWPFs except caps) are curved or irregularly shaped."[545]  As noted in the Draft Redetermination, "caps are unambiguously covered by the scope of the *China BWPFs Order*, and, therefore, this is not a characteristics that distinguishes outlets from BWPFs."[546]  In fact, it is puzzling that the importers ask us to dismiss caps as a point of comparison given the fact that caps are among the BWPFs enumerated in the industry standard emphasized by the importers (*i.e.*, ASME B16.9) and they were identified by the ITC as among the "most common" types of BWPFs.[547]  Similarly, lap joint stub ends are straight in design.[548]  The body of a lap joint stub end has no bend or curvature along its length, and only has a deviation from the straight cylindrical shape at the ends (*i.e.*, the "stub" located at the base and the bevel located at the

---

[544] *See* USITC Investigation Final at "Imported and Domestic Product Comparison" (stating that the two "producers noting quality differences stated that butt-weld fittings from China often do not meet ASTM and/or ANSI specifications when tested by distributors and end users," and that "{a}s with two domestic producers, importers also noted that Chinese butt-weld pipe fittings often do not meet ASTM and ANSI specifications").

[545] *See* Vandewater Draft Redetermination Comments at 22.

[546] *See* Draft Redetermination at 34.

[547] *See* USITC Investigation Final at "The Product" ("Butt-weld pipe fittings come in several basic shapes, the most common of which are elbows, tees, reducers, and *caps*") (emphasis added).

[548] *Id*. at 13.

top).[549]  Therefore, the fact that outlets share this characteristic with key types of BWPFs demonstrates that the so-called "straight" design of outlets is not a distinguishing physical characteristic.

We also note this line of argument, downplaying the similarity between outlets and caps, for instance, reflects a broader flaw in the importers' arguments throughout their comments – they continue to attempt to artificially narrow the scope of the *China BWPFs Order* by pointing to subsets of subject merchandise (or subsets of uses/expectation, as discussed below) in their analysis.  This is incorrect.  In our (k)(2) analysis, we must assess physical similarities between outlets and other in-scope merchandise; this includes cap, lap joint stub ends, elbows, and the variety of fittings that fall within the greater heading of BWPFs.

Fifth, with respect to the relevant production process, the importers assert that Commerce improperly characterizes the inputs and processing required to produce BWPFs.  Vandewater asserts that there is no forming or forging involved in the creation of an outlet.[550]  However, elsewhere in the submission, Vandewater asserts that "Threaded Welded Outlets Are *Forged* Steel Pipe Fittings."[551]  Moreover, the Sperko declaration provided by Vandewater also states that "*Forged* steel branch outlets normally are manufactured using *forgings* or bar stock as the raw material.  The forging or bar stock is then shaped through a die *forging* process, either a closed-die *forging*, or an open-die *forging*."[552]  Thus, we find that outlets are, like other BWPFs, formed or forged.

We also previously addressed the importers' assertions regarding the starting materials

---

[549] *See* Island Rebuttal Comments at Exhibit 2 at 82-83 (lap joint stub ends dimensions).
[550] *See* Vandewater Draft Redetermination Comments at 22.
[551] *Id*. at 8 (emphasis added).
[552] *See* Vandewater Comments at Exhibit 7.

for outlets and other BWPFs.  In the Draft Redetermination, we explained:

> the importers' argument that outlets and BWPFs are manufactured from different starting material is not supported by the record.  The importers' assert that BWPFs are typically made from "seamless pipe" or "welded pipe …" or "seamless or welded pipe and tube."  The ITC stated that, additionally, "some types of fittings, such as caps, are formed from carbon steel plate, billet, or bar stock."  Accordingly, there is a range of starting materials from which BWPFs are made.  Vandewater states that its "grooved steel outlets are made from welded pipe," and its "threaded steel branch outlets are made from steel bars."  Thus, Vandewater's outlets are produced from starting materials used to produce other in-scope merchandise.[553]

Thus, although there is a variation in starting materials across the range of BWPFs, we find that the materials for outlets and other BWPFs are comparable.

