UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| VANDEWATER INTERNATIONAL INC., ) <br> ) <br> *Plaintiff*, ) <br> ) <br> and ) <br> ) <br> SIGMA CORPORATION, ) <br> SMITH-COOPER INTERNATIONAL, INC., ) <br> ) <br> *Plaintiff-Intervenors*, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> *Defendant*, ) <br> ) <br> and ) <br> ) <br> ISLAND INDUSTRIES, ) <br> ) <br> *Defendant-Intervenor*. ) <br> ) | Court No. 18-00199 |

**SIGMA'S COMMENTS IN OPPOSITION TO THE FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

Plaintiff-Intervenor SIGMA Corporation ("SIGMA") submits these comments in opposition to the final results of redetermination by the Department of Commerce ("Commerce"). See <u>Final Results of Redetermination Pursuant to Court Remand</u>, July 23, 2021, ECF 112 ("<u>Redetermination</u>"); <u>Vandewater International Inc. v. United States</u>, 476 F. Supp. 3d 1357 (Ct. Int'l Trade 2020).[1]

---

[1] Where relevant, the record from the underlying review is referenced with "CD" ("confidential document") and "PD" ("public document"); the remand record is referenced with "RCD" ("remand confidential document") and "RPD" ("remand public document").

## I.  BACKGROUND

In Vandewater, the Court held that Commerce's determination that the welded outlets produced by Plaintiff Vandewater International Inc. ("Plaintiff" or "Vandewater") fall within the scope of Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China, 57 Fed. Reg. 29,702 (Dep't of Comm. July 6, 1992) ("Order"), based on an analysis of sources listed in 19 C.F.R. § 351.225(k)(1) (the "(k)(1) sources"), was not supported by substantial evidence. See Vandewater, 476 F. Supp. 3d at 1362.  The Court therefore remanded the matter to Commerce to consider whether the products fall within the scope of the Order pursuant to an analysis of Vandewater's outlets based on the factors listed in 19 C.F.R. § 351.225(k)(2) (the "(k)(2) factors").

On remand – and at Commerce's request – interested parties, including Plaintiff, SIGMA, and Plaintiff-Intervenor Smith-Cooper International, Inc. ("SCI") submitted "written arguments and supporting documentation," followed by rebuttal comments, regarding these products, and demonstrating how and why they fall outside the scope of the Order.  See generally SIGMA Rebuttal Comments, Dec. 3, 2020, RPD 49, bar code 4061346-01 ("SIGMA Rebuttal Comments"); Vandewater Rebuttal Comments, Dec. 3, 2020, RPD 43, bar code 4061153-01 ("Vandewater Rebuttal Comments"); SCI Rebuttal Comments, Dec. 3, 2020, RPD 48, bar code 4061337-01 ("SCI Rebuttal Comments").  SIGMA Comments, Nov. 19, 2020, RPD 40, bar code 4055696-01 ("SIGMA Comments"); Vandewater Comments, Nov. 19, 2020 RCD 2-24, bar codes 4055446-01–14, RPD 11-35, bar codes 4055605-01–11, 4055634-01–14 ("Vandewater Comments"); SCI Comments, Nov. 19, 2020, RPD 8-10, bar codes 4055590-01–03 ("SCI Comments").

In its draft redetermination, Commerce concluded "that Vandewater's outlets are within the scope of the {Order} pursuant to an analysis under the (k)(2) criteria on remand."  Draft Results of Redetermination Pursuant to Court Remand, Apr.19, 2021, RPD 53, bar code 4111297-01 at 2

("Draft Redetermination"). Following a round of comments by the parties, Commerce again reached this conclusion in the Redetermination. See generally Redetermination.

