UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| VANDEWATER INTERNATIONAL INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| SIGMA CORPORATION and SMITH-COOPER ) | |
| INTERNATIONAL, INC., ) | |
| ) | |
| Plaintiff-Intervenors, ) | |
| ) | |
| v. ) | Court No. 18-00199 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| ISLAND INDUSTRIES, ) | |
| ) | |
| Defendant-Intervenor. ) | |

## ORDER

Upon consideration of the Department of Commerce's remand redetermination, plaintiffs' comments on the remand redetermination, defendant's and defendant-intervenor's responses thereto, and all other pertinent papers and proceedings in this action, it is hereby

ORDERED that the remand redetermination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States; and it is further

ORDERED that the subject entries enjoined in this action (ECF No. 23) must be liquidated in accordance with the final court decision, as provided in section 516A(e) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(e).

Dated: _____                    _____
       New York, NY                                    SENIOR JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| VANDEWATER INTERNATIONAL INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| SIGMA CORPORATION and SMITH-COOPER ) | |
| INTERNATIONAL, INC., ) | |
| ) | |
| Plaintiff-Intervenors, ) | |
| ) | |
| v. ) | Court No. 18-00199 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| ISLAND INDUSTRIES, ) | |
| ) | |
| Defendant-Intervenor. ) | |

## <u>DEFENDANT'S RESPONSE TO COMMENTS ON THE REMAND RESULTS</u>

BRIAN M. BOYNTON
Acting Assistant Attorney General


PATRICIA M. McCARTHY
Director


L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                             JOSHUA E. KURLAND
SAAD Y. CHALCHAL                        Trial Attorney
Senior Attorney                        U.S. Department of Justice
Office of the Chief Counsel            Commercial Litigation Branch
for Trade Enforcement and Compliance   P.O. Box 480
U.S. Department of Commerce            Ben Franklin Station
                                       Washington, D.C. 20044
                                       Tel: (202) 616-0477
                                       Fax: (202) 353-0461
                                       Email: Joshua.E.Kurland@usdoj.gov

January 11, 2022                       *Attorneys for Defendant United States*

## <u>TABLE OF CONTENTS</u>

PROCEDURAL HISTORY ................................................................................................2

ARGUMENT ................................................................................................................3

I.    Legal Standards ...................................................................................................3

    A.  Standard Of Review ...................................................................................3

    B.  Legal Framework For Scope Rulings .........................................................4

II.   Commerce's Remand Redetermination Complies With The Court's Order ...............6

III.  Commerce Lawfully Determined That Vandewater's Steel Branch Outlets Are
Covered By The Scope Of The *China BWPFs Order* Because it Reasonably
Concluded That Each Criterion Under 19 C.F.R. § 351.225(k)(2) Supported An
Interpretation Of The Scope That Includes Vandewater's Steel Branch Outlets .........7

    A.  Physical Characteristics .............................................................................9

        1.  Vandewater's Steel Branch Outlets Possess Physical Characteristics
That Are Similar To Other Subject Merchandise ................................9

        2.  The Beveled Edge Of Subject Merchandise Is Not Required To Be
Designed For An End-to-End Connection ........................................11

        3.  Commerce Fully Considered Mr. Sperko's Declarations And Properly
Weighed Conflicting Record Evidence ...........................................17

        4.  The Physical Characteristics Of Subject Merchandise Are Not Coextensive
With A Particular Industry Standard Or Tariff Classification ..................20

        5.  The Importers' Arguments Based On The Harmonized Tariff Schedule Of
The United States (HTSUS) Lack Merit ...........................................26

        6.  The Importers' Claims Concerning The Exclusion For "Butt Weld Outlets"
In The Scope Of The Forged Steel Fittings Proceedings Lack Merit ..............27

    B.  Expectations Of Ultimate Purchasers .......................................................29

    C.  Ultimate Use Of The Product ...................................................................31

    D.  Channels Of Trade ...................................................................................34

    E.  Manner In Which The Product Is Advertised And Displayed .............................35

IV.  Vandewater's Entries Of Steel Branch Outlets That Predate Initiation Of The
Scope Inquiry Must Remain Suspended Pending A Final Decision In This Action ...37

CONCLUSION ..............................................................................................................46

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                    **PAGE**

*Agilent Technologies v. United States,*
    256 F. Supp. 3d 1338 (Ct. Int'l Trade 2017) ........................................................18

*Crawfish Processors Alliance v. United States,*
    431 F. Supp. 2d 1342 (Ct. Int'l Trade 2006) ..........................................................6

*Decca Hospitality Furnishings, LLC v. United States,*
    427 F. Supp. 2d 1249 (Ct. Int'l Trade 2006) ........................................................43

*Diamond Sawblades Mfrs. Coalition v. United States,*
    626 F.3d 1374 (Fed. Cir. 2010)..............................................................40, 41, 43

*Downhole Pipe & Equip. L.P. v. United States,*
    776 F.3d 1369 (Fed. Cir. 2015).................................................................9

*Duferco Steel, Inc. v. United States,*
    296 F.3d 1087 (Fed. Cir. 2002)............................................................4, 21

*DynaEnergetics U.S., Inc. v. United States,*
    298 F. Supp. 3d 1363 (Ct. Int'l Trade 2018) ..........................................................3

*Ericsson GE Mobile Commc'ns, Inc. v. United States,*
    60 F.3d 778, 784 (Fed. Cir. 1995), *corrected on reh'g* (Sept. 1, 1995)................................11

*Fedmet Resources Corp. v. United States,*
    755 F.3d 912 (Fed. Cir. 2014)..............................................................5, 6

*Haixing Jingmei Chem. Prod. Sales Co. v. United States,*
    335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018) ........................................................23

*Hosiden Corp. v. United States,*
    85 F.3d 589 (Fed. Cir. 1996)................................................................41

*King Supply Co. LLC v. United States,*
    674 F.3d 1343 (Fed. Cir. 2012)..........................................................6, 16, 24

*Legacy Classic Furniture Inc. v. United States,*
    867 F. Supp. 2d 1321 (Ct. Int'l Trade 2012) ........................................................32

*Meridian Prods. LLC v. United States,*
    851 F.3d 1375 (Fed. Cir. 2017)............................................................4, 5

# TABLE OF AUTHORITIES
### -continued-

*Mid Continent Nail Corp. v. United States*,
  725 F.3d 1295 (Fed. Cir. 2013) ................................................................................6

*Novosteel SA v. United States*,
  284 F.3d 1261 (Fed. Cir. 2002) ...............................................................................4

*Novosteel SA v. United States*,
  128 F. Supp. 2d 720 (Ct. Int'l Trade 2001) .................................................17, 32

*Olympia Indus., Inc. v. United States*,
  30 CIT 1,011 (2006) ................................................................................................31

*Power Train Components, Inc. v. United States*,
  911 F. Supp. 2d 1338 (Ct. Int'l Trade 2013) ........................................................6

*Rogero v. Sec'y of Health and Human Services*,
  748 Fed. Appx. 996 (Fed. Cir. 2018) ...................................................................17

*Sandvik Steel Co. v. United States*,
  164 F.3d 596 (Fed. Cir. 1998) .................................................................................6

*Sango Int'l L.P. v. United States*,
  567 F.3d 1356 (Fed. Cir. 2009) .............................................................................31

*Sango Int'l L.P. v. United States*,
  484 F.3d 1371 (Fed. Cir. 2007) ...............................................................................5

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*,
  776 F.3d 1351 (Fed. Cir. 2015) ...............................................................................4

*Smith Corona Corp. v. United States*,
  915 F.2d 683 (Fed. Cir. 1990) ...............................................................................26

*Sunpower Corp. v. United States*,
  253 F. Supp. 3d 1275 (Ct. Int'l Trade 2017) ......................................................27

*Sunpreme Inc. v. United States*,
  946 F.3d 1300 (Fed. Cir. 2020) ......................................................................39, 45

*Taiwan Semiconductor Indus. Ass'n v. United States*,
  105 F. Supp. 2d 1363 (Ct. Int'l Trade 2000) ......................................................12

# TABLE OF AUTHORITIES
## -continued-

*Tak Fat Trading Co. v. United States*,
  396 F.3d 1378 (Fed. Cir. 2005) ...................................................................................5

*Tianjin Wanhua Co. v. United States*,
  253 F. Supp. 3d 1318 (Ct. Int'l Trade 2017) ...........................................................20

*Timken Co. v. United States*,
  893 F.2d 337 (Fed. Cir. 1990) ..........................................................................38, 41, 42

*Torrington Co. v. United States*,
  745 F. Supp. 718 (Ct. Int'l Trade 1990) ..................................................................33

*Trans Texas Tire, LLC v. United States*,
  519 F. Supp. 3d 1275 (Ct. Int'l Trade 2021) ...........................................................27

*Trent Tube Div. Crucible Materials Corp. v. Avesta Sandvik Tube AB*,
  975 F.2d 807 (Fed. Cir. 1993) ...................................................................................9

*United Steel and Fasteners, Inc. v. United States*,
  947 F.3d 794 (Fed. Cir. 2020) .........................................................................5, 6, 21

*Usinor Sacilor v. United States*,
  893 F. Supp. 1112 (Ct. Int'l Trade 1995) ................................................................18

*Vandewater International, Inc. v. United States*,
  476 F. Supp. 3d 1357 (Ct. Int'l Trade 2020) ............................................... *passim*

*Viraj Forgings, Ltd. v. United States*,
  283 F. Supp. 2d 1335 (Ct. Int'l Trade 2003) ...........................................................23

*Wirth Ltd. v. United States*,
  5 F. Supp. 2d 968 (Ct. Int'l Trade 1998), *aff'd*, 185 F.3d 882 (Fed. Cir. 1999) ...............5, 32

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*,
  968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014) ...........................................................3

## STATUTES

19 U.S.C. § 1516a(b) ...........................................................................................................3

19 U.S.C. § 1516a(c) ...............................................................................................37, 38, 40, 41

## TABLE OF AUTHORITIES
### -continued-

19 U.S.C. § 1516a(e) .................................................................................... *passim*

19 U.S.C. § 1673d(c) ....................................................................................43

19 U.S.C. § 1673e(a) ......................................................................................4

28 U.S.C. 2645(c) .........................................................................................41

19 U.S.C. § 1677(25) ......................................................................................4

**REGULATIONS**

19 C.F.R. § 351.225(a) .....................................................................................4

19 C.F.R. § 351.225(d) ................................................................................5, 44

19 C.F.R. § 351.225(e) .....................................................................................5

19 C.F.R. § 351.225(k)(1) .............................................................................2, 5

19 C.F.R. § 351.225(k)(2) ........................................................................ *passim*

19 C.F.R. § 351.225(l) .............................................................................. *passim*

**ADMINISTRATIVE DETERMINATIONS**

*Aluminum Extrusions from the People's Republic of China*,
    78 Fed. Reg. 34,984 (Dep't of Commerce June 11, 2013) ...................................42

*Carbon and Certain Alloy Steel Wire Rod from Mexico*,
    80 Fed. Reg. 44,326 (Dep't of Commerce July 27, 2015) ...................................42

*Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China:  Notice of
Court Decision Not in Harmony With Final Scope Ruling and Notice of Amended Final
Scope Ruling Pursuant to Court Decision*,,
    76 Fed. Reg. 4,633 (Dep't of Commerce Jan. 26, 2011) ...................................42

*Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China*,
    57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992) ............................. *passim*

*Certain Softwood Lumber Products from Canada*,
    82 Fed. Reg. 51,814 (Dep't of Commerce Nov. 8, 2017) ...................................18

## TABLE OF AUTHORITIES
### -continued-

*Certain Steel Nails from the People's Republic of China*,
  86 Fed. Reg. 43,993 (Dep't of Commerce Aug. 11, 2021)...................................................42

*Forged Steel Fittings from the People's Republic of China*,
  83 Fed. Reg. 50,339 (Dep't of Commerce October 5, 2018)..................................................28

*Forged Steel Fittings from Italy and the People's Republic of China*,
  83 Fed. Reg. 60,397 (Dep't of Commerce November 26, 2018).........................................28

*Multilayered Wood Flooring from the People's Republic of China*,
  83 Fed. Reg. 44,027 (Dep't of Commerce August 29, 2018)..............................................43

*Regulations to Improve Administration and Enforcement of Antidumping and
Countervailing Duty Laws*,
  86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021) .................................................38