Finally, Vandewater repeats its argument regarding HTSUS classification.  As discussed in the Draft Redetermination, although we considered the decisions of CBP, we are not bound by such classifications.  Here, given our analysis regarding the physical characteristics of in-scope merchandise, do not find that the CBP classification is suggestive of different physical characteristics between outlets and other BWPFs.[554]

In summary, with respect to physical characteristics, we find that Vandewater's outlets are formed or forged, made of carbon steel, have a diameter of less than 14 inches, and have one butt-welded end with a beveled edge suitable for permanent attachment to a piping system that conveys gas or liquid.  We also find that outlets have a variety of characteristics in common with other common BWPFs, such as having one butt-welded end (similar to caps and lap joint stub ends) and also attach to a header pipe via a butt-weld (similar to saddles).

---

[553] *See* Draft Redetermination at 52.  Additionally, the Sperko affidavit states that "{b}utt-weld pipe fittings most commonly are manufactured using seamless pipe as the raw material," and notes that "for lower pressure applications, branch outlets may also be machined from seamless or welded pipe and tube," in addition to forgings and bar stock.  *See* Vandewater Comments at Exhibit 7.
[554] *See* Draft Redetermination at 53.

With respect to the expectations of ultimate purchasers, we continue to find that expectations for outlets and other BWPFs are consistent.  Outlets and other BWPFs are, similarly, expected to be welded into permanent, fixed piping systems for gases or liquids in plumbing, heating, refrigeration, air conditioning, and fire sprinklers systems.  As discussed above, the fact that Vandewater's outlets have a temporary connection on one end is not a feature that distinguishes outlets from other in-scope merchandise, and, therefore, does not change consumer's expectations regarding the product.  Regarding this fact, Vandewater again asks Commerce to credit the expert affidavit it provided, rather than the other sources on the record, such as the ITC report, to ascertain the expectations of consumers and users.  For the reasons stated above, we do not find that the affidavit represents more reliable evidence than other record evidence that was not created specifically for this scope proceeding.[555]

SIGMA also asserts that different industry standards apply to the product, which impact consumer expectations.  For the same reasons discussed above – *i.e.*, that the scope is not coextensive with ANSI/ASME B16.9 – we continue to find the importers' characterization of the applicable industry standards to be without merit.  In any case, we also note that the two standards in question, ANSI/ASME B16.9 and MSS SP-97, reflect substantial overlap in terms of attributes, and in turn expectations, for outlets and BWPFs.  For example, the standard states that outlets are attached "at an opening in a run pipe by means of a full penetration weld," which the importers identify as a defining feature of a BWPF.[556]  Also, SIGMA states that Commerce's conclusion regarding the overlap between the ANSI/ASME B16.9 and MSS SP-97 standards "makes no sense" because "{i}ndustry standards, by their very nature, exist to define distinct

---

[555] *See Softwood Lumber* IDM at Comment 19.
[556] *See* Vandewater Comments at Tab 2 at 1.

products; the idea that a product could conform to multiple industry standards, thereby recategorizing that product, would render those standards meaningless."[557]  However, as noted in the Draft Redetermination, MSS SP-97 is a "non-exclusive standard" and, in fact, several aspects of the standard incorporate by reference the standards established by ASTM and ANSI/ASME.[558]

SCI also asserts that the installation costs differ across outlets and other BWPFs, claiming that "the number and strength of welds involved in installing a BWPFs make it more expensive than installation for a branch outlet."[559]  Since there are multiple types of unambiguously in-scope BWPFs that only have one welded end (*e.g.*, caps and lap joint stub ends), we disagree that the number of welds results in different expectations in terms of installation costs for ultimate purchasers.  With respect to the strength of the welds, SCI's argument is based on the assertion that the type of weld (*i.e.*, full penetration for BWPFs vs. fillet for outlets) is a distinguishing feature.  However, as noted above, we find that outlets and other BWPFs both utilize a full penetration weld; this finding is supported by a description of the product contained in the standard proffered by the importers that relates specifically to outlets (*i.e.*, MSS SP-97)[560] as well as the affidavit submitted by Vandewater.[561]