## II. ARGUMENT

Commerce's Redetermination is not supported by substantial evidence and is not in accordance with law. As explained below, Commerce has mischaracterized and disregarded key evidence with respect to almost all of the (k)(2) factors – namely, physical characteristics; the expectations of the ultimate purchasers; the ultimate use of the product; and the manner in which the product is advertised and displayed. Consistent with the Court's instructions in its August 5, 2021 scheduling order (ECF 130), the argument below does not repeat arguments made by Plaintiff. SIGMA further (1) adopts Plaintiff's and SCI's arguments and incorporates them by reference in this submission; and (2) adopts and incorporates by reference all prior arguments made by Plaintiff in this action.

### A. Commerce Mischaracterized and Disregarded Key Record Evidence in its (k)(2) Analysis

In accordance with the regulation, the Redetermination contains Commerce's assessment of the five (k)(2) factors. See Redetermination at 45-62. However, Commerce's mischaracterization and/or outright disregard of key record evidence undermines its assessment of almost every factor. As explained below, this renders the Redetermination unsupported by substantial evidence.

#### 1. Physical characteristics

Commerce's discussion of physical characteristics contains three crucial shortcomings that, taken together, invalidate its consideration of such characteristics.

##### a. Industry standards

First, Commerce's discussion of industry standards is misguided:

> The importers' assertions regarding differences in physical characteristics presuppose that subject merchandise must meet a particular industry standard (ANSI/ASME B16.9). . . . However, the scope does not include a requirement that subject merchandise must conform to that standard.  A mere reference to an industry standard in the petition, without more, does not mean that subject merchandise *must* meet the specifications of that industry standard. Evidence on the record shows that BWPFs may be made to conform to specifications other than those referenced in the footnote in the Petition.  Therefore, including a requirement that all BWPFs subject to the *China BWPFs Order* must conform to ASTM A234-82a and ANSI/ASME B16.9 would introduce a restriction that is not found in the scope language and would unduly restrict the coverage of the scope. . . . In any case, while the importers emphasize the distinct industry standards – asserting that ANSI/ASME B16.9 covers BWFPs while MSS SP-97 covers the outlets in question . . . . we find no reason to conclude that products conforming to MSS SP-97 cannot also be BWPFs.

Redetermination at 50-51 (emphasis original, footnotes omitted).

Commerce's discussion cannot be squared with the very nature of industry standards; its practice; or court jurisprudence.  Industry standards exist to define distinct products; the idea that a product could conform to multiple industry standards, thereby re-categorizing that product, would effectively render those standards meaningless.  See Viraj Forgings Ltd. v. United States, 27 C.I.T. 1472, 1478 n.4, 283 F. Supp. 2d 1335, 1341 n.4  (2003) ("Standardization, in manufacturing, means establishing 'desirable criteria for the shape, size, quality and other aspects of a product.'"); see also BP Oil Supply Co. v. United States, CIT No. 04-00321, Slip Op. 14-48 at 16 (Apr. 29, 2014) ("The record demonstrates that there are clear differences in recognized industrial standards between many of the types of imported merchandise and the substitute merchandise."); cf., e.g., Bell Supply Co., LLC v. United States, 393 F. Supp. 3d 1229, 1242 (Ct. Int'l Trade 2019) (noting that "threading is a common process in the industry with various standards for different types of thread joints."); Tai-Ao Aluminium (Taishan) Co. v. United States, 391 F. Supp. 3d 1301, 1308 n.2 (Ct. Int'l Trade 2019) ("The Aluminum Association is the authority that maintains the standards for the U.S. aluminum industry with respect to aluminum alloy

4

designations, the chemical composition for the alloys, and the approved tempering methods for the different alloys.").