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| VANDEWATER INTERNATIONAL INC., <br><br>    Plaintiff, <br><br>  and <br><br> SIGMA CORPORATION and SMITH-COOPER INTERNATIONAL, INC., <br><br>    Plaintiff-Intervenors, <br><br>  v. <br><br> UNITED STATES, <br><br>    Defendant, <br><br>  and <br><br> ISLAND INDUSTRIES, <br><br>    Defendant-Intervenor. | Court No. 18-00199 |

## **DEFENDANT'S RESPONSE TO COMMENTS ON THE REMAND RESULTS**

Defendant, the United States, respectfully submits this response to the comments filed by plaintiff Vandewater International Inc. (Vandewater), plaintiff-intervenor SIGMA Corporation (SIGMA), and plaintiff-intervenor Smith-Cooper International, Inc. (SCI) (collectively, plaintiffs or importers) regarding the Department of Commerce's (Commerce's) remand redetermination in response to the Court's order in *Vandewater International, Inc. v. United States*, 476 F. Supp. 3d 1357 (Ct. Int'l Trade 2020) (*Remand Order*).  *See* Final Results of Redetermination Pursuant to Court Remand, ECF No. 74-1 (Remand Redetermination).  On remand, in accordance with the Court's instructions, Commerce conducted a scope inquiry to evaluate the five additional criteria

under 19 C.F.R. § 351.225(k)(2) and concluded that Vandewater's imports of CEREICO brand threaded and grooved steel branch outlets are covered by the scope of Commerce's antidumping duty order on carbon steel butt-weld pipe fittings from China.  Plaintiffs contest Commerce's analysis and conclusion with respect to each criterion under 19 C.F.R. § 351.225(k)(2).  *See* Vandewater Cmts. 1-26; SIGMA Cmts. 3-13; SCI Cmts. 1-2.[1]  Alternatively, they challenge the suspension of liquidation that remains in effect with respect to Vandewater's imports of steel branch outlets that were entered, or withdrawn from warehouse, for consumption prior to the initiation date of the scope inquiry under the (k)(2) criteria.  *See* Vandewater Cmts. 27; SIGMA Cmts. 3; SCI Cmts. 2-14.  We demonstrate below that the remand redetermination complies with the Court's order, is supported by substantial evidence, and is otherwise lawful.

## PROCEDURAL HISTORY

The administrative determination underlying this action is Commerce's final scope ruling regarding Vandewater's CEREICO brand threaded or grooved steel branch outlets from China. Final Scope Ruling on Vandewater International Inc.'s Steel Branch Outlets, P.D. 48 (Dep't of Commerce Sept. 10, 2018) (Final Scope Ruling); *see also Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China*, 57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992) (antidumping duty order) (*China BWPFs Order*).  Commerce interpreted its order's scope language to encompass Vandewater's steel branch outlets because, after consulting the sources enumerated in 19 C.F.R. § 351.225(k)(1), Commerce found that the characteristic distinguishing a butt-weld pipe fitting from other pipe fittings, for purposes of the order, is a beveled edge on at

---

[1] Although Vandewater, SIGMA, and SCI separately filed comments regarding the remand redetermination, they each state that they agree with, and incorporate by reference, the arguments contained in each other's filings to comply with the Court's request not to repeat arguments.  *See* Vandewater Cmts. 20, 27; SIGMA Cmts. 3; SCI Cmts. 1-2.  Accordingly, with few exceptions, in this submission we attribute arguments raised in the comments to "the importers" collectively and include citations to the relevant submission(s).

least one end that facilitates a permanent, welded connection.  *See* Final Scope Ruling at 8-11; Remand Redetermination at 5-6.  Vandewater's steel branch outlets feature this distinguishing characteristic and otherwise satisfy the physical description of subject merchandise.

On appeal, the Court rejected the importers' central contention at the outset of this action that Vandewater's steel branch outlets are not covered by the *China BWPFs Order* because the term "butt-weld pipe fittings" in the scope has a clear and unambiguous industry meaning excluding the products.  *See* ECF No. 87.  However, the Court held in the *Remand Order* that Commerce unreasonably determined that the scope language, with the aid of the descriptions of subject merchandise in the (k)(1) sources Commerce consulted, was dispositive on inclusion of Vandewater's steel branch outlets within the order's scope.  476 F. Supp. 3d at 1359-62.  The Court thus remanded the case with instructions for Commerce to conduct a scope inquiry and determine whether Vandewater's steel branch outlets are covered by the *China BWPFs Order* based on an evaluation of the criteria under 19 C.F.R. § 351.225(k)(2).  *Id.* at 1362.

## ARGUMENT

### I.  Legal Standards

#### A.  Standard Of Review

The Court sustains any determination, finding, or conclusion found by Commerce unless it is unsupported by substantial evidence upon the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B).  This standard applies equally to remand redeterminations. *DynaEnergetics U.S., Inc. v. United States*, 298 F. Supp. 3d 1363, 1367 (Ct. Int'l Trade 2018). Remand redeterminations are also reviewed for compliance with the Court's order.  *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014).

### B. **Legal Framework For Scope Rulings**

When Commerce publishes an antidumping duty order, it defines the scope and "includes a description of the subject merchandise, in such detail as {Commerce} deems necessary." 19 U.S.C. § 1673e(a)(2). At the same time, the scope must be written in general terms because it concerns the overall "class or kind" of merchandise subject to the order. *Meridian Prods. LLC v. United States*, 851 F.3d 1375, 1379 (Fed. Cir. 2017) (discussing 19 C.F.R. § 351.225(a) and 19 U.S.C. § 1677(25)). Commerce issues a scope ruling when a question arises as to whether a particular product is included within the scope of an antidumping or countervailing duty order. *See* 19 C.F.R. § 351.225(a); *see also Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002). When Commerce confronts such a question, it follows the procedures and analytical framework set forth in its regulations. *See* 19 C.F.R. § 351.225; *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015) ("There is no specific statutory provision governing the interpretation of the scope of antidumping or countervailing duty orders.").

The first step in considering whether a certain product is within the scope of an order is the language of the order itself. *See Meridian Prods.*, 851 F.3d at 1381 (explaining that "case law has added another layer to the inquiry" and that Commerce "must begin with the order's scope to determine whether it contains ambiguity and, thus, is susceptible to interpretation") (citations omitted). Scope language is "unambiguous" if the relevant terms have "a single clearly defined or stated meaning." *Id.* at 1381 n.7 (citation omitted). The threshold to show that Commerce justifiably found an ambiguity is low. *Id.* at 1381 n.6 (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1272 (Fed. Cir. 2002)).

If the scope language does not unambiguously answer the question, Commerce engages in an interpretive analysis using the sources enumerated in 19 C.F.R. § 351.225(k)(1), which include the petition, initial investigation, prior Commerce determinations (including scope determinations), and those of the International Trade Commission (ITC). *See Meridian Prods.*, 851 F.3d at 1382. If the descriptions of the subject merchandise contained in the (k)(1) sources are dispositive, Commerce issues a final scope ruling regarding whether the products fall within the order's scope. *See* 19 C.F.R. § 351.225(d); *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005). The (k)(1) sources are "dispositive" when they "definitively answer the scope question." *Sango Int'l, L.P. v. United States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007). This Court reviews "Commerce's analysis of the (k)(1) sources against the product in question" as a question of fact under the substantial evidence standard. *United Steel and Fasteners, Inc. v. United States*, 947 F.3d 794, 799 (Fed. Cir. 2020); *see Meridian Prods.*, 851 F.3d at 1382 (citing *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 919-22 (Fed. Cir. 2014)).

Only when Commerce finds the (k)(1) sources non-dispositive will Commerce initiate a scope inquiry pursuant to 19 C.F.R. § 351.225(e) to consider the five additional criteria set forth in 19 C.F.R. § 351.225(k)(2). *See, e.g.*, *Fedmet*, 755 F.3d at 918. These criteria are: (i) "{t}he physical characteristics of the product"; (ii) "{t}he expectations of the ultimate purchasers"; (iii) "{t}he ultimate use of the product"; (iv) "{t}he channels of trade in which the product is sold"; and (v) "{t}he manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2). The criteria are applied to "determine whether a product is *sufficiently similar* as merchandise unambiguously within the scope of an order as to conclude the two are merchandise of the same class or kind." *Wirth Ltd. v. United States*, 5 F. Supp. 2d 968, 981 (Ct. Int'l Trade 1998) (emphasis added), *aff'd*, 185 F.3d 882 (Fed. Cir. 1999). Commerce has

discretion in how to balance the criteria. *See Crawfish Processors Alliance v. United States*, 431 F. Supp. 2d 1342, 1347 (Ct. Int'l Trade 2006) (citations omitted). The Court reviews Commerce's analysis of the (k)(2) criteria under the substantial evidence standard. *See Power Train Components, Inc. v. United States*, 911 F. Supp. 2d 1338, 1346 (Ct. Int'l Trade 2013).

Further, the Court grants "significant deference to Commerce's interpretation of a scope order." *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300 (Fed. Cir. 2013) (citation omitted). Deference is appropriate because scope rulings are "'highly fact-intensive and case-specific,'" *Fedmet*, 755 F.3d at 918 (quoting *King Supply Co. v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012)), and "the meaning and scope of antidumping orders are issues 'particularly within the expertise' and 'special competence' of Commerce." *King Supply*, 674 F.3d at 1348 (quoting *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998)). "{P}arties challenging Commerce's scope determinations under substantial evidence review confront a high barrier to reversal." *United Steel and Fasteners*, 947 F.3d at 798 (citing *King Supply*, 674 F.3d at 1348) (additional citation omitted).

## II.      Commerce's Remand Redetermination Complies With The Court's Order

Commerce complied with the Court's instructions in the *Remand Order*, which ordered Commerce "to conduct a scope inquiry to evaluate the factors under (k)(2)." 476 F. Supp. 3d at 1362. Commerce initiated a scope inquiry and reopened the record to provide interested parties an opportunity to submit comments and new factual information relating to the criteria under 19 C.F.R. § 351.225(k)(2). Remand Redetermination at 8; *see also* Initiation of Scope Inquiry, Remand P.D. 1, barcode 4047169-01 (Oct. 30, 2020). Each of the importers submitted comments and new factual information to support their shared position that an analysis of the (k)(2) criteria demonstrates that Vandewater's steel branch outlets are not covered by the *China*

*BWPFs Order*.  Remand Redetermination at 8.  Island Industries (Island) submitted comments

and new factual information maintaining that the steel branch outlets are sufficiently similar to

other, unambiguous examples of subject merchandise covered by the order.  *Id.*  Thereafter,

Commerce released its draft remand redetermination and received comments from each of the

importers and Island.  *Id.* at 8-9; *see also* Draft Results of Remand Redetermination Pursuant to

Court Remand, Remand P.D. 53, barcode 4111297-01 (Apr. 19, 2021).

On July 23, 2021, after considering the totality of the evidence on the record, Commerce

issued its remand redetermination and determined that Vandewater's steel branch outlets are

covered by the *China BWPFs Order* pursuant to the (k)(2) criteria.  Remand Redetermination at

45-62.  Commerce also addressed the importers' arguments, which did not demonstrate that

Commerce's (k)(2) analysis of the scope language was unreasonable.  *Id.* at  62-96.  In addition,

Commerce explained its intent with respect to suspension of liquidation and cash deposit

requirements that U.S. Customs and Border Protection (CBP) would be instructed to apply to

Vandewater's entries of steel branch outlets if the courts were to sustain the remand

redetermination.  *Id.* at 62, 96-103.  Although the importers disagree with Commerce's analysis

and conclusion that Vandewater's steel branch outlets are covered by the order, they do not

dispute that Commerce's redetermination complies with the Court's instructions.