As to the ultimate uses of the product, Vandewater essentially raises the same argument addressed above, contending that  "{a} BWPF is *never* suitable for connecting to a sprinkler

---

[557] *See* SIGMA Draft Redetermination Comments at 5.
[558] *See* Vandewater Comments at Tab 2 at 3.
[559] *See* SCI Draft Redetermination Comments at 20.
[560] *See* Vandewater Comments at Tab 2 at 1 (containing MSS SP-97, which notes that outlets are attached to a header/run pipe via "an opening in a run pipe by means of a full penetration weld").
[561] *See* Vandewater Comments at Exhibit 7 (Report of Walter Sperko) ("This 45-degree angle groove allows welding of a *full-penetration* or partial penetration groove weld reinforced by a fillet weld") (emphasis added); *see also* Vandewater Comments at Tab 14 (Bonney Forge catalog at 23 (noting that the outlet in question is connected to the header pipe with a butt-weld).

head, precisely because the sprinkler head must be attached in manner that it can be changed, and *not* permanently attached through a butt weld."[562]  As noted, the fact of a temporary connection does not render outlets distinct from other BWPFs, as certain BWPFs (*e.g.*, lap joint stub ends) have this same characteristic.[563]

SCI similarly asserts that the uses of outlets and other BWPFs are distinct because "BWPFs are used in numerous applications involving highly-pressured substances and requiring a permanent connection (*e.g.*, chemical synthesis, petroleum refining, electric power generation, construction, and shipbuilding)."[564]  Although SCI argues that such applications necessarily require the use of a permanent connection, this too ignores the record evidence, including evidence highlighted by the importers, that not all BWPFs have exclusively permanent connections.[565]  Although Vandewater's outlets have a particular application, *i.e.*, are use in low pressure piping systems and typically have a lower pressure rating due to the use of one non-permanent connection, we continue to find that the uses for such outlets are consistent with the uses of other BWPFs (*i.e.*, permanently welded into a piping system that conveys gases or liquids).

SIGMA asserts that Commerce's analysis of the use criteria is simplistic and merely finds that outlets and BWPF are similar in that they "connect pipes."[566]  However, that is an obvious mischaracterization of Commerce's analysis.  The products do not just connect pipes – they connect pipes in a variety of overlapping settings, *e.g.*, fire protection and other low-pressure

---

[562] *See* Vandewater Draft Redetermination Comments at 33 (emphasis in the original).
[563] *See, e.g.*, Petition at Appendix B; and Vandewater Comments at Tab 1.
[564] *See* SCI Draft Redetermination Comments at 21.
[565] *See, e.g.*, Petition at Appendix B; and Vandewater Comments at Tab 1.  We note that the importers routinely suggest that the ANSI/ASME B16.9 standard defines the scope here, despite the fact that the standard contains fittings (*i.e.*, lap joint stub ends) that do not rely on permanent welds for all ends.  The importers attempt to selectively rely on the industry standard where it supports finding Vandewater's outlets to be out of scope.
[566] *See* SIGMA Draft Redetermination Comments at 10.

piping systems, and do so in a similar manner, *i.e.*, through at least one permanent, full penetration welded joint. Although SCI emphasizes that outlets and other BWPFs do not have the same use within fire protection systems, the same could be said of many subsets of the broader range of BWPF products. For instance, an elbow connects pipe in a manner that changes the flow of the substance being transported, while caps restrict the flow at a certain location and reducers modify the size of the pipe containing the flow.[567] All subject fittings have a particular purpose within the broader piping system. Moreover, certain BWPFs have particular uses that are closely analogous to that of an outlet. As noted above, a saddle is attached axially to a length of pipe in a manner that changes the flow of the transported substance.[568] A "tee" is designed to perform a similar function – creating an outbound flow from a run pipe that is perpendicular to the main flow.[569] A comparison of two images showing Vandewater's outlet and a tee, both provided by Vandewater, demonstrates a high level of similarity in the two products' purpose and function.[570]