Commerce seeks to cast this fundamental contradiction aside by claiming that the two standards (i.e., ANSI/ASME B16.9 and MSS SP-97) "contain substantial overlap." Redetermination at 90. Overlap does not guarantee that products are identical, or even interchangeable, and Commerce's focus on it is misplaced: it is not the overlap that matters – it is the differences. For example, in the antidumping duty administrative review underlying Viraj Forgings, Commerce concluded that, despite being produced to different DIN and ASTM standards, certain stainless steel flanges at issue involved differences that were "very *likely* minor or nonexistent." 27 C.I.T. at 1484, 283 F. Supp. 2d at 1346 (emphasis original, citation omitted). The Court deemed Commerce's analysis unsupported by substantial evidence because it did not consider "that differences exist between forgings and flanges" made pursuant to each respective standard. See id., 27 C.I.T. at 1484-89, 283 F. Supp. 2d at 1346-51 (citing USX Corp. v. United States, 11 CIT 82, 88, 655 F. Supp. 487, 492 (1987), for the principle that "the court 'cannot defer to a decision which is based on inadequate analysis or reasoning.'"). The same applies here.

Moreover, the CAFC has affirmed Commerce's reliance on discrete industry standards in a separate scope proceeding concerning the ***exact same order*** as the one at issue in this appeal. In King Supply Co., LLC v. United States, 674 F.3d 1343 (Fed. Cir. 2012), the CAFC affirmed Commerce's decision in the underlying scope decision because it found that Commerce "emphasized that, not only were King's products physically identical to the products described in the first sentence of the *AD Order*, ***but evidence also showed King's products met the same ASTM and ANSI industry standards as were referenced in the Petition***." 674 F.3d at 1347 (emphasis added). Based on this reasoning, if a product is produced according to ASTM A234-82a or ANSI

5

B16.9, then it will fall within the scope of the Order. It follows that, where a product is neither physically identical to the products described in the Order, nor produced according to these industry standards, it will *not* fall within the scope of the Order.

Yet, by reaching the determination that it did in the Redetermination, Commerce contradicted CAFC jurisprudence and its prior practice, thereby rendering the Redetermination unsupported by substantial evidence. The "substantial evidence" standard of review does not allow Commerce to treat similar situations in dissimilar ways – which is exactly what Commerce has done here. See Nakornthai Strip Mill Pub. Co. v. United States, 587 F. Supp. 2d 1303, 1307 (Ct. Int'l Trade 2008) ("Agencies have a responsibility to administer their statutorily accorded powers fairly and rationally, which includes not 'treating similar situations in dissimilar ways'") (citation and internal brackets omitted).

Finally, Commerce disregarded the relevance of other industry standards that demonstrate the difference between welded outlets and butt-weld pipe fittings. For example, in his expert report submitted with SIGMA's comments (discussed further below in Section II.A.1.b), Walter Sperko, P.E. discusses the NFPA-13 standard for the installation of sprinkler systems. See SIGMA Comments, Exhibit 2 at 17 (Expert Report of Walter Sperko, P.E., Annex A). According to Mr. Sperko's export report, "full-penetration, partial penetration and fillet welds {can} be used" – thereby distinguishing between products using each of these types of welds. See id. In order to not repeat arguments made by the other parties, SIGMA respectfully refers the Court to Plaintiff's comments in opposition to the remand redetermination, which discuss how Vandewater's outlets using a fillet weld differ from butt weld pipe fittings, which use full penetration welds. See also Vandewater Comments at 9 (stating that "a butt-weld . . . is a full penetration weld.").

In light of the above, Commerce's expansion of the scope to include Vandewater's welded outlets – despite the inherent contradiction in its reasoning, the explicit language of King Supply, and other record evidence – makes the Redetermination "*ipso facto* unreasonable." See SunEdison, Inc. v. United States, 179 F. Supp. 3d 1309, 1317 (Ct. Int'l Trade 2016).

### b. Sperko expert report

Second, the Redetermination contains no meaningful discussion of the expert report of Walter Sperko, P.E. – to which SIGMA, Vandewater, and SCI *all cited* in their comments prior to Commerce's issuance of the remand. See SIGMA Comments at 5-6, Exhibit 2; Vandewater Comments at 7-9, 11-15, Exhibit 6; SCI Comments at 22. As SIGMA underscored to Commerce, Mr. Sperko's testimony contains a "succinct summary of the physical differences between butt-weld pipe fittings on one hand, and Vandewater's steel branch outlets on the other. . . ." SIGMA Comments at 5. In order to comply with the Court's instructions to not repeat arguments made by Plaintiff, ECF 130, SIGMA respectfully refers the Court to Vanderwater's comments regarding Commerce's treatment of Mr. Sperko's testimony.