**III.     Commerce Lawfully Determined That Vandewater's Steel Branch Outlets Are
           Covered By The Scope Of The Order Because it Reasonably Concluded That Each
           Criterion Under 19 C.F.R. § 351.225(k)(2) Supported An Interpretation Of The
           <u>Scope That Includes Vandewater's Steel Branch Outlets</u>**

After evaluating the five additional criteria listed in section 351.225(k)(2), Commerce

determined that Vandewater's steel branch outlets are sufficiently similar to unambiguous

examples of subject merchandise and that the record evidence supported including the products

within the *China BWPFs Order*.  Remand Redetermination at 45-96.  Specifically, as we explain

below, Commerce found that: (i) steel branch outlets possess physical characteristics that are similar to other subject merchandise because they are formed or forged, made of carbon steel, have a diameter of less than 14 inches, and are designed to have at least one end with a beveled edge for permanent attachment to a pipe or fitting (*id.* at 45-54); (ii) the expectations of ultimate purchasers of steel branch outlets and other subject merchandise are similar because they expect both to be welded into permanent, fixed piping systems for gases or liquids, and fire sprinkler systems are a contemplated application for subject merchandise (*id.* at 54-57); (iii) the ultimate uses of steel branch outlets and other subject merchandise are similar because both are permanently welded to piping systems to change or divide the flow of liquids, *e.g.*, redirecting water in an automatic fire sprinkler system (*id.* at 58-60); (iv) steel branch outlets and other subject merchandise are sold in similar channels of trade because they are both sold through distributors and to fabricators and contractors (*id.* at 60); and (v) steel branch outlets and other subject merchandise are similarly advertised and displayed in online catalogs. *Id.* at 60-62.

    In reaching its conclusion, Commerce addressed comments submitted by the importers and found that the evidence was insufficient to show that steel branch outlets are fundamentally different from subject merchandise such that they should not be considered within the class or kind of merchandise covered by the *China BWPFs Order*. *Id.* at 62-96. The importers favor a more narrow interpretation of the term "butt-weld pipe fitting{}" that gives undue significance to purported differences to create false distinctions between steel branch outlets and other subject merchandise. Although they disagree with Commerce's analysis and findings with respect to each criterion (physical characteristics in particular), the importers' arguments fail to satisfy the high bar of demonstrating that Commerce's determination is unsupported by substantial evidence and they improperly ask the Court to reweigh the evidence and substitute its judgment for the

agency's.  *See Downhole Pipe & Equip. L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015) (citing *Trent Tube Div. Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1993) ("It is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew.")).  Accordingly, the Court should sustain the scope determination on remand as supported by substantial evidence and otherwise lawful.

### A.  Physical Characteristics

#### 1.  Vandewater's Steel Branch Outlets Possess Physical Characteristics That Are Similar To Other Subject Merchandise

For the first criterion, Commerce explained that the scope of the *China BWPFs Order* describes subject merchandise, in relevant part, as "carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form" and "{t}hese formed or forged fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings)."  Remand Redetermination at 45 (quoting *China BWPFs Order*).  The plain language "indicates that subject merchandise must be formed or forged, made of carbon steel, and have a{n inside} diameter of less than 14 inches."  *Id.* Vandewater's threaded outlets are manufactured from forged steel bars, the grooved outlets are machined from welded pipe, and the "branch or outlet side is '*formed* with a threaded or grooved end.'"  *Id.* at 46 (quoting Scope Request at 3-4, 12, P.D. 2, barcode 3708194-01 (May 17, 2018) (emphasis added)).  The steel branch outlets are made from carbon steel and are offered in sizes ranging from ½ inch to 2½ inches for threaded outlets and from 1¼ inch to 8 inches for grooved outlets.  *Id.* (citing Scope Request at 4, Ex. 1, P.D. 2, barcode 3708194-01).  Thus, Commerce found that Vandewater's steel branch outlets possess the characteristics of subject merchandise

"in terms of manufacturing method (*i.e.*, formed/forged), material (*i.e.*, carbon steel forged steel bars or welded pipe), and size requirements (*i.e.*, less than 14 inches in inside diameter)." *Id.*

Further examination of the record was required to determine whether Vandewater's steel branch outlets possess the requisite characteristics to be considered a "butt-weld pipe fitting" for purposes of the order. The steel branch outlets at issue are designed to be "permanently attached to at least one pipe in a fire sprinkler or other low-pressure piping system" and "feature a beveled edge for permanent attachment to a pipe or fitting." *Id.* At the same time, the steel branch outlets have one end with a threaded or grooved temporary connection for a fire sprinkler head. *Id.* at 3 (citing Scope Request at 3-4, P.D. 2, barcode 3708194-01). However, Commerce found that "to be an in-scope 'butt-weld pipe fitting{},' the merchandise must be designed to have at least one end with a beveled edge, whether contoured or not, for permanent attachment to at least one pipe or fitting and may have a temporary connection on another end." *Id.* at 45. Commerce provided the following explanation in support of its finding that subject merchandise may have one end with a beveled edge for permanent attachment to another pipe and another end with a temporary fastening method:

> {N}ot all ends must have a beveled edge to facilitate a permanent connection to be in-scope merchandise; one unambiguously in-scope fitting type – lap joint stub ends – has a beveled edge for a permanent connection on one end and the other end is temporarily bolted in place with the use of a flange. The lap joint stub ends example shows that the essential characteristic that distinguishes in-scope {butt-weld pipe fittings} from other pipe fittings is a beveled edge on at least one end that facilitates a permanent, welded connection. Like the lap joint stub ends, Vandewater's outlets have a beveled edge for a permanent connection on one end (*i.e.*, the end that is welded to the midsection of another pipe) and one of the non-permanent fastening methods mentioned in the scope language on the other end (*i.e.*, the threaded or grooved end to which a sprinkler head or other pipe fitting is attached).

10

*Id.* at 52 (citing Carbon Steel Butt-Weld Pipe Fittings Petition at App'x B, P.D. 39, barcode 3747665-03 (May 22, 1991) (Petition)); *see also id.* at 83-84.

The importers do not dispute, and in fact expressly acknowledge, that lap joint sub ends are an unambiguous example of subject merchandise. *See* Vandewater Cmts. 17; Vandewater Draft Remand Cmts. at 19, Remand P.D. 57, barcode 4116480-01 (Apr. 30, 2021); SCI Draft Remand Cmts. at 15, Remand P.D. 58, barcode 4116549-01 (Apr. 30, 2021). Thus, Commerce found that "outlets have a variety of characteristics in common with other common {butt-weld pipe fittings}, such as having one butt-welded end (similar to caps and lap joint stub ends) and also attach to a header pipe via a butt-weld (similar to saddles)." Remand Redetermination at 89.

### 2. The Beveled Edge Of Subject Merchandise Is Not Required To Be Designed For An End-to-End Connection

The importers argue extensively that the definition of "butt weld" is the starting place for determining whether a product is a "butt-weld pipe fitting" under the order and direct the Court's attention to various pieces of evidence that purportedly show that a "butt weld" would entail an end-to-end connection. Vandewater Cmts. 2-11. However, the noun "butt weld" is not in the scope. The scope covers "butt-weld pipe fittings" and Commerce interpreted the adjective "butt-weld," as used in the scope, as describing the physical characteristics of subject fittings.[2] As we explained above, Commerce reasonably found that the distinguishing characteristic of butt-weld pipe fittings under the *China BWPFs Order* is at least one end with a beveled edge facilitating

---

[2] Contrary to the importers' claim that Commerce failed to "ask the right question" in analyzing the (k)(2) sources, Vandewater Cmts. 2, 11, it is *the importers* who pursue the wrong question because they focus on defining the noun "butt weld" in the abstract, rather than the pertinent question of how Commerce in the scope of the *China BWPFs Order* defined a "butt-weld pipe fitting" in terms of physical characteristics. *See Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 784 (Fed. Cir. 1995), *corrected on reh'g* (Sept. 1, 1995) (holding it was not unreasonable for Commerce to interpret term "as used in the antidumping duty order").

permanent attachment to another pipe or fitting.  Remand Redetermination at 52.  In this regard, the importers wrongly assert that Commerce "ignored" or "disregarded" evidence that they claim demonstrates a requirement that subject merchandise be designed to use a "butt weld" welding method for permanent connection to the adjoining pipe and that the steel branch outlets at issue do not possess this characteristic.  *See, e.g.*, Vandewater Cmts 1, 3.  Commerce is presumed to have adequately considered the issue and all the evidence in the record in making its decision. *See, e.g.*, *Taiwan Semiconductor Indus. Ass'n v. United States*, 105 F. Supp. 2d 1363, 1367, 1378 (Ct. Int'l Trade 2000).  As we explained when Vandewater previously made a similar assertion, the absence of an explicit and comprehensive discussion on each and every piece of evidence or argument raised by the interested parties does not satisfy the high burden to rebut that presumption, nor justify a remand to Commerce on procedural grounds.  *See id.*

In any event, the record evidence the importers cite regarding the "butt weld" welding method does not mandate an interpretation of the scope that imposes a requirement that subject merchandise be designed for an "end-to-end" connection as the importers contend.  To support their position, the importers rely on the definition of "butt weld" from the American Weld Society (Vandewater Cmts. 2-3), declarations of Mr. Walter Sperko and the Internet website of Mr. Werner Sölken (*id.* at 3-9), the petition from the underlying investigation and the ITC's determination in the 2016 sunset review (*id.* at 9-11), and what the importers characterize as "common sense."  *Id.* at 11.  Below we demonstrate that Commerce reasonably found that there was insufficient support to interpret the scope to include an "end-to-end" design requirement.

The American Welding Society's definition expressly recognizes that "butt weld" is a "nonstandard term."  Scope Request at Ex. 7 ¶ 11, P.D. 3, bar code 3708194-02.  The source defines this nonstandard term by referencing the definition for a "butt joint," but there is no

indication that this is an industry-wide accepted meaning for a butt-weld pipe fitting or even that this definition necessarily excludes the steel branch outlets in question. *Id.* Indeed, elsewhere in its analysis Commerce explains that SCI previously has identified its *own* imports of steel branch outlets, which are nearly identical to those imported by Vandewater, as threaded or grooved "butt-weld" outlets in its import records. *See* Remand Redetermination at 62 n.396.

The record also contains additional evidence contradicting the importers' position. For example, product specification sheets for a U.S.-based outlet distributor, Aleum USA, describe threaded and grooved outlet products as having "{b}utt welding ends." *Id.* at 47 (citing Island (k)(2) Cmts. at Exs. 4A, 4B, Remand P.D. 38, barcode 4055670-03 (Nov. 19, 2020)). A product catalog for a U.S. producer of the domestic like product, Bonney Forge—which was submitted to Commerce by Vandewater—includes an illustration of a "vesselet" designed to be welded to the curved side of a pipe like the steel branch outlets at issue (*i.e.*, not an end-to-end connection). The illustration labels the header end of the vesselet as a "butt-weld" along with a description stating "{t}rue butt-weld installation in header." *Id.* at 48 (citing Vandewater (k)(2) Cmts. at Tab 14 (Bonney Forge catalog p. 23), Remand P.D. 34, barcode 4055634-13 (Nov. 19, 2020)); *see also* Scope Request at Ex.17, P.D. 4-5, barcodes 3708194-03–04. Thus, contrary to the importers' claims (and notwithstanding their unpersuasive efforts to distinguish these products), the American Welding Society's nonstandard definition of "butt weld" does not require a "straightforward distinction" that excludes steel branch outlets from the class or kind of products covered by the *China BWPFs Order*. *See* Vandewater Cmts. 2, 12-14.

Further, the examples of outlet products referred to as butt-weld products in Aleum USA's and Bonney Forge's product catalogs feature a contoured edge designed for connection at the mid-section of a pipe and not for an end-to-end connection. *See* Remand Redetermination at

47.  "Like Vandewater's outlets, Aleum USA's outlets have one threaded or grooved end and a contoured edge on the other end that is connected to the middle of another pipe."  *Id.*  Similarly, the Bonney Forge catalog specifies that the contoured edge connecting to the mid-section of the header pipe involves a "{t}rue butt-weld installation *in header*."  *Id.* at 48 (emphasis added); *see id.* at 84-86 (further addressing issue).  The importers' attempts to suggest otherwise lack merit.

Commerce also observed that the contoured edge of the steel branch outlets is a characteristic of saddles, which are an unambiguous example of subject merchandise:

> Vandewater has described the contoured edge of its outlets as a feature that allows the outlets to sit on the mid-section of the header pipe like a saddle.  The exhibits accompanying the Petition included a product catalog from a U.S. producer of the domestic like product with illustrations of basic shapes of {butt-weld pipe fittings} (under the heading "seamless welded fittings") and among them is a product that is referred to as a saddle, which, like Vandewater's outlets, has a contoured edge and is connected to the midsection of a pipe.  Saddles (whether full or partial), by design, are meant to fit to a hole cut into the side of a pipe, and do not rely on an end-to-end connection for their contoured end.  Further, the current version of the same U.S. producer's product catalog continues to include saddles as a type of "seamless welded fitting," and the product is displayed side-by-side with a full range of other {butt-weld pipe fittings}.  Similarly, the product catalog for a major U.S. distributor of pipes and fittings also includes a saddle as one of the various "standard butt weld fitting types."  At least one of the importers {(SIGMA)} agrees that saddles are a type of {butt-weld pipe fitting}.