With respect to the channels of trade, Vandewater asserts that the record evidence does not support a finding that outlets and BWPFs are sold in the same channel. It urges Commerce to consider the declaration of Neil Shyman to find differences in the ultimate consumer of the products.[571] We did consider this evidence in our Draft Redetermination. Specifically, we noted that the declaration states that "welded branch outlets and butt-weld fittings are both sold to

---

[567] *See, e.g.*, Vandewater Comments at 13.
[568] *See, e.g.*, Petition at Appendix B (showing the shape of a saddle, which is designed to connect to the run pipe).
[569] *See* Vandewater Comments at 13.
[570] Compare *id.* (showing a tee) and Vandewater Draft Redetermination Comments at 8 (showing an installed outlet). SCI also asserts that "a BWPF is used to connect pipes within the piping system." *See* SCI Draft Redetermination Comments at 19. Although this is clearly a common use for such products, unambiguous BWPFs, such as caps, are not designed to connect pipes.
[571] *See* Vandewater Draft Redetermination Comments at 35.

distributors like Neill Supply."[572]  The importers concede that outlets and BWPFs are both sold

to distributors, but emphasize that distributors resell these two categories of products to distinct

market segments:  BWPFs to mechanical and industrial contractors, and outlets to the fire

protection sprinkler industry.[573]  We agree that Vandewater's outlets are typically sold to a

particular type of contractor given their targeted application, when compared to BWPFs more

generally – which cover a wide range of products and applications.  However, this is true in any

circumstance when comparing a particular product to a broad class of products.  Outlets and

other BWPFs are sold to distributors and then to contractors and users involved in constructing

piping systems, even if the particular type of contractor/customer for Vandewater's outlets

focuses on certain types of systems, *i.e.*, fire protection and other low-pressure applications.

SIGMA asserts that Island's advertising materials reference particular end uses and

industry standards which "draw a clear dividing line between butt-weld pipe fittings on one hand

and steel branch outlets on the other."[574]  Throughout the Draft Redetermination and these final

results of redetermination, we continue to find that the importers give undue significance to

ANSI/ASME B16.9, and those same considerations apply here.

The record indicates that advertisements for outlets and other BWPFs contain similar

types of information, such as measurements of length and inside/outside diameter, and often list

applicable standards.[575]  Although SCI asserts that the sizes reported for outlets are different, *i.e.*,

they are sold on the basis of run pipe size, rather than the dimensions of the end of the recipient

---

[572] *See* Vandewater Rebuttal Comments at Attachment A.
[573] *See, e.g.*, Vandewater Draft Redetermination Comments at 35.
[574] *See* SIGMA Draft Redetermination Comments at 11.
[575] *See, e.g.*, Petition at Appendix B (listing products and applicable ASTM standards); Island Rebuttal Comments at Exhibit 10 (listing products, dimensions, and applicable ASTM standards).

pipe,[576] this is not a distinguishing feature.  For instance, a reducer, cap, and saddle would all be sold according to the dimensions relevant to the type of connection(s) contemplated.

Moreover, outlets (and similar products, such as saddles) and BWPFs are displayed side by side.[577]  In some instances, outlets are explicitly referenced in advertising materials as having butt-weld ends.[578]  We do not agree that, simply because the advertising materials reference particular standards (*i.e.*, ANSI/ASME B16.9 for certain products) and or references particular uses, that this reflects a clear dividing line between the method of advertising for each product.

Finally, although the importers repeatedly suggest that Vandewater's outlets are exclusively sold to the fire protection industry[579] – and highlight that the outlets were sold at an exhibition for the fire protection industry while other BWPFs were not – its own product literature advertises outlets for fire protection *and other "Low Pressure Piping Systems."*[580]  This fact demonstrates that the target audience of Vandewater's advertising extends beyond exclusively the fire protection industry.  The fact that these outlets happened to be featured at an exhibition for fire protection products does not demonstrate that the outlets are advertised

---

[576] *See* SCI Draft Redetermination Comments at 19.