### c. Relevance of the contoured edge

Third, Commerce mischaracterized a key point raised by SIGMA regarding a fundamental physical characteristic of steel weld outlets. Commerce concluded in the Redetermination that products with a contoured edge (*i.e.*, a "fishmouth" design) "can be BWPF." Redetermination at 47. It then stated that SIGMA "agrees that saddles are a type of BWPF." Id. at 48. Yet SIGMA's explanation – verbatim quoted in the Redetermination – was that saddles can be BWPF "***not*** . . . by reason of the 'fish mouth' opening on one side" but rather by reason of the other side of the fittings (*i.e.*, the beveled branch end)." Id. at 48, n.339 (quoting "SIGMA Rebuttal Comments at 4-5"). Indeed, as SIGMA went on to explain in its comments to Commerce:

7

> This, in turn, is consistent with the Department's September 19, 2018 clarification on the record of the forged steel fittings antidumping investigation that a fitting or outlet "with at least one . . . butt welded end connection" are within the scope of the Order "so long as the other requirements of {the scope of the Order} are satisfied."

SIGMA Comments at 9-10 (citation omitted). It follows that, to be a butt-weld pipe fitting, that fitting must have at least one butt weld.

Such mischaracterization of SIGMA's position is grounds to find a determination unsupported by substantial evidence. See Allegheny Ludlum Corp. v. United States, 29 C.I.T. 157, 168, 358 F. Supp. 2d 1334, 1344 (2005) (stating that agencies do not "have carte blanche to ignore facts {or} misread studies . . . such that their factual findings are unsupported by substantial evidence.").

### 2. Expectations of the ultimate purchasers

With respect to ultimate purchasers' expectations, Commerce dismisses the idea that different industry standards lead to different expectations. See Redetermination at 55. For the reasons explained above, that conclusion is equally invalid with respect to purchasers' expectations as it is with respect to physical characteristics. The courts have long recognized purchasers' expectations of conformity with industry standards as fundamental to their consumption and use of a given product. Cf., e.g., Toshiba Corp. v. Imation Corp., 681 F.3d 1358, 1366 (Fed. Cir. 2012) (citing "expert evidence that compliance with such standards is a 'a commercial necessity'" that is "necessary, and expected by the marketplace"); Maher-App & Co. v. United States, 57 C.C.P.A. 31, 35 (1969) (citing "an abundance of proof relating to binder twine in what can best be described as its commercially acceptable form. In this form, the twine is expected to possess certain physical qualities, among which is the requirement that it measure 500 feet per pound. The testimony reveals that this characteristic is expected by the importers, sellers, and ultimate users and is the standard aimed for by the manufacturer.")

8

Moreover, as SIGMA explained in its comments, purchasers expect to use steel branch outlets in fire protection systems, and use butt-weld pipe fittings for a variety of other uses, namely "the oil, gas, steam, and chemical industries" as well as construction. SIGMA Comments at 8. Commerce disagreed with this fact, finding that "fire protection sprinkler systems are a contemplated application of BWPFs." Redetermination at 42 (citations omitted). Yet, it nevertheless stated that different "usages will, of course have different requirements and expectations regarding pressure rating and related features. . . ." Id. at 56.