*Id.* at 47-48 (citing Petition at 4, App'x B p.1, P.D. 38-39, barcode 3747665-02–03; Island (k)(2) Cmts. at Exs. 3, 5 (H. Ladish and Kelly Pipe catalogs), Remand P.D. 38, barcode 4055670-03).

In short, multiple examples on the record show that subject merchandise *is not* always designed for an end-to-end connection.  Substantial evidence supports Commerce's finding that "the contoured edge that connects Vandewater's outlets to the midsection of the header or run

pipe is not a physical characteristic that distinguishes the outlets from {butt-weld pipe fittings} that are subject to the scope of the *China BWPFs Order*, such as saddles." *Id.* at 48.

Vandewater's argument that saddles are not a type of butt-weld pipe fitting covered by the scope should be rejected. *See* Vandewater Cmts. 17-18. Commerce explained that the petition from the underlying investigation included an appendix with illustrations of various types of butt-weld pipe fittings, which identified saddles alongside other basic shapes of subject merchandise (*e.g.*, elbows, tees, caps, reducers). *See* Remand Redetermination at 47 n.335 (citing Petition at 4, App'x B p.1, P.D. 38-39, barcodes 3747665-02–03). SIGMA, for its part, disagrees with Commerce's characterization of SIGMA's position regarding saddles because, although it does not dispute that saddles can be butt-weld pipe fittings, it claims that the beveled edge on the non-contoured branch end of a saddle is the feature that makes saddles potentially subject merchandise. *See* SIGMA Cmts. 7-8. The importers, however, have not identified any record evidence that saddles are exclusively categorized as subject merchandise by virtue of featuring a beveled edge on the non-contoured branch end rather than the contoured header end. Regardless, the fact remains that saddles are a type of butt-weld pipe fitting covered by the *China BWPFs Order*, and like Vandewater's steel branch outlets, feature a contoured end that makes the product not designed for an end-to-end connection. Consequently, Commerce's analysis of the physical characteristics reasonably declined to interpret the scope in a way that imposes an end-to-end connection design requirement.

The importers also disagree with Commerce's reliance on lap joint stub ends—which Commerce cited to show that butt-weld pipe fittings need only have a welded connection on one end—because they claim that, unlike steel branch outlets, the branch/outlet end of lap joint stub ends is the end that is beveled to allow for a permanent, welded connection to another pipe or

fitting.  *See* Vandewater Cmts. 16-17; Remand Redetermination at 52, 84, 89, 91.  However, they have not identified any record evidence demonstrating that the branch/outlet end, rather than the header/run end, is the one that must feature the beveled edge for a product to be considered subject merchandise.  *See* Remand Redetermination at 84 n.536, 92 n.565 (noting importers' previous attempts to suggest that lap joint stub ends with single welded connection are not subject merchandise, when they are clearly in-scope).

The importers argue that the petition and the ITC's determination in the 2016 sunset review "plainly show that a butt-weld pipe fitting is intended to be an end-to-end connection." Vandewater Cmts. 9-11.  Commerce acknowledged that language from the petition and the ITC's prior determination "*imply* that end-to-end connections and beveling on the recipient pipe are important characteristics of {butt-weld pipe fittings}," but the totality of the evidence on the record did not support finding that the scope is limited to products that are designed for end-to-end connections.  Remand Redetermination at 49 n.345 (emphasis added).  For instance, as we explained above, saddles are clear examples of subject merchandise that are not designed for an end-to-end connection.  Commerce also expressed concerns with relying on the descriptions of the recipient pipe from the petition and ITC determination to interpret what physical characteristics the scope requires for subject merchandise because doing so "would essentially introduce an end-use requirement for subject merchandise," *i.e.*, a product that otherwise satisfies the scope's requirements is subject merchandise only if it is attached to the beveled end of another pipe or fitting.  *Id.* at 49 (citing *King Supply*, 674 F.3d at 1348-49, holding that "end-use restrictions do not apply to {antidumping duty} orders unless the {antidumping duty} order at issue includes clear exclusionary language").

The importers assert that "common sense" dictates that the steel branch outlets are not butt-weld pipe fittings because "the absence of any butt weld" in steel branch outlets is a significant physical difference.  *See* Vandewater Cmts. 11.  However, as we established above, the steel branch outlets possess the critical physical characteristic of subject merchandise (*i.e.*, at least one end with a beveled edge for permanent attachment to a pipe or fitting), and the other physical differences plaintiffs identify do not distinguish steel branch outlets from the class or kind of merchandise covered by the *China BWPFs Order*.

### 3. Commerce Fully Considered Mr. Sperko's Declarations And Properly Weighed Conflicting Record Evidence

The importers take issue with Commerce's treatment of documents prepared by Mr. Sperko.  *See* Vandewater Cmts. 2-9; SIGMA Cmts. 7.  Commerce weighed the evidence Mr. Sperko prepared—*i.e.*, his opinion that Vandewater's steel branch outlets possess physical characteristics that are materially distinct from butt-weld pipe fittings—against the other record evidence demonstrating that industry participants refer to threaded and grooved outlets as having a butt-weld end and that, like other examples of subject merchandise (*e.g.*, saddles), they need not be designed for an end-to-end connection.  Exercising its discretion in judging the credibility of conflicting record evidence, Commerce explained that it considered the documentary evidence stemming from the ordinary course of business to be a more reliable source of information to ascertain the defining physical characteristics of butt-weld pipe fittings (including whether the product must be designed for an end-to-end connection).  *See* Remand Redetermination at 84-86; *see also Rogero v. Sec'y of Health and Human Services*, 748 Fed. Appx. 996, 1001 (Fed. Cir. 2018) (unpublished) ("Determinations of relative weight of different evidence are generally for the trier of fact." (citation omitted)); *Novosteel SA v. United States*, 128 F. Supp. 2d 720, 736 (Ct. Int'l Trade 2001) (declining to reweigh the evidence in review of scope determination because

17

"Commerce is entitled to accord that weight it feels is due the evidence." (citations omitted));
*Usinor Sacilor v. United States*, 893 F. Supp. 1112, 1123 (Ct. Int'l Trade 1995) (recognizing agency discretion as fact-finder to attach greater or lesser weight to the evidence presented).

That Mr. Sperko's declarations were prepared specifically for the scope proceeding and litigation was a factor in determining the appropriate *weight* to accord the evidence. *See* Remand Redetermination at 86. Commerce's weighing of the evidence in this case is also consistent with its past practice. *Id.* (citing *Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51,814 (Dep't of Commerce Nov. 8, 2017) and accompanying IDM at Cmt. 19, stating that "{a}lthough we consider all evidence on the record of a proceeding, in determining the weight to be accorded to a particular piece of evidence, we consider whether the evidence in question was prepared in the ordinary course of business, or for the express purpose of submission in the ongoing administrative proceeding"). The importers assert that Commerce's reasoning in this respect is inconsistent with Federal Rule of Evidence 702, *see* Vandewater Cmts. 4-5, but concede that Federal Rule of Evidence 702 does not govern Commerce's fact-finding discretion and do not cite any authority that imposes similar requirements when Commerce is presented with expert evidence in the context of its proceedings. *Id.* at 5 n.3.

The importers incorrectly assert that Commerce's analysis here involves the same deficiency that the Court identified in Commerce's evaluation of certain evidence in *Agilent Technologies v. United States*, 256 F. Supp. 3d 1338 (Ct. Int'l Trade 2017). *See* Vandewater Cmts. 5-6. That case involved a scope ruling in which Commerce found that a mass filter radiator was covered by the scope of the antidumping and countervailing duty orders on aluminum extrusions from China and that neither the finished merchandise nor the finished heat sink exclusions applied. *Id.* at 1340-41. The party that requested the scope ruling submitted a

declaration from its research and development project manager to demonstrate that the mass filter radiator qualified for the finished heat sink exclusion, which requires the product to be designed to meet certain thermal performance requirements. *Id.* at 1341. In remanding the matter, the Court explained that Commerce improperly "did not consider" the research and development project manager's declaration because it was not prepared contemporaneously with the development of the mass filter radiator. The remand redetermination in this case, by contrast, does not involve a situation in which Commerce failed to consider record evidence. Commerce discussed Mr. Sperko's declarations throughout the redetermination, and, in fact, found that certain aspects of the declarations support Commerce's conclusion that Vandewater's steel branch outlets and subject merchandise have similar physical characteristics. *See, e.g.*, Remand Redetermination at 48-49 n.343, 86 n.542, 88, and 89 n.553. However, other record evidence contradicted Mr. Sperko's claims that certain physical characteristics distinguished steel branch outlets from subject merchandise, and Commerce assigned greater weight to this documentary evidence stemming from the ordinary course of business. *Id.* at 84-86. Thus, the circumstances warranting remand in *Agilent* are not present here.

The importers argue that Commerce's reason for assigning less weight to Mr. Sperko's declarations is "factually inaccurate" because the declarations, in part, reflect views that are consistent with other record materials that predate the administrative proceeding and were prepared in the ordinary course of business, such as the American Welding Society's definition of "butt weld" (which, in turn, is based on the definition of "butt joint") and Mr. Sperko's paper entitled "Welding Fire Protection Piping 101." Vandewater Cmts. 2 n.1, 4, 6. We have already addressed the American Welding Society's nonstandard definition above and explained why it does not demonstrate that Commerce's analysis of the physical characteristics criterion was

unreasonable.  According to the importers, Mr. Sperko's paper is from 2012 and "shows the different joint designs for piping welds" and "illustrates how butt welds differ in configuration from other types of welds."  Vandewater Cmts. 6.  The paper (along with Mr. Sölken's website) is among record evidence that the importers rely on to argue that butt-weld pipe fittings must be beveled at an angle of 37.5 degrees with a tolerance of plus or minus 2.5 degrees to allow a full penetration weld, which Commerce fully addressed.  Remand Redetermination at 48-49, 86-87.

Commerce declined to interpret the scope to include a bevel angle requirement because no such requirement is apparent in the scope language, the petition, or prior ITC determinations.  Remand Redetermination at 48.  These sources indicate that "{a} pipe fitting possesses the requisite beveled edge if it is capable of creating a shallow channel to accommodate the bead of the weld that fastens the two adjoining pieces," and "Vandewater's outlets are . . . able to support a permanent, welded connection."  *Id.* at 48-49.  Mr. Sperko's declarations—evidence that the importers rely upon heavily to support their position—are "consistent with a finding that the contoured end of an outlet features a full penetration weld."  *Id.* at 86 n.542 (citing Scope Request at Ex. 7, P.D. 3, barcode 3708194-02, stating that the bevel angle of steel branch outlets "allows welding of a *full-penetration* or partial penetration groove weld reinforced by a fillet weld" (emphasis added)).  Thus, the importers have failed to meet their burden of establishing that their interpretation of the evidence as imposing a bevel angle requirement for subject merchandise is the "one and only reasonable" option on the record.  *See Tianjin Wanhua Co. v. United States*, 253 F. Supp. 3d 1318, 1328 (Ct. Int'l Trade 2017).

### 4.  The Physical Characteristics Of Subject Merchandise Are Not Coextensive With A Particular Industry Standard Or Tariff Classification

The importers contend that subject merchandise must conform to a specific industry standard, namely, the American National Standards Institute (ANSI)/American Society of

Mechanical Engineers (ASME) B16.9 standard, while the steel branch outlets at issue conform to the Manufacturers Standardization Society (MSS) SP-97 standard.[3]  *See* Vandewater Cmts. 18-22; SIGMA Cmts. 3-7.  Commerce acknowledged that the ANSI/ASME B16.9 industry standard is referenced in a footnote in the petition.  *See* Remand Redetermination at 50.  However, Commerce explained that "{a} mere reference to an industry standard in the petition, without more, does not mean that subject merchandise *must* meet the specifications of that industry standard."  *Id.* (emphasis in original); *see also United Steel and Fasteners*, 947 F.3d at 800 (rejecting similar argument concerning relationship between industry standards and physical characteristics of products covered by order's scope).  Commerce additionally explained that "{e}vidence on the record shows that {butt-weld pipe fittings} may be made to conform to specifications other than those referenced in the footnote in the petition."  *Id.* at 50-51 (citing Island (k)(2) Rebuttal Cmts. at Ex. 2, Remand P.D. 44, barcode 4061328-01).  Thus, Commerce concluded that "including a requirement that all {butt-weld pipe fittings} subject to the *China BWPFs Order* must conform to . . . ANSI/ASME B16.9 would introduce a restriction that is not found in the scope language and would unduly restrict the coverage of the scope."  *Id.* at 51; *see also Duferco*, 296 F.3d at 1095 (Commerce may not interpret scope contrary to its terms).