[577] *See* Petition at Appendix B (showing "elbows," "reducers," "lap joint stub ends," "saddles," and "multiple outlet fittings" in the same product catalog); and Island Rebuttal Comments at Exhibit 15 (showing an outlet with a butt-weld branch end on the same page as an outlet with a threaded branch end); *see also* Island Rebuttal Comments at Exhibit 10 (describing outlets with threaded/grooved branch ends, and a beveled and contoured end, as having "butt welding ends").

[578] *See* Vandewater Comments at Tab 14 (Bonney Forge catalog at 23) (noting that the vesselet outlet features a "{t}rue butt-weld installation in header"); and Island Comments at Exhibits 4A (Aleum USA's specification sheet for a female threaded outlet) and 4B (Aleum USA's specification sheet for a grooved outlet) (stating that the outlets feature "butt welding ends").

[579] *See, e.g.*, Vandewater Draft Redetermination Comments at 35 ("Vandewater explained that the advertising of its welded outlets—all of which are used for the fire sprinkler industry—differs significantly from the advertising of BWPFs"); SIGMA Comments at 7 ("As both SIGMA and Vandewater explained in their original scope ruling requests, their steel threaded outlets are used exclusively for fire protection, or fire sprinkler systems"); and SCI Comments at 33 ("All of Vandewater's outlets are designed for fire protection applications …").

[580] *See* Vandewater Draft Redetermination Comments at 35.

exclusively to the fire protection industry and/or that other BWPFs cannot be advertised to that industry.

For these reasons, we continue to find that outlets and other BWPFs are advertised in a similar manner.[581]

## Comment 3:   Commerce's Suspension of Liquidation and Cash Deposit Requirements

In the Draft Redetermination, we found it unnecessary to change Commerce's previous CBP instructions and determined that, consistent with 19 CFR 351.225(l)(1) and (l)(3), CBP should continue any suspension of liquidation of entries of outlets imported by Vandewater.

*Vandewater's Comments*

- Commerce's interpretation of the suspension of liquidation requirements in the Draft Redetermination is wrong as a matter of law.[582]  The CAFC found in *United Steel and Fasteners* that Commerce cannot retroactively suspend liquidation, holding that the "regulation is clear …{it} does not allow suspension before a scope inquiry."[583]  Further, the CAFC found in *Sunpreme* that, "{w}hen Commerce rules that a product falls within the scope of an order, but there has been no suspension of liquidation {pursuant to a scope inquiry under 19 CFR 351.225(l)(1) or a preliminary scope ruling under 19 CFR 351.225(l)(2)}, a new suspension must be ordered beginning only 'on or after the date of initiation of the scope inquiry."[584]  The CAFC held that "{a}nything else would be

---

[581] *See* Petition at Appendix B (showing BWPFs in a product catalog); and Island Rebuttal Comments at Exhibits 10 and 15 (showing various outlets in product catalogs).
[582] *See* Vandewater Draft Redetermination Comments at 37-42.
[583] *Id.* at 39 (citing *United Steel and Fasteners, Inc. v. United States*, 947 F.3d 794, 801 (Fed. Cir. 2020) (*United Steel and Fasteners*).
[584] *Id.* (citing *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1319 (Fed. Cir. 2020) (*Sunpreme*) (*en banc*) (quoting 19 CFR 351.225(l)(3)) (internal quotation marks and brackets omitted)).

impermissibly retroactive."[585]

- Commerce initiated a formal scope inquiry on October 30, 2020, and, therefore, Commerce's authority to suspend liquidation is limited to outlets entered on or after that date.[586]  In its letter soliciting (k)(2) comments, Commerce stated that, "{i}n accordance with the *Remand Order*, Commerce is hereby initiating a formal scope inquiry, pursuant to 19 CFR 351.225(e), to evaluate the (k)(2) factors and determine whether Vandewater's steel outlets are covered by the scope of the {*China BWPFs Order*}."[587]