This recognition supports the exact opposite of Commerce's conclusion: if "different requirements" correspond with different "expectations regarding pressure rating and related features," this is a reason to find that the branch outlets are *outside* the scope of the Order. See, e.g., Allegheny Bradford Corp. v. United States, 28 C.I.T. 830, 839, 851-52, 342 F. Supp. 2d 1172, 1181, 1190-91 (2004) (discussing plaintiff's argument that "because its tube fittings are not used in the same applications as pipe fittings, the expectations of the ultimate purchaser of sanitary/hygienic stainless steel butt-weld tube fittings are different from that of the ultimate purchaser of pipe fittings"); cf. also Torrington Co. v. United States, 14 C.I.T. 507, 518, 714 F. Supp. 718, 726-27 (1990) ("The expectations of the ultimate purchasers of antifriction bearings differ depending on the needs of the customer and the ability of the particular bearing to perform a given task. For example, a customer who needs bearings that can handle heavy loads, but who is not concerned with speed, would be interested in a plain bearing. Conversely, a purchaser who expects a bearing to perform at high speeds, but with a light load, would find a ball bearing more useful. . . . Customer expectations do vary depending on the needs of the customer and the ability of a particular bearing to perform a given task.").

Failure to consider this key point means that Commerce's determination is unsupported by substantial evidence, as Commerce must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" Huaiyin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

### 3.    Ultimate use of the product

With respect to ultimate use, Commerce cites to its conclusion from the discussion regarding customers' expectations, stating that the "fact that Vandewater's outlets are designed for a specific use within a sprinkler system, *i.e.*, connecting the piping system to a sprinkler head, whereas another BWPF *might* be used to connect two pipes in the system, does not mean that the products do not have similar uses." Redetermination at 58-59 (emphasis added). Here again, Commerce's logic is unreasonable. Despite Commerce's assertions of "similarity," the uses outlined by SIGMA, Vandewater, and SCI are clearly different from those for which butt-weld pipe fittings are produced. See, e.g., SIGMA Comments at 7 (explaining that steel branch outlets are used "exclusively for fire protection, or fire sprinkler systems, whereas butt-weld pipe fittings "are used in environments where piping systems must carry a fluid at high temperatures, or carry a fluid that is inherently dangerous.") (quoting "Sperko Expert Report at 12"). As a result, concluding that these products are interchangeable because they *can or might* be used in different contexts, made "similar" by the fact that they both involve pipe connections, is unreasonable.

Indeed, the courts have previously ruled against such equivocation. For example, in the proceeding underlying Torrington Co. v. United States, Commerce distinguished between five

types of antifriction bearings, ultimately rescinding investigations of certain bearings.[2]  See 14 C.I.T. 507, 508-09, 745 F. Supp. 718, 719 (1990).  The petitioner appealed to this Court, and citing to the (k)(2) factors, challenged Commerce's decision, asserting "that all bearings . . . have the same ultimate function, that is, 'to reduce friction between moving parts.'"  Id., 14 C.I.T. at 517, 745 F. Supp. at 726.  In response, the Court deemed the "claim that all bearings reduce friction and therefore have the same ultimate use is a simplistic and unpersuasive argument.  ***Clearly, different bearings exist because they have various uses.  The industry is a vast and diverse one***, and the different types of bearings serve the disparate needs of the modern mechanized world."  Id. (emphasis added); see also, e.g., Legacy Classic Furniture Inc. v. United States, 36 C.I.T. 1304, 1310, 867 F. Supp. 2d 1321, 1327 (2012) ("The fact that seating furniture can, and often is, located in the bedroom does not place it within the scope of the *WBF Order*. It is unreasonable to conclude that customers seeing a product marketed as a 'bench' or 'seating furniture' would primarily expect to use it as a bedroom chest. Commerce apparently made its conclusion based on conjecture and not on evidence, or even logical inference from the evidence.").

  The same can be said with respect to the comparison between Vandewater's steel branch outlets and butt-weld pipe fittings.  These two products exist because they have distinct uses (with distinct industry standards).  To conclude that they are "similar" because they "connect pipes" is, in the words of this Court, "simplistic and unpersuasive."  Although Commerce attempts to further expand on this justification, its efforts fail.  Commerce states that Vandewater's products "do not just connect pipes – they connect pipes in a variety of overlapping settings, *e.g.*, fire protection

---

[2]  The five types of bearings were (1) ball bearings; (2) spherical roller bearings; (3) cyclindrical roller bearings; (4) needle roller bearings: and, (5) plain bearings.  Torrington, 14 C.I.T. at 509, 745 F. Supp. at 720.