Commerce further examined the MSS SP-97 standard and found that "outlets conforming to that standard may possess physical characteristics similar to other in-scope {butt-weld pipe fittings}."  Remand Redetermination at 51.  For example, Commerce found the following specifications consistent with the record evidence relating to the physical characteristics of subject merchandise:  (1) "section 1.2 in MSS SP-97 provides that branch outlet fittings

---

[3] Standard 16.9 refers to the standard of ANSI and ASME.  *See* Scope Request at 18 n.28, P.D. 2, barcode 3708194-01; *see also* Remand Redetermination at 13 n.79.

manufactured to the standard are 'designed to make a fully reinforced branch connection in accordance with applicable piping requirements, when attached, at an opening in a run pipe by means of a full penetration weld'"; and (2) "section 6.5 in MSS SP-97 states that '{t}he contour weld bevel angle on the longitudinal section of the fittings shall be a minimum of 35 degrees,' which is consistent with the essential characteristic of the beveled edge of in-scope {butt-weld pipe fittings} (*i.e.*, creates a shallow channel to accommodate the bead of the weld)." *Id.* (quoting Vandewater (k)(2) Cmts. at Tab 2, pp. 1, 3, Remand P.D. 15, barcode 4055605-05). Commerce considered industry standards to the extent that they are relevant to the physical characteristics criterion in the (k)(2) analysis and determined that "products covered by MSS SP-97 explicitly have many of the same characteristics that the importers attribute to {butt-weld pipe fittings}, *e.g.*, full penetration welds and similar bevel angles." *Id.* at 51-52.

Commerce also found that the MSS SP-97 standard "is described as a 'non-exclusive standard'" and "several aspects of the standard incorporate by reference the standards established by ASTM and ANSI/ASME." *Id.* at 52 (quoting Vandewater (k)(2) Cmts. at Tab 2, p. i, Remand P.D. 15, barcode 4055605-05). For example, sections 5.1 and 5.2 of the MSS SP-97 standard adopt the requirements set out in various ASTM standards for materials. while provisions under section 6 of the MSS SP-97 standard adopt requirements stemming from various ASME design and dimension standards. *See* Vandewater (k)(2) Cmts. at Tab 2, pp. 2-3, Remand P.D. 15, barcode 4055605-05. The reliance on other standards is so extensive in the non-exclusive MSS SP-97 standard that it includes an annex listing the other referenced standards for convenience, and that annex is described as an "integral part" of the MSS SP-97 standard. *Id.* at Annex C.

The importers contend that the "very nature of industry standards" is "to define distinct products" and "that a product could conform to multiple industry standards . . . would effectively

render those standards meaningless." SIGMA Cmts. 4-5. Commerce, however, did not find that the overlap between MSS SP-97 and other ASTM or ANSI/ASME standards means that they are the same. *See* Remand Redetermination at 83 n.533. Rather, Commerce "observe{d} that there are a number of aspects of the standards that demonstrate common physical characteristics across the products covered by each." *Id.* The importers incorrectly assert that Commerce disregarded differences between steel branch outlets and subject merchandise reflected in industry standards. Vandewater Cmts. 20; SIGMA Cmts. 5. Commerce addressed the physical characteristics that the importers claim represent fundamental differences between steel branch outlets and subject merchandise, and as we explained above, disagreed that "the various industry standards reflect bright-line distinctions between outlets and other {butt-weld pipe fittings} for the purposes of analyzing the *China BWPFs Order* scope." Remand Redetermination at 83;[4] *cf. Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018) ("mere disagreement" with Commerce's weighing of evidence insufficient basis for challenge).

The Court decisions the importers cite in support of their claims about industry standards also do not undermine Commerce's findings. *See* SIGMA Cmts. 4-6. *Viraj Forgings, Ltd. v. United States* concerned Commerce's consideration of differences between United States and German industry standards in Commerce's model-matching methodology used to compare identical or similar products in an antidumping duty administrative review. *See* 283 F. Supp. 2d 1335, 1346-50 (Ct. Int'l Trade 2003). The case did not address Commerce's consideration of industry standards in the context of analyzing the physical characteristics criterion in a (k)(2) analysis to determine whether a product is covered by the scope of an order. In any event, the

---

[4] Commerce also noted that the importers make conflicting statements that undermine their position that the ANSI/ASME B16.9 standard represents a bright-line distinction between subject and non-subject merchandise. *See id.* at 82 n.529, 84 n.536, and 92 n.565.

Court held in *Viraj* that Commerce had inadequately explained its conclusion that differences between products conforming to the United States standard and the German standard were likely minor or insignificant in large part because "there {was} no record evidence that Commerce independently determined that the foreign like product that Commerce used, German DIN flanges, were in fact either fundamentally identical or similar to the United States ASTM forgings . . . ." *Id.* at 1347-48. The analytical flaw the Court identified in *Viraj* is not present in this case because Commerce fully explained how the record evidence supported its conclusion that the physical characteristics of steel branch outlets and subject merchandise are similar.

Likewise, the importers' reliance on the Court of Appeals for the Federal Circuit's decision in *King Supply* is misguided. *See* SIGMA Cmts. 5-6. The importers argue that the Federal Circuit affirmed a scope determination concerning the same order at issue in this case because "not only were King's products physically identical to the products described in the first sentence of the *AD Order*, *but evidence also showed King's products met the same ASTM and ANSI industry standards as were referenced in the Petition*." *Id.* (quoting *King Supply*, 674 F.3d at 1347, emphasis added by SIGMA). The importers misconstrue the Federal Circuit's reasoning in *King Supply* as validation that a product is covered by the scope of the order *only* if it is produced according to ASTM and ANSI/ASME standards referenced in a footnote in the petition. Although conformity with such standards may be considered evidence to support including merchandise within the scope of the *China BWPFs Order*, *King Supply* "does not stand for the proposition that the industry standard and the scope of the order are, or must be, coextensive." Remand Redetermination at 81.

The importers further assert that "{t}he ITC has repeatedly stated that '*{all}* butt-weld pipe fittings, whether imported or domestically produced, *must* meet ASTM and ANSI

specifications."  Vandewater Cmts. 20 (citation omitted).  However, "the ITC report at the time

of the investigation explicitly noted that not all shipments of {butt-weld pipe fittings} from

China – the precise product for which the petitioner sought relief – met the ASME standard."

Remand Redetermination at 49 (citing *Certain Carbon Steel Butt-Weld Pipe Fittings from China

and Thailand*, Inv. Nos. 731-TA-520–521, USITC Pub. 2528 (June 1992), at I-10–I-11, P.D. 21,

barcode 4055605-11, explaining that "producers noting quality differences stated that butt-weld

fittings from China often do not meet ASTM and/or ANSI specifications when tested by

distributors and end users" and that "importers also noted that Chinese butt-weld pipe fittings

often do not meet ASTM and ANSI specifications").  This evidence is consistent with an

interpretation that does not "make the scope coextensive with industry standards, in light of the

fact that such standards were not consistently adhered to by producers of subject merchandise in

the exporting country."  *Id.* at 87.

Despite this clear language in the ITC's determination, the importers claim that

Commerce "misread" the ITC report and downplay the significance of the quality differences

United States producers and importers identified during the investigation.  *See* Vandewater Cmts.

21.  The importers aver that the discussion regarding quality differences between the domestic

like product and subject merchandise should be read to mean that "{t}he Chinese and Thai

industries tend to be based on the hot-process for making elbows and do not possess the

capability for heat-treatment or shot blasting."  *Id.* (quoting USITC Pub. 2528 at I-9–I-10, P.D.

21, barcode 4055605-11).  It is unclear how this statement, which is explicitly limited to elbows,

disproves Commerce's finding that the ITC's report supports an interpretation of the scope that

does not require conformity with ASTM and ANSI/ASME standards.  Regardless, the very next

sentence in the ITC's decision states that Chinese producers' limitations with respect to heat-

treatment or shot blasting "*may* account for why the hot-process was chosen and for *some* of the reported quality differences."  USITC Pub. 2528 at I-10 (emphases added).

### 5.  The Importers' Arguments Based On The Harmonized Tariff Schedule Of The United States (HTSUS) Lack Merit

The importers additionally contend that steel branch outlets possess physical characteristics that differ from subject merchandise because they are imported under a different subheading of the HTSUS.  *See* Vandewater Cmts. 22.  Commerce explained that HTSUS classification "is not determinative because the HTSUS subheadings listed in the scope are not dispositive."  Remand Redetermination at 54 (citing *China BWPFs Order*, 57 Fed. Reg. at 29,702; *Smith Corona Corp. v. United States*, 915 F.2d 683, 687 (Fed. Cir. 1990)).

The importers do not dispute that HTSUS classification is not dispositive; however, they argue that Commerce "misses the point" because the HTSUS classification of steel branch outlets "is corroborating evidence that confirms" their interpretation of the evidence that the products are not covered by the scope.  Vandewater Cmts. 22.  This overlooks a key section of Commerce's analysis.  Commerce acknowledged that it *may* consider CBP classification decisions in its analysis, even though it is not bound by them.  Remand Redetermination at 54.  Commerce thus considered why the steel branch outlets are imported under a different HTSUS subheading for customs purposes by reviewing a prior CBP ruling on the record, which stated:

> The product to be imported is a forged nonalloy steel threaded weld outlet pipe fitting made to ASTM Specification A 105, the Standard Specification for Carbon Steel Forgings for Piping Applications.  The fitting is contoured on one end to provide a precise fit at the opening in the run pipe and threaded on the other end to provide a threaded outlet branch connection.  The applicable subheading for the forged steel threaded weld outlet fitting will be 7307.99.5045 . . . .

SCI (k)(2) Rebuttal Cmts. at Ex. 5, Remand P.D. 48, barcode 4061337-01 (Dec. 3, 2020).

Commerce considered the ruling, but found that, "in light of {Commerce's} broader analysis

regarding physical characteristics of in-scope merchandise – including the characteristics of

Vandewater's outlets in particular – CBP's ruling does not warrant arriving at a different

conclusion here."  Remand Redetermination at 54.  In other words, when considering the totality

of the record, CBP's ruling "that Vandewater's outlets are imported under a different subheading

within the same chapter and heading of the HTSUS as the subheading listed in the scope" did not

demonstrate that Vandewater's steel branch outlets possessed physical characteristics that were

distinguishable from subject merchandise for purposes of the *China BWPFs Order*.  *Id.*

### 6.  The Importers' Claims Concerning The Exclusion For "Butt Weld Outlets" In The Scope Of The Forged Steel Fittings Proceedings Lack Merit

The importers attempt to undermine Commerce's scope interpretation based on a scope

exclusion for "butt weld outlets" in the context of the then-ongoing investigations of forged steel

fittings from multiple countries, including China.  Vandewater Comments 13-16.  As Commerce

explained, its "construction of an exclusion in a separate proceeding is not determinative here."

Remand Redetermination at 85 n.539.  The *China BWPFs Order* and the forged steel fittings

orders are separate proceedings that cover two distinct classes or kinds of merchandise.  *See*

*SunPower Corp. v. United States*, 253 F. Supp. 3d 1275, 1286-88 (Ct. Int'l Trade 2017), *aff'd*

*sub nom.*, 918 F.3d 909 (Fed. Cir. 2019).  Commerce's objective in each proceeding is to craft a

scope that includes the specific products for which the petitioning industry requests relief and

excludes those that the petitioning industry does not seek to include.  In doing so, Commerce

generally grants ample deference to the intent of the petitioning industry regarding the class or

kind of products for which it seeks relief.  *See Trans Texas Tire, LLC v. United States*, 519 F.