- Accordingly, pursuant to section 351.225(l)(3), absent a prior and continuing "suspension of liquidation under paragraph (l)(1) or (l)(2)," any instructions from Commerce to suspend liquidation are expressly limited to "each unliquidated entry of the product entered... on or after the date of initiation of the scope inquiry."[588]  Here, however, there is no prior and continuing "suspension of liquidation under paragraph (l)(1) or (l)(2)" that would authorize Commerce's suspension of liquidation for outlets entered before the initiation of the scope inquiry (*i.e.*, October 30, 2020).[589]

- Commerce has not shown that the outlets were subject to suspension at the time Commerce issued its cash deposit instructions to CBP on September 17, 2018.[590]  Based on this fact alone, any prior and continuing suspension under 19 CFR 351.225(l)(3) must

---

[585] *Id.* (citing *United Steel and Fasteners*, 947 F.3d at 801 (noting that "'{t}he unambiguous language of {351.225(l)} only authorizes Commerce to act on a prospective basis, and such express prospective authorization reasonably is interpreted to preclude retroactive authorization'") (quoting *AMS Assocs., Inc. v. United States*, 737 F.3d 1338, 1344 (2013) (*AMS Assocs.*)).

[586] *Id.* at 39-42.

[587] *Id.* (citing Commerce October 30, 2020 Letter).

[588] *Id.* at 39-40 (citing *United Steel and Fasteners*, 947 F.3d at 801; and *Sunpreme v. United States* 946 F.3d at 1319.)

[589] *Id.* at 40.

[590] *Id.*

necessarily derive from Commerce's cash deposit instructions.[591]  There is no dispute that these instructions arose from Commerce's Final Scope Ruling.[592]  However, this ruling was not only issued absent a formal scope inquiry, but it was also stricken by the Court as "unreasonable," in part, due to Commerce's failure to initiate a formal scope inquiry and consider the (k)(2) factors.[593]  Thus, the instructions derived from a ruling that was rejected by the Court as "unsupported by substantial evidence on the record, or otherwise not in accordance with law."[594]

- Commerce argues that its suspension authority is not limited by the scope inquiry date because "Vandewater has not provided any information to show that its outlets were not subject to the suspension of liquidation prior to the date of initiation of this scope inquiry."[595]  But in making this assertion, Commerce does not (and, indeed, cannot) point to any regulation that requires an importer to provide such information.[596]

- The only requirement here is clear:  Commerce must fulfill its legal obligation of issuing instructions consistent with its limited prospective authority under 19 CFR 351.225(l)(3).[597]  Thus, absent a prior and continuing suspension of liquidation (which Commerce implicitly admits it cannot show here), any and all suspension instructions must be limited by the October 30, 2020, date of initiation of the (k)(2) scope inquiry.[598]

---

[591] *Id.* at 40.

[592] *Id.* (citing Commerce's Final Scope Ruling, dated September 10, 2018).

[593] *Id.* (citing *Remand Order* at 9 ("Commerce unreasonably concluded that the sources in {19 CFR 351.225(k)(1)} were dispositive... and remands the matter to Commerce to conduct a full scope inquiry and evaluate the factors under {19 CFR 351.225(k)(2)}").

[594] *Id.* (citing *Remand Order* at 2 and 9; and *Sunpreme v. United States*, 256 F.Supp.3d 1265, 1293 (CIT 2017), *aff'd in part and rev'd in part on other grounds*, 946 F.3d at 1319).

[595] *Id.* (citing *Remand Order* at 62).

[596] *Id.* at 41.

[597] *Id.* at 42.

[598] *Id.*

Any notion that Commerce's authority to suspend is based on requiring an impacted

party to prove a negative is unfounded and contrary to law.[599]

- Commerce also appears to suggest that the parties have waived their ability to challenge

  Commerce's authority under 19 CFR 351.225(l) because "{n}o party challenged

  Commerce's instructions to CBP before the {CIT}."[600]  Even if a waiver theory were a

  viable basis to preclude Vandewater from raising this issue in post-remand administrative

  proceedings, Commerce's baseline assertion is incorrect, since Vandewater did, in fact,

  raise this issue before the Court.[601]

- Any suspension of liquidation instruction to CBP must observe the "clear" dictates of 19