11

and other low-pressure piping systems, and do so in a similar manner, *i.e*., through at least one permanent, full penetration welded joint." Redetermination at 92-93.

Here again, Commerce glosses over the finite distinctions highlighted by SIGMA, Vandwater, and SCI (which, as noted above, explained that their products are used *exclusively* for fire-protection) by expanding the end use of these products to cover allegedly "overlapping settings" including endless "other low-pressure piping systems." Commerce's weighing of evidence must not be unreasonable. Zhaoqing New Zhongya Aluminum Co. v. United States, 929 F. Supp. 2d 1324, 1328 (Ct. Int'l Trade 2013) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)). Here, by fundamentally mischaracterizing the end use of the products in question, Commerce has engaged in such unreasonable weighing of the evidence, thereby rendering the Redetermination unsupported by substantial evidence.

### 4. Manner in which the product is advertised and displayed

Finally, Commerce cited to the fact that steel branch outlets and butt-weld pipe fittings are "advertised in a similar manner" and "side by side" – thereby justifying inclusion in the scope of the Order. Redetermination at 60-62. Although Commerce mentioned in passing that industry standards and other characteristics are included in these advertisements, id. at 61 (citation omitted), it disregarded a crucial distinction with respect to such inclusion, raised by SIGMA on remand:

> Island advertises and displays these products in separate and distinctive ways. The first three advertisements . . . are for Island's "Fabricated Crosses and Tees," "Welding Laterals," and "True Wye" fittings. As seen in each one, the "***Bevels conform to ANSI B16.9***" – thereby clearly ***identifying these products as butt-weld pipe fittings***. ***None of these products is advertised as being used for fire protection or sprinkler systems***; instead, the advertisement touts them as conforming to certain "boiler and pressure vessel code" standards, and otherwise being "{d}esigned to provide unobstructed full flow characteristics."
>
> Conversely, the second set of three advertisements . . . are for Island's Type 40 & 10 and Type 50 & 80 weld outlets. These advertisements explicitly identify these carbon steel branch outlet{s}" and "weld outlet{s}" as being sold "***For Fire***

> *Protection and Low Pressure Piping Systems*{.}" They likewise contain **no reference to ANSI/ASME B16.9**.

SIGMA Comments at 9-10 (emphasis added, citation omitted). These specific, advertised characteristics – end use and industry standards – draw a clear dividing line between butt-weld pipe fittings on one hand and steel branch outlets on the other.

In response to this, Commerce claimed that SIGMA, Vandewater, and SCI gave "undue significance" to the inclusion of standards in the advertisement. Redetermination at 94. To the contrary, given the repetition and centrality of these standards in the advertisements, Commerce failed to give this evidence due regard. Consequently, its rejection renders the Redetermination unsupported by substantial evidence. See, e.g., A.L. Patterson, Inc. v. United States, 36 C.I.T. 1132, 1136 (2012) (quoting Allegheny Ludlum Corp. v. United States, 24 C.I.T. 452, 479, 112 F. Supp. 2d 1141, 1165 (2000)).

## II.     CONCLUSION

For the foregoing reasons, SIGMA urges the Court to remand to Commerce, with instructions to revise its conclusion in its final remand redetermination, and find that based on a consideration of the (k)(2) factors, the scope of the Order does ***not*** cover Vandewater's steel branch outlets.

Respectfully submitted,

**WHITE & CASE** LLP

By:   */s/ Lucius B. Lau*
     Walter Spak
     wspak@whitecase.com
     Lucius B. Lau
     alau@whitecase.com
     Ron Kendler
     ron.kendler@whitecase.com
     701 Thirteenth Street, N.W.
     Washington, DC 20005
     tel.: (202) 626-3600
     fax: (202) 639-9355

Dated:  September 24, 2021            *Counsel for SIGMA Corporation*