Supp. 3d 1275, 1284 (Ct. Int'l Trade 2021).  The forged steel fittings scope contains an exclusion

for butt-weld fittings or outlets and, based on the record of those investigations and the intent of the petitioning industry, Commerce determined that fittings or outlets with one butt-welded end connection do not qualify for the exclusion. This exclusion helped define the class or kind of merchandise in the forged steel fittings investigations. However, the description of butt-weld fittings or outlets for purposes of the exclusion in the then-ongoing forged steel fittings investigations did not, in effect, modify the parameters of the class or kind of merchandise covered by the preexisting *China BWPFs Order*.

Moreover, before issuing final determinations in the forged steel fittings investigations, Commerce clarified the parameters of the exclusion for butt-weld fittings and outlets in relation to the products covered by the *China BWPFs Order*. *See* SIGMA (k)(2) Cmts. at Ex. 5, P.D. 40, barcode 4055696-01 (Nov. 19, 2020) (forged steel fittings clarification memo); *see also Forged Steel Fittings from the People's Republic of China*, 83 Fed. Reg. 50,339, 50,339 n.5 (Dep't of Commerce Oct. 5, 2018) (final determ.) (citing clarification memo); *Forged Steel Fittings from Italy and the People's Republic of China*, 83 Fed. Reg. 60,397, 60,397 n.3 (Dep't of Commerce Nov. 26, 2018) (order) (same). Hence, the scope exclusion for "butt weld outlets" established for purposes of the forged steel fittings orders does not undermine Commerce's interpretation that products subject to the *China BWPFs Order* may have only one end with a beveled edge for permanent attachment to a pipe or fitting. As Commerce explained, the record evidence relating to the *China BWPFs Order* shows that "one unambiguously in-scope fitting type – lap joint stub ends – has a beveled edge for a permanent connection on one end and the other end is temporarily bolted in place with the use of a flange." Remand Redetermination at 52. The importers claim that Commerce's interpretation is arbitrary and capricious, but, as the Court has stated, "{f}or over 25 years . . . Commerce has treated steel branch outlets as butt-weld fittings"

in the context of another antidumping duty order, with very similar scope language, covering carbon steel butt-weld pipe fittings from Taiwan.  *Remand Order*, 476 F. Supp. 3d at 1361.

## B.  Expectations Of Ultimate Purchasers

For the second criterion, Commerce explained that "{o}utlets and other {butt-weld pipe fittings} are, similarly, expected to be welded into permanent, fixed piping systems for gases or liquids in plumbing, heating, refrigeration, air condition, and fire sprinkler systems."  Remand Redetermination at 90.  Specifically, "fire protection sprinkler systems are a contemplated application of {butt-weld pipe fittings}" and "{t}his is the intended application for Vandewater's product."  *Id.* at 56 (citing *Carbon Steel Butt-Weld Pipe Fittings from Brazil, China, Japan, Taiwan, and Thailand*, Inv. Nos. 731-TA-308–310 and 731-TA-520–521, USITC Pub. 4628 (Aug. 2016), at 6, P.D. 37, barcode 3747665-01 (ITC Sunset)).  Steel branch outlets and subject merchandise both "connect pipes in a variety of overlapping settings, *e.g.*, fire protection and other low-pressure piping systems, and do so in a similar manner, *i.e.*, through at least one permanent, full penetration welded joint."  *Id.* at 92-93.  Based on this evidence, Commerce found that the expectations of ultimate purchasers of steel branch outlets are similar to those of subject merchandise because both are expected to be welded into permanent, fixed piping systems for gases or liquids and fire sprinkler systems.

The importers disagree with Commerce's finding regarding this criterion, arguing that the ultimate purchasers of steel branch outlets "do *not* want and cannot use permanent connections . . . because the outlets are used for functions such as sprinkler heads, which must be capable of removal and replacement."  Vandewater Cmts. 23.  The sprinkler heads may be removed from the threaded or grooved branch end of the steel branch outlets, but the beveled edge on the header end is permanently affixed to the fire sprinkler system.  Ultimate purchasers of steel

29

branch outlets, like subject merchandise, expect outlets to be welded into permanent, fixed fire sprinkler piping systems.  Commerce explained that "the fact that Vandewater's outlets have a temporary connection on one end is not a feature that distinguishes outlets from other in-scope merchandise, and, therefore, does not change consumer's expectations regarding the product." *Id.* at 90.  Indeed, as explained above, Commerce found that there are types of unambiguously in-scope butt-weld pipe fittings that purchasers do not expect to be capable of permanent connection on all ends, such as lap joint stub ends with a beveled edge for a permanent welded connection on one end and the other end temporarily bolted in place.

The importers argue that Commerce "dismisse{d} the idea that different industry standards lead to different expectations."  SIGMA Cmts. 8.  However, this argument incorrectly presupposes that the class or kind of merchandise subject to the *China BWPFs Order* must conform only to ANSI/ASME B16.9 or another industry standard.  Commerce explained, in analyzing the physical characteristics criterion, that the scope is not coextensive with a particular industry standard.  *See* Remand Redetermination at 50-52, 90-91.  Commerce also reiterated that "the two standards in question, ANSI/ASME B16.9 and MSS SP-97, reflect substantial overlap in terms of attributes, and in turn expectations, for outlets and {butt-weld pipe fittings}."  *Id.* at 90.  Commerce found the expectations of the ultimate purchasers to be similar because both steel branch outlets and subject merchandise are "expected to be welded into permanent, fixed piping systems for gases or liquids in plumbing, heating, refrigeration, air conditioning, and fire sprinkler systems."  *Id.*; *see also id.* at 91 (MSS SP-97 explicitly defined as "non-exclusive").

The importers underscore that ultimate purchasers "expect to use steel branch outlets in fire protection systems" and expect to "use butt-weld pipe fittings for a variety of other uses, namely the oil, gas, steam, and chemical industries as well as construction."  SIGMA Cmts. 9

(internal quotation marks omitted).  The Federal Circuit previously has rejected this line of

argument, and has agreed that expectations of ultimate purchasers are similar when the product

in question is for one of the contemplated applications of subject merchandise, even if there are a

wide number of possible applications for the entire class or kind of merchandise covered by the

order.  *See Sango Int'l L.P. v. United States*, 567 F.3d 1356, 1365 (Fed. Cir. 2009).  This Court

likewise has explained that "if two products can be used in at least some of their applications for

similar, if not identical purposes, Commerce may conclude that purchases of the products have

similar expectations."  *Olympia Indus., Inc. v. United States*, 30 C.I.T. 1011, 1026 (2006).  The

importers argue that ultimate purchasers have different expectations regarding pressure ratings

when purchasing steel branch outlets, which supports finding the outlets outside the scope.  *See*

SIGMA Cmts. 9.  But Commerce explained that, although some types of subject merchandise

may be able to handle high-pressure applications, subject merchandise may also be used for low-

pressure fire sprinkler systems in that "products with at least one non-welded side (and their

concomitant pressure rating) still fall within the scope of the *China BWPFs Order*."  Remand

Redetermination at 59-60.  This criterion supports including the steel branch outlets within the

scope of the *China BWPFs Order* because permanent attachment to a fire sprinkler system is an

intended application for both subject merchandise and steel branch outlets.

### C.  <u>Ultimate Use Of The Product</u>

For the third criterion, consistent with the expectations of ultimate purchasers, Commerce

found that the ultimate uses of steel branch outlets and subject merchandise are similar because

"Vandewater's outlets are designed to be permanently welded to a fire sprinkler system, which is

a recognized application for {butt-weld pipe fittings} that are subject to the scope of the *China*

*BWPFs Order*."  Remand Redetermination at 58 (citing ITC Sunset, USITC Pub. 4628, at 6).

The importers contest this finding and argue that steel branch outlets are used for temporary functions (*i.e.*, connection to a sprinkler head on the branch end of the outlets), which differs from the permanent functions of subject merchandise.  *See* Vandewater Cmts. 23-24. Again, the importers are incorrect because the header end of steel branch outlets is permanently welded to fire sprinkler systems and subject merchandise is also permanently welded to piping systems—including fire sprinkler systems—that convey gases or liquids.  *See* Remand Redetermination at 58-59.  Commerce explained that "not all {butt-weld pipe fittings} have exclusively permanent connections" and "a temporary connection {on one end} does not render outlets distinct from other {butt-weld pipe fittings}, as certain {butt-weld pipe fittings} (*e.g.*, lap joint stub ends) have this same characteristic."  *Id.* at 92.

The importers claim that a "lack of substitutability" detracts from Commerce's analysis. *See* Vandewater Cmts. 24.  However, the ultimate use criterion does not require "a complete overlap of uses" and "the two products need not be an identical replacement for one another to have similar ultimate uses."  *Novosteel*, 128 F. Supp. 2d at 734-35 (citing *Wirth*, 5 F. Supp. 2d at 980).  Commerce explained that "the uses of outlets and other {butt-weld pipe fittings} are similar because . . . both are permanently welded into automatic fire sprinkler systems to change or divide the flow of water."  Remand Redetermination at 59.

The importers rely on two decisions from this Court, neither of which demonstrates that Commerce's findings with respect to the ultimate use criterion were improper.  *See* SIGMA Cmts. 10-11.  *Legacy Classic Furniture Inc. v. United States* is inapposite because, unlike this case, the record of that scope matter contained "no direct evidence" regarding how the product at issue was actually used, and as a result the Court found that Commerce had "made its conclusion based on conjecture and not on evidence, or even logical inference from the evidence."  867 F.

Supp. 2d 1321, 1327 (Ct. Int'l Trade 2012). The importers also argue that Commerce's rationale is "simplistic and unpersuasive" based on language in the Court's decision in *Torrington Co. v. United States*, 745 F. Supp. 718 (Ct. Int'l Trade 1990). *Torrington*, however, examined Commerce's analysis of ultimate use in the context of an antidumping duty investigation in determining that the petition concerned five distinct classes or kinds of antifriction bearings. *Id.* at 719-20. The Court found that the various uses in the "vast and diverse" antifriction bearings industry supported Commerce's decision to subdivide antifriction bearings into five distinct classes or kinds of merchandise. *Id.* at 726. In contrast, the butt-weld pipe fittings subject to the *China BWPFs Order* constitute a *single* class or kind of merchandise, notwithstanding their different uses across various industries. *See* Remand Redetermination at 92-93 (addressing SIGMA's argument regarding allegedly "simplistic" reasoning).

The importers recognize that the ITC has said that "{b}utt-weld pipe fittings are used to connect pipe sections where conditions require permanent, welded connections." Vandewater Cmts. 22-24 (quoting ITC Sunset, USITC Pub. 4628, at I-4); *but see* Remand Redetermination at 93 n.570 (explaining that not all subject merchandise does so). The ITC also explained that butt-weld pipe fittings are "welded into permanent, fixed piping systems that convey gases or liquids in plumbing, heating, refrigeration, air-conditioning, *automatic fire sprinkler*, electric conduit, irrigation, and process-piping systems." ITC Sunset, USITC Pub. 4628, at 6 (emphasis added). Commerce found similarities in the ultimate uses of steel branch outlets and subject merchandise because "they connect pipes in a variety of overlapping settings, *e.g.*, fire protection and other low-pressure piping systems, and do so in a similar manner, *i.e.*, through at least one permanent, full penetration welded joint." Remand Redetermination at 92-93.

Commerce acknowledged that "outlets and other {butt-weld pipe fittings} do not have the same use within fire protection systems," but recognized the various uses in the *single* class or kind of merchandise covered by the *China BWPFs Order* and concluded that "the same could be said of many subsets of the broader range of {butt-weld pipe fitting} products." *Id.* at 93.  On this point, Commerce observed the following:

> {A}n elbow connects a pipe in a manner that changes the flow of the substance being transported, while caps restrict the flow at a certain location and reducers modify the size of the pipe containing the flow.  All subject fittings have a particular purpose within the broader piping system.  Moreover, certain {butt-weld pipe fittings} have particular uses that are closely analogous to that of an outlet. . . . {A} saddle is attached axially to a length of pipe in a manner that changes the flow of the transported substance.  A "tee" is designed to perform a similar function – creating an outbound flow from a run pipe that is perpendicular to the main flow.  A comparison of two images showing Vandewater's outlet and a tee, both provided by Vandewater, demonstrates a high level of similarity in the two products' purpose and function.