  CFR 351.225(l):  absent a prior and continuing suspension of liquidation (which does not

  exist here), Commerce is prohibited from ordering the suspension of liquidation on

  outlets entered before the October 30, 2020, date of the initiation of this scope inquiry.[602]

*SCI Comments*

- Commerce's analysis in the Draft Redetermination concerning the suspension of

  liquidation of Vandewater's entries is unlawful and inconsistent with multiple CAFC

  precedents.[603]

- Commerce never explains how it reached the determination that Vandewater's entries

  were "already subject to suspension of liquidation" prior to the initiation of the instant

---

[599] *Id.*
[600] *Id.* (citing Draft Redetermination at 61).
[601] *Id.* (citing Vandewater's Mem. of Points and Authorities, *Vandewater Int'l v. United States*, 1:18-cv-00199-LMG (CIT June 24, 2020), ECF No. 93 at 29 ("If the Court determines that the (k)(1) sources are not dispositive either way, then the Court should remand with instructions directing Commerce to initiate a formal scope inquiry, examine the (k)(2) sources, and at a minimum, release any of Vandewater's steel branch outlets that were entered prior to initiation of the formal scope inquiry")).
[602] *Id.*
[603] *See* SCI Draft Redetermination Comments at 26.

scope proceeding initiated pursuant to the *Remand Order*.[604]

- Commerce's position is contrary to the CAFC's decision in *United Steel and Fasteners*,[605] which prohibits Commerce from instructing CBP to suspend liquidation of entries prior to the initiation of a scope inquiry.

- Additionally, the language of the applicable regulations themselves demonstrates that the effective date of suspension of liquidation should be the initiation of the current scope inquiry.[606]

- Outlets were not subject to suspension of liquidation prior to Commerce's 2018 scope ruling for Vandewater.  That decision has been invalidated by the Court in its *Remand Order*.[607]

- The present scope inquiry demonstrates that the status of Vandewater's outlets was not knowable without this new scope inquiry.[608]  This is precisely why the regulations call for suspension only from the point of the initiation of the scope inquiry.[609]

- Commerce's characterization of the proposed amendments to 19 CFR 351.225 supports the importers' position.  In that notice, Commerce explained that, under the current rule, "all entries not already suspended prior to the date on which Commerce initiates a scope inquiry are essentially excused from AD/CVD duties, even if Commerce finds through the scope inquiry that such duties should have applied."[610]

---

[604] *Id.* at 27 (citing Draft Redetermination at 62).
[605] *Id.* at 28-30 (citing *United Steel and Fasteners*, 947 F.3d at 794).
[606] *Id.* at 30 (citing 19 CFR 351.225(l)(1)).
[607] *Id.*
[608] *Id.*
[609] *Id.*
[610] *Id.* (citing *Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 85 FR 49483 (August 13, 2020)).

- In this new scope inquiry, there currently exists no valid suspension of Vandewater's entries prior to the initiation of the scope proceeding on October 30, 2020.[611]  Commerce previously issued instructions to CBP based on the now-invalidated decision regarding Vandewater's scope request.[612]  Therefore, those previous instructions likewise, necessarily, are invalidated.[613]

- Commerce must confirm that any suspension of liquidation applies only to entries made, or withdrawn from warehouse, on or after the date of initiation of this scope inquiry.

*SIGMA's Comments*

- Commerce misinterprets 19 CFR 351.225(l) and misapplies that regulation to Vandewater**.**  Commerce criticizes Vandewater for not providing information showing that its outlets were not subject to suspension of liquidation prior to the date of initiation of the scope inquiry.[614]  The error, however, does not lie with Vandewater.[615]  Rather, the error lies with Commerce for instructing CBP to "continue" the suspension of liquidation as opposed to instructing CBP to affirmatively suspend liquidation.[616]

- Commerce's scope regulation is clear as to the consequences of a final scope ruling that a product is within the scope of an order.  "Where there has been no suspension of liquidation, the Secretary will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties …"[617]  Separately, that same regulation provides that "any suspension of liquidation under paragraph (l)(1) or (l)(2) will