*Id.* (internal footnotes omitted).  Thus, the importers fail to demonstrate that the uses of steel branch outlets "are clearly different from those for which butt-weld pipe fittings are produced," SIGMA Cmts. 10, and Commerce reasonably found that the record evidence on the ultimate use criterion further supported inclusion of the steel branch outlets within the order's scope.

### D.  Channels Of Trade

For the fourth criterion, Commerce found that the channels of trade for outlets and subject merchandise are similar because "{t}hey are both sold through distributors and to fabricators and contractors."  Remand Redetermination at 60.  The record contains "examples of companies and catalogs that sell both outlets and {butt-weld pipe fittings}, indicating that there is significant overlap in the channels of trade." *Id.* (citing Petition at App'x B, P.D. 38, barcode 3747665-02; Island (k)(2) Rebuttal Cmts. at Exs. 10, 15 (Aleum USA and Shin-Tech catalogs),

Remand P.D. 46-47, barcodes 4061328-03–04 (Dec. 3, 2020)).  Commerce also found that an affidavit Vandewater submitted from the former Vice President and General Manager of Neill Supply, a fire sprinkler and industrial piping fabricator/supplier that sells Vandewater's products, "states that outlets and {butt-weld pipe fittings} are both sold to distributors." *Id.* (citing Vandewater (k)(2) Rebuttal Cmts. at Att. A, Remand P.D. 43, barcode 4061153-01).

The importers argue that the "ultimate purchasers" of Vandewater's steel branch outlets are all fire sprinkler system fabricators and rely on the former Neill Supply official's affidavit to argue that subject merchandise and steel branch outlets are resold to distinct segments in the market.  Vandewater Cmts. 24-25.  But the alleged differences in the ultimate purchasers do not mean that steel branch outlets and subject merchandise are sold in distinct channels of trade. Commerce agreed that "Vandewater's outlets are typically sold to a particular type of contractor given their targeted application, when compared to {butt-weld pipe fittings} more generally – which cover a wide range of products and applications."  Remand Redetermination at 94.  The fact remains, however, that "{o}utlets and other {butt-weld pipe fittings} are sold to distributors and then to contractors and users involved in constructing piping systems, even if the particular type of contractor/customer for Vandewater's outlets focuses on certain types of systems, *i.e.*, fire protection and other low-pressure applications." *Id.*  Thus, Commerce properly considered channels of trade, rather than ultimate purchasers, and found overlap because both steel branch outlets and subject merchandise are sold through distributors and to fabricators and contractors.

### E.  Manner In Which The Product Is Advertised And Displayed

For the fifth and final criterion, Commerce found that steel branch outlets and subject merchandise are advertised in a similar manner because both are found in "online catalogs in company websites or affiliated or third-party online sources" and displayed similarly through

materials that "identify the size, weight, and other technical specifications of the merchandise, including pressure resistance, materials used, and industry standard."  Remand Redetermination at 60-61 (citing Petition at App'x B, P.D. 38, barcode 3747665-02; Island (k)(2) Rebuttal Cmts. at Exs. 2 (Hackney Ladish catalog), 3 (Kelly Pipe catalog), 10 (Aleum USA catalog), 12 (SCI catalog), 13 (SIGMA catalog), 15 (Shin-Tech catalog), Remand P.D. 44-47, barcodes 4061328-01–04); *see also id.* at 94-96.  The record further contains evidence of steel branch outlets and subject fittings advertised side-by-side: "the Shin Tech catalog advertises two outlet products – one with a beveled edge that allows for a permanent connection only on the branch end, and one with such edges on both the branch *and* contoured ends – in a similar manner."  *Id.* at 61.

The importers argue that "Island's own advertising references particular end uses and industry standards, and both reflect the clear dividing line between butt-weld pipe fittings and outlets."  Vandewater Cmts. 25; *see also* SIGMA Cmts. 12-13.  This argument is an extension of the importers' overall position with respect to physical characteristics and ultimate use, which we have already addressed above.  For the reasons Commerce explained in its analysis of those two criteria, the reference to particular standards or particular uses in the advertising materials does not "reflect{} a clear dividing line between the method of advertising for each product." Remand Redetermination at 95.

The importers also ask the Court to "reject Commerce's assertion that outlets and butt-weld pipe fittings are 'displayed side by side.'"  Vandewater Cmts. 25-26.  We agree with the importers that the pages from Hackney Ladish's catalog included in the petition do not advertise and display steel branch outlets alongside other butt-weld pipe fittings.  *See* Petition at App'x B, P.D. 38, barcode 3747665-02.  However, Commerce's finding is supported by the section in Shin-Tech's catalog with products for a "Cold Forging Fire Sprinkler Prefabrication Piping

System" that advertises and displays a "Butt Weld Outlet" alongside a "Female Threaded

Outlet," "Male Threaded Outlet," and "Grooved Outlet."  Remand Redetermination at 61 (citing

Island (k)(2) Rebuttal Cmts. at Ex. 15 (Shin-Tech catalog), Remand P.D. 47, barcode 4061328-

04).  The importers suggest that this evidence does not suffice because the "Butt Weld Outlet" in

Shin-Tech's catalog is not what the importers consider to be "traditional butt-weld pipe fittings."

Vandewater Cmts. 26.  The importers do not explain what they consider to be a "traditional"

butt-weld pipe fitting, and we can only infer that it is a reference to the most common shapes of

subject merchandise (*e.g.*, elbows, tees, reducers, and caps).  Although outlets generally are not

identified as one of the most common shapes of subject merchandise, the importers expressly

acknowledge that butt weld outlets are butt-weld pipe fittings and possess the features that are

characteristic of subject merchandise.  *See id.* at 26 n.10.  Therefore, Commerce did not err in

finding that record evidence showed butt-weld pipe fittings advertised and displayed side-by-side

with steel branch outlets.

**IV.    Vandewater's Entries Of Steel Branch Outlets That Predate The Initiation Of The
Scope Inquiry Must Remain Suspended Pending A Final Decision In This Action**

As demonstrated above, Commerce reasonably concluded that Vandewater's steel branch

outlets are covered by the *China BWPFs Order* after conducting a scope inquiry and evaluating

the (k)(2) criteria based on the factual record of the proceeding.  In response to comments

submitted by the importers during the remand proceeding, Commerce stated its intent with

respect to the suspension of liquidation and cash deposit requirements that Commerce would

instruct CBP to apply to Vandewater's entries of steel branch outlets:

> In light of the Court's *Remand Order*, should the Court affirm this
> remand redetermination in a subsequent decision, Commerce
> intends to issue instructions to CBP consistent with 19 CFR
> 351.225(l) and {19 U.S.C. § 1516a(c) and (e)}.  Specifically,
> Commerce intends to instruct CBP to suspend or continue to

> suspend entries that entered, or were withdrawn from warehouse, for consumption on or after the date of initiation of this scope inquiry.  With respect to entries pre-dating the date of initiation of the inquiry that were suspended pursuant to the instructions issued following the September 10, 2018, Final Scope Ruling, Commerce intends to instruct CBP to refund cash deposits upon request but continue to suspend the entries at a zero percent cash deposit rate pending any appeals.  In the event that the Court's final judgment is not appealed or is upheld on appeal, Commerce intends to instruct CBP to lift suspension of liquidation and liquidate such entries without regard to antidumping duties.

Remand Redetermination at 102-03.[5]

In other words, if the Court issues a final judgment sustaining Commerce's (k)(2)

analysis conducted on remand, the *Timken* notice published pursuant to 19 U.S.C. § 1516a(c)(1)[6]

would provide the following:  (1) for Vandewater's entries of steel branch outlets that entered, or

were withdrawn from warehouse, for consumption *on or after* the date of initiation of the scope

inquiry, *i.e.*, on or after October 30, 2020, Commerce will instruct CBP to suspend or continue to

suspend liquidation and require cash deposits of estimated antidumping duties; (2) for

Vandewater's entries of steel branch outlets that entered, or were withdrawn from warehouse, for

consumption *before* the initiation date of October 30, 2020, and that were suspended pursuant to

---

[5] We note that Commerce recently finalized changes to its regulations that govern antidumping and countervailing duty proceedings.  *See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021).  These changes include modifications to 19 C.F.R. § 351.225(l), the regulatory provision that outlines suspension of liquidation and cash deposit requirements in the context of scope proceedings.  However, the final rule explains that the modifications to 19 C.F.R. § 351.225(l) apply to any scope ruling applications filed, or any scope inquiry that Commerce self-initiates, on or after November 4, 2021.  *Id.* at 52,300.  Accordingly, the modifications to 19 C.F.R. § 351.225(l) do not apply here.

[6] Pursuant to 19 U.S.C. § 1516a(c)(1), Commerce is required to publish notice of a decision of this Court "not in harmony" with the agency's original determination.  The publication requirement under this statutory provision was the subject of *Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990), and notices published pursuant to 19 U.S.C. § 1516a(c)(1) have become known as *Timken* notices.

Commerce's previously-issued instructions regarding the final scope ruling rather than pursuant to CBP's independent suspension authority,[7] Commerce will instruct CBP to continue to suspend liquidation of these entries with no cash deposit requirement (with authorization to refund cash deposits upon request) until there is a final and conclusive court decision in the action; and (3) for Vandewater's pre-initiation entries of steel branch outlets that are subject to the continued suspension of liquidation with no cash deposit requirement, Commerce will instruct CBP to lift the suspension of liquidation and liquidate the entries without regard to antidumping duties in the event this Court's final judgment is not appealed or is upheld.

Although the importers agree with the proposed cash deposit requirements if the Court were to sustain Commerce's scope determination under its analysis of the (k)(2) criteria, they assert that continuing to suspend liquidation of entries that predate the date of initiation of the scope inquiry is contrary to law. *See* SCI Cmts. 2-14. The importers' central contention is that 19 C.F.R. § 351.225(l) does not provide Commerce with authority to continue to suspend liquidation of entries that predate the date of initiation of the scope inquiry under the factual circumstances of this case. *See id.* at 11-14. The importers acknowledge that the regulation contemplates a scenario in which Commerce may continue suspending entries, including entries

---

[7] CBP "has a statutory responsibility to fix the amount of duty owed on imported goods" and is empowered to suspend liquidation when it "determine{s} in the first instance whether goods are subject to existing antidumping or countervailing duty orders." *Supreme Inc. v. United States*, 946 F.3d 1300, 1317 (Fed. Cir. 2020) (*en banc*). Section 351.225(l)(3) of Commerce's regulations distinguishes two scenarios when Commerce conducts a scope inquiry and determines that the product in question is covered by the scope of the order(s): (1) if entries of the merchandise made have not already been suspended by CBP, then "a new suspension must be ordered beginning only 'on or after the date of initiation of the scope inquiry'"; and (2) if entries of the merchandise made prior to the date of initiation of the inquiry have already been suspended by CBP, then the regulation "dictates that the existing suspension 'will continue.'" *Id.* at 1319. Any existing suspension of liquidation and cash deposit requirements imposed by CBP pursuant to its independent statutory authority will continue under the second scenario, even if the entries predate the date of initiation of the scope inquiry.

that predate the date of initiation of a scope inquiry, if CBP suspended the entries on its own initiative. *See id.* at 8-14. But the importers claim that the steel branch outlets were not subject to suspension of liquidation prior to the issuance of the final scope ruling and any suspension resulting from Commerce's previously-issued instructions does not qualify as a valid basis for continuing suspension of liquidation in light of the *Remand Order* and the initiation of a scope inquiry on remand. *See id.*

The importers' entire argument is based on an erroneous understanding that Commerce would rely upon 19 C.F.R. § 351.225(l) as the legal authority for continuing to suspend entries of Vandewater's steel branch outlets that were made prior to October 30, 2020, pending any further appeal. By stating its intent to authorize refunds relating to Vandewater's steel branch outlets that were suspended by CBP pursuant to Commerce's final scope ruling (and to lift suspension of liquidation) for entries that predate the date of initiation of the scope inquiry if a judgment sustaining the remand redetermination is not subject to further appeal or is appealed and affirmed, Commerce expressed recognition that 19 C.F.R. § 351.225(l)(3) does not authorize retroactively suspending liquidation of entries made prior to the date of initiation of the scope inquiry when such entries were not already suspended by CBP.