---

[611] *Id.*
[612] *Id.* at 33 (citing Memorandum, "Placing CBP Instructions on the Record," dated September 17, 2018 (CBP Instruction Memorandum)).
[613] *Id.* at 33.
[614] *See* SIGMA Draft Redetermination Comments (citing Draft Redetermination at 61-62).
[615] *Id.* at 12.
[616] *Id.*
[617] *Id.* (citing 19 CFR 351.225(l)(3)).

continue."[618]

- In this instance, Commerce instructed CBP to "continue" the suspension of liquidation of BWPFs from China, including Vandewater's outlets.[619]  It is unclear why Commerce believed that Vandewater's outlets were already subject to suspension of liquidation and, as a result, that such suspension should "continue."  In a case where Vandewater has always contended that its outlets were not BWPFs, it appears that Commerce erred in its conclusion that Vandewater's outlets were already subject to suspension of liquidation.[620]

- If Commerce believed that there was a suspension of liquidation in place that applied to Vandewater's outlets, then it should have identified where this suspension of liquidation was first implemented.[621]

- Finally, Commerce criticizes the parties for not challenging Commerce's CBP instructions before the Court.[622]  SIGMA did not challenge these instructions because it was not harmed by these instructions.[623]

**Commerce's Position:**  On September 14, 2018, upon determining that Vandewater's outlets are covered by the scope of the *China BWPFs Order* pursuant to 19 CFR 351.225(d), Commerce instructed CBP to "{c}ontinue to suspend liquidation of entries of carbon steel butt-weld pipe fittings from the People's Republic of China, including Vandewater International Inc.'s steel branch outlets imported by Vandewater International Inc...."[624]  The importers argue that, in light of the initiation of a scope inquiry on remand, any suspension of liquidation on Vandewater's

---

[618] *Id.* (citing 19 CFR 351.225(l)(3)).
[619] *Id.* at 12.
[620] *Id.* at 12-13.
[621] *Id.* (citing *Professional Air Traffic Controllers Organization v. Federal Labor Relations Authority,* 685 F.2d 547, 577 n. 65 (D.C. Cir. 1981)).
[622] *Id.* (citing Draft Redetermination at 61).
[623] *Id.* at 14.
[624] *See* CBP Instruction Memorandum (containing Message No. 8257302).

outlets should be applied only to entries made on or after the date of initiation of this scope inquiry on remand, *i.e.*, October 30, 2020.

In the *Remand Order*, the Court held that Commerce's determination that the scope language and the descriptions of the merchandise contained in the sources under 19 CFR 351.225(k)(1) are dispositive as to the inclusion of Vandewater's outlets within the scope of the *China BWPFs Order* was unsupported by substantial evidence.  In light of the Court's *Remand Order*, should the Court affirm this remand redetermination in a subsequent decision, Commerce intends to issue instructions to CBP consistent with 19 CFR 351.225(l) and section 516A(c) and (e) of the Act.  Specifically, Commerce intends to instruct CBP to suspend or continue to suspend entries that entered, or were withdrawn from warehouse, for consumption on or after the date of initiation of this scope inquiry.  With respect to entries pre-dating the date of initiation of the inquiry that were suspended pursuant to the instructions issued following the September 10, 2018, Final Scope Ruling, Commerce intends to instruct CBP to refund cash deposits upon request but continue to suspend the entries at a zero percent cash deposit rate pending any appeals.  In the event that the Court's final judgment is not appealed or is upheld on appeal, Commerce intends to instruct CBP to lift suspension of liquidation and liquidate such entries without regard to antidumping duties.

## IX. FINAL RESULTS OF REDETERMINATION

Consistent with the *Remand Order*, and in view of the parties' comments on the Draft

Redetermination, we have conducted an analysis pursuant to the criteria set forth in 19 CFR

351.225(k)(2). We continue to find that Vandewater's outlets are within the scope of the *China*

*BWPFs Order.*

7/22/2021

X _____

Signed by: CHRISTIAN MARSH

Christian Marsh
Acting Assistant Secretary
 for Enforcement and Compliance