However, Commerce's discussion of this issue in the remand also makes explicit reference to 19 U.S.C. § 1516a(c) and (e). *See* Remand Redetermination at 62, 102-03. The Federal Circuit has explained that these provisions governing the liquidation of entries subject to judicial review are "designed to ensure that the rights of the parties are not irrevocably compromised before the judicial review process has been completed and the rights of the respective parties are settled." *Diamond Sawblades Mfrs. Coalition v. United States*, 626 F.3d 1374, 1380 (Fed. Cir. 2010). When a party files an action to contest Commerce's determination

that a product falls within the class or kind of merchandise covered by an order, it may seek a statutory injunction to prevent liquidation of its entries in accordance with the contested determination while the litigation is pending.  *See* 19 U.S.C. § 1516a(c)(2).  Vandewater did so at the outset of this litigation and the Court issued a statutory injunction enjoining liquidation of unliquidated entries of Vandewater's steel branch outlets.  *See* ECF No. 23.  Section 1516a(e) provides, in relevant part, that "entries, the liquidation of which was enjoined under subsection (c)(2), shall be liquidated in accordance with the final court decision in the action."

In *Timken Co. v. United States*, the Federal Circuit held that liquidation under 19 U.S.C. § 1516a(e) must await a final and conclusive court decision in the action.  *See* 893 F.2d at 339-42.  In analyzing the plain meaning of section 1516a(e), the Federal Circuit explained that "the term 'final court decision' must be read together with the words that follow, specifically, 'in the action'" and "'{a}n action' does not end when one court renders a decision, but continues through the appeal process."  *Id.* at 339.  The Federal Circuit reasoned that "final" under section 1516a(e) must be given the same meaning as "final" under 28 U.S.C. § 2645(c), which states that "'{a} decision of the {Court of International Trade} is final and conclusive, unless retrial or rehearing is granted . . . or an appeal is taken to the {Federal Circuit}."  *Id.* at 339-40 (quoting 28 U.S.C. § 2645(c)).  A statutory injunction under 19 U.S.C. § 1516a(c)(2) thus prevents liquidation of the enjoined entries until a final and conclusive court decision is reached, and such a decision does not occur until all avenues of appeal are exhausted.  *See id.* at 339.  Subsequent decisions of the Federal Circuit have reaffirmed this understanding of 19 U.S.C. § 1516a(e).  *See, e.g.*, *Diamond Sawblades*, 626 F.3d at 1381; *Hosiden Corp. v. United States*, 85 F.3d 589, 590-91 (Fed. Cir. 1996).  Indeed, the injunction issued in this action provides that "the entries subject to this

injunction shall be liquidated in accordance with the final court decision in this action, *including all appeals and remand proceedings*, as provided in 19 U.S.C. § 1516a(e)."  ECF No. 23.

Further, because at the time this Court issues final judgment "there is no way to know what the *conclusive* decision will be . . . , it is necessary to suspend liquidation until there is a *conclusive* decision in the action."  *Timken*, 893 F.2d at 341.  Suspension of liquidation preserves the *status quo* and the parties' substantive rights to the eventual outcome while the agency's determination is being challenged and the conclusive outcome is uncertain.  Therefore, to ensure that enjoined entries are liquidated in accordance with the final and *conclusive* court decision in this action, as required by 19 U.S.C. § 1516a(e), Commerce stated that liquidation of entries predating the date of initiation of the scope inquiry (*i.e.*, October 30, 2020) that are suspended pursuant to Commerce's final scope ruling will continue to be suspended at a zero percent cash deposit rate pending any further appeal.  *See* Remand Redetermination at 103.  Commerce has consistently adopted this approach in prior cases under similar circumstances.  *See, e.g.*, *Certain Steel Nails from the People's Republic of China: Notice of Court Decision Not in Harmony With Final Scope Ruling and Notice of Amended Final Scope Ruling Pursuant to Court Decision*, 86 Fed. Reg. 43,993 (Dep't of Commerce Aug. 11, 2021); *Carbon and Certain Alloy Steel Wire Rod from Mexico: Notice of Court Decision Not in Harmony With Final Results and Notice of Amended Final Determination*, 80 Fed. Reg. 44,326, 44,327 (Dep't of Commerce July 27, 2015); *Aluminum Extrusions from the People's Republic of China: Notice of Court Decision Not in Harmony With Final Scope Ruling and Notice of Amended Final Scope Ruling Pursuant to Court Decision*, 78 Fed. Reg. 34,984, 34,985 (Dep't of Commerce June 11, 2013); *Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China:  Notice of Court Decision Not in*

*Harmony With Final Scope Ruling and Notice of Amended Final Scope Ruling Pursuant to Court Decision*, 76 Fed. Reg. 4,633, 4,633 (Dep't of Commerce Jan. 26, 2011).

Continuing to focus their arguments on 19 C.F.R. § 351.225(l), the importers argue that "{t}here is nothing in the regulation that suggests that cash deposits and suspension should be handled differently, since both are addressed in the very same sentence of the regulation." SCI Cmts. 5. Although there are many circumstances in which entries are simultaneously subject to suspension of liquidation and cash deposit requirements, the Federal Circuit has explained that the provisions under 19 U.S.C. § 1516a that deal with liquidation of entries do not govern all other legal consequences of the Court's final decision (*e.g.*, collection of cash deposits). *See Diamond Sawblades*, 626 F.3d at 1378-82. Suspension of liquidation is required until there is a final and conclusive court decision in the action because of the "irrevocable consequences of liquidation." *Id.* at 1380 (citing *Decca Hospitality Furnishings, LLC v. United States*, 427 F. Supp. 2d 1249, 1264 (Ct. Int'l Trade 2006)).

Conversely, whether Commerce collects cash deposits after a final decision by the Court does not result in an irrevocable consequence because cash deposits may be paid or refunded with interest if this Court's final decision is reversed on appeal. *Id.* For example, Commerce previously has continued suspending liquidation pending completion of the judicial review process but refunded cash deposits and released any bond or other security pursuant to 19 U.S.C. § 1673d(c)(2)(A)-(B) after this Court's decision resulted in the exclusion of one company from an order. *See, e.g.*, *Multilayered Wood Flooring from the People's Republic of China: Amendment to Notice of Court Decision Not in Harmony With the Second Amended Final Determination and Notice of Third Amended Final Determination of the Antidumping Duty Investigation*, 83 Fed. Reg. 44,027, 44,028 (Dep't of Commerce August 29, 2018). Here,

although 19 U.S.C. § 1516a(e) requires continuing to suspend liquidation of the entries at issue

until a final and conclusive court decision, the Federal Circuit's decision in *Diamond Sawblades*

supports adjusting cash deposit requirements consistent with 19 C.F.R. § 351.225(l)(3) if this

Court's final judgment sustains the remand redetermination.

The importers claim that Commerce has proposed suspending liquidation in a manner

that is impermissibly retroactive back to the date of first suspension in the antidumping duty

proceeding in 1992.  *See* SCI Cmts. 4-5, 8-14.  In support, they rely on the Federal Circuit's

decisions in *United Steel and Fasteners* and *Supreme*.  *Id.* at 11-14.  Both *United Steel and*

*Fasteners* and *Supreme* discuss the bounds of Commerce's authority under 19 C.F.R.

§ 351.225(l) to instruct CBP to suspend (or continue to suspend) liquidation and collect cash

deposits after Commerce issues a ruling that a product is covered by the scope of an antidumping

or countervailing duty order.  Here, on September 10, 2018, Commerce issued the final scope

ruling pursuant to 19 C.F.R. § 351.225(d) and determined that Vandewater's steel branch outlets

are covered by the scope of the *China BWPFs Order*.  Upon making this determination,

Commerce instructed CBP to "{c}ontinue to suspend liquidation of entries of carbon steel butt-

weld pipe fittings from the People's Republic of China, including Vandewater International

Inc.'s steel branch outlets imported by Vandewater Inc. . . . ."  Memo re: CBP In-Scope

Instruction, P.D. 50, barcode 3754200-01 (Sept. 17, 2018).  This instruction is consistent with

*United Steel and Fasteners* because, unlike the facts presented in that case, Commerce did not

instruct CBP to *begin* suspending liquidation of Vandewater's entries of steel branch outlets

retroactive to the date of first suspension in the antidumping duty proceeding as the importers

claim.  Commerce instructed CBP to *continue* suspending liquidation and "{t}here is nothing

'retroactive' about continuing to suspend liquidation where liquidation has already been

suspended for the entire relevant period." *Sunpreme*, 946 F.3d at 1319.  The importers state that

there was no suspension to "continue" because Vandewater's outlets were not subject to

suspension prior to the date of the final scope ruling.  *See* SCI Cmts. 8-11.  The record does not

contain any evidence regarding whether entries were already subject to an existing suspension by

CBP.  However, even assuming *arguendo* that they were not subject to an existing suspension,

the importers have not identified any language in the instruction that instructed CBP to suspend

liquidation retroactively.  Indeed, Vandewater did not include a challenge to the instructions that

Commerce issued regarding the final scope ruling, indicating that the importers' arguments at

this stage primarily concern entries that were made between the date of the final scope ruling

(*i.e.*, September 10, 2018) and the date of initiation of the scope inquiry (October 30, 2020).

Moreover, the facts here are distinct from the facts present in *United Steel and Fasteners*

and *Sunpreme*.  Specifically, the final scope ruling was remanded for Commerce to conduct a

scope inquiry and evaluate the (k)(2) criteria.  After conducting the scope inquiry on remand,

Commerce explained that the entries of steel branch outlets that were suspended by CBP

pursuant to the final scope ruling and that predate the date of initiation of the scope inquiry

would be liquidated without regard to antidumping duties if the final and conclusive court

decision in this action sustains the remand redetermination.  *See* Remand Redetermination at

102-03.  This approach ensures that the entries at issue will be liquidated in accordance with the

requirements of 19 U.S.C. § 1516a(e) and 19 C.F.R. § 351.225(l), whereas the importers' request

to lift suspension for the entries before there is a final and conclusive court decision would be

inconsistent with 19 U.S.C. § 1516a(e).  Neither *United Steel and Fasteners* nor *Sunpreme*

address the interplay of the requirements under 19 U.S.C. § 1516a(e) and 19 C.F.R. § 351.225(l)

when a final decision of this Court sustains an affirmative scope determination after Commerce

initiates a scope inquiry and evaluates the (k)(2) criteria on remand.  Indeed, it is the Court's

October 2018 injunction under section 1516a that enjoins the United States from liquidating any

unliquidated entries of subject merchandise entered on or after June 24, 1992.  *See* ECF No. 23.

Lastly, the importers state that the "fundamental failure" in Commerce's proposed course

of action is that Vandewater's entries of steel branch outlets predating the date of initiation of the

scope inquiry may not be subject to suspension of liquidation, even if the scope determination

based on an analysis of the (k)(1) sources is later reinstated in this action.  *See* SCI Cmts. 11.

This statement is incorrect because all entries suspended by CBP pursuant to the September 10,

2018, final scope ruling and the previously-issued instructions would be subject to suspension of

liquidation pursuant to 19 C.F.R. § 351.225(l)(3) if the (k)(2) analysis conducted on remand is

later reversed in favor of the original (k)(1) analysis.  Stated differently, the date of the final

scope ruling would become the start date for any new suspension rather than the date that

Commerce initiated the scope inquiry on remand.  Thus, suspension of liquidation is required

under 19 U.S.C. § 1516a(e) to ensure that the parties' rights are not irrevocably compromised

and that the entries at issue are liquidated in accordance with the final and conclusive court

decision in this action.

## <u>CONCLUSION</u>

For these reasons, Commerce's remand redetermination complies with the Court's order,

is supported by substantial evidence, is otherwise lawful, and should be sustained.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

46

/s/ L. Misha Preheim

L. MISHA PREHEIM
Assistant Director

/s/ Joshua E. Kurland

OF COUNSEL:                            JOSHUA E. KURLAND
SAAD Y. CHALCHAL                       Trial Attorney
Senior Attorney                        U.S. Department of Justice
Office of the Chief Counsel            Commercial Litigation Branch
for Trade Enforcement and Compliance   P.O. Box 480
U.S. Department of Commerce            Ben Franklin Station
                                       Washington, D.C. 20044
                                       Tel: (202) 616-0477
                                       Fax: (202) 353-0461
                                       Email: Joshua.E.Kurland@usdoj.gov

January 11, 2022                       *Attorneys for Defendant United States*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation set forth in the Court's August 5, 2021 scheduling order and contains approximately 14,761 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied on the word count function of the word processing system used to prepare the brief.


/s/ Joshua E. Kurland