Slip Op. 22-104

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| VANDEWATER INTERNATIONAL INC., | |
| Plaintiff, | |
| and | |
| SIGMA CORPORATION, and SMITH-COOPER INTERNATIONAL, INC., | |
| Plaintiff-Intervenors, | Before: Leo M. Gordon, Judge |
| v. | Court No. 18-00199 |
| UNITED STATES, | |
| Defendant, | |
| and | |
| ISLAND INDUSTRIES, | |
| Defendant-Intervenor. | |

**OPINION**

[Sustaining Commerce's Remand Results.]

Dated: September 8, 2022

Richard P. Ferrin, D. Alicia Hickok, and Douglas J. Heffner, Faegre Drinker Biddle & Reath, LLP of Washington, D.C., for Plaintiff Vandewater International, Inc.

Lucius B. Lau, Walter Spak, and Ron Kendler, White & Case LLP of Washington, D.C., for Plaintiff-Intervenor SIGMA Corporation.

Gregory S. McCue and Zachary Simmons, Steptoe & Johnson LLP of Washington, D.C., for Plaintiff-Intervenor Smith-Cooper International, Inc.

Joshua E. Kurland, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for Defendant United States. With him

on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>L. Misha Preheim</u>, Assistant Director.  Of counsel was <u>Saad Y. Chalchal</u>, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, D.C.

<u>Matthew J. McConkey</u>, Mayer Brown LLP of Washington, D.C., for Defendant-Intervenor Island Industries.

Gordon, Judge: This action involves the scope of the antidumping duty order on Carbon Steel Butt-Weld Pipe Fittings ("BWPFs") from the People's Republic of China that covers:

> carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form.  These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (<u>e.g.</u>, threaded, grooved, or bolted fittings).  Carbon steel butt-weld pipe fittings are currently classified under subheading 7307.93.30 of the Harmonized Tariff Schedule (HTS).  Although the HTS subheading is provided for convenience and customs purposes, our written description of the scope of the order is dispositive.

<u>Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China</u>, 57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992) ("<u>China BWPFs Order</u>").  Plaintiff Vandewater International Inc. ("Vandewater") sought a scope ruling from the U.S. Department of Commerce ("Commerce") as to whether its products, steel branch outlets used to join sections in fire sprinkler systems, were covered by the <u>China BWPFs Order</u>.  Commerce determined that these products were within the scope of the <u>China BWPFs Order</u>.  <u>See</u> <u>Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China</u>, ECF No. 25-4 (Dep't of Commerce Sept. 10, 2018) (final scope ruling on Vandewater's steel branch outlets) ("<u>Final Scope Ruling</u>").  Plaintiff-Intervenors SIGMA

Corporation ("SIGMA") and Smith-Cooper International, Inc. ("SCI") similarly sought scope rulings from Commerce excluding their respective outlet products from the China BWPFs Order.  And, as with Vandewater, Commerce determined that SIGMA and SCI's outlet products were covered by the China BWPFs Order.  See Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, Court No. 19-00003, ECF No. 29-4 (Dep't of Commerce Dec. 11, 2018) (final scope ruling on SIGMA's fire-protection weld outlets); Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China, Court No. 19-00011, ECF No. 29-4 (Dep't of Commerce Dec. 10, 2018) (final scope ruling on SCI's cooplet weld outlets).    Plaintiffs collectively now challenge Commerce's determinations that their respective outlet products fall under the scope of the China BWPFs Order.[1]

The court presumes familiarity with the history of this action.  See Vandewater Int'l, Inc. v. United States, 44 CIT ___, 476 F. Supp. 3d 1357 (2020) ("Vandewater I"). In Vandewater I, the court held that "Commerce unreasonably concluded that the sources in 19 C.F.R. § 351.225(k)(1) were dispositive on the inclusion of Plaintiff's steel branch outlets within the Order," and remanded the matter to Commerce "to conduct a full scope inquiry and evaluate the factors under 19 C.F.R. § 351.225(k)(2)."  Vandewater I, 44 CIT at ___, 476 F. Supp. 3d at 1359.

---

[1]  Plaintiffs all commenced their own individual actions—Vandewater (Court No. 18-00199); SIGMA (Court No. 19-00003); and SCI (Court No. 19-00011).  Because each action had its own administrative record, the court did not consolidate the three actions.  However, for litigation efficiency, the court permitted SIGMA and SCI to intervene in this action and brief the merits.

Before the court are Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 112 ("Remand Results"), filed pursuant to Vandewater I. On remand, Commerce "continue[d] to find that Vandewater's outlets are within the scope of the China BWPFs Order pursuant to an analysis under the (k)(2) criteria."  See Remand Results at 2.  Plaintiffs challenge that determination.  See Comments of Vandewater in Opp'n to Commerce's Remand Redetermination, ECF No. 133 ("Vandewater Comments"); SIGMA's Comments in Opp'n to Remand Results, ECF No. 132 ("SIGMA Comments"); Comments of SCI in Opp'n to Commerce's Remand Redetermination, ECF No. 134 ("SCI Comments"); see also Defendant's Response to Comments on the Remand Results, ECF No. 144 ("Def.'s Resp."); Defendant-Intervenor's Response to Comments on the Remand Results, ECF No. 146.  SCI's comments focused on challenging as unlawful Commerce's determination that it would "continue" to suspend liquidation of Plaintiffs' entries that pre-date the initiation of the underlying scope inquiry.  See SCI Comments at 2–14.  The court has jurisdiction pursuant to Section 516A(a)(2)(B)(vi) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi)[2], and 28 U.S.C. § 1581(c) (2018).  For the reasons set forth below, the court sustains Commerce's analysis and scope determination in the Remand Results.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, (1966).

Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2022).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record."  8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2022).

## II. Discussion

### A. Framework of 19 C.F.R. § 351.225(k)

Scope proceedings are governed by 19 C.F.R. § 351.225.  Commerce may self-initiate a scope proceeding, see § 351.225(b), or an interested party may submit a request for a scope ruling, see § 351.225(d).  In determining whether a product is covered by the scope of an order, Commerce will consider the "language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of the merchandise expressly excluded from the scope, is dispositive."   19 C.F.R. § 351.225(k)(1).  Additionally, Commerce may consider the following interpretive sources in making its determination—the descriptions of the merchandise contained in the petition pertaining to the subject order, the initial investigation, and Commerce's prior or concurrent determinations, including prior scope determinations pertaining to the subject order, and other orders with similar language, and determinations of the U.S. International Trade Commission ("ITC") regarding the subject order.  § 351.225(k)(1)(i).  If the (k)(1) sources are not dispositive, then Commerce is to conduct a full scope inquiry and consider the additional criteria in § 351.225(k)(2)—namely, (1) the product's physical characteristics, (2) ultimate purchasers' expectations, (3) the ultimate use of the product, (4) trade channels in which the product is sold, and (5) the manner in which the product is advertised and displayed.  § 351.225(k)(2).  At the conclusion of its scope inquiry, Commerce will issue a final scope ruling.  § 351.225(h).  As noted previously, the court, in Vandewater I, rejected Commerce's determination that the (k)(1) sources were

dispositive, and directed Commerce to conduct a full scope inquiry and evaluate the additional criteria provided under § 351.225(k)(2).  See Remand Results at 9–10.

### B. Commerce's Analysis Under 19 C.F.R. § 351.225(k)(2)

After evaluating the (k)(2) criteria, Commerce determined that Vandewater's steel branch outlets are sufficiently similar to unambiguous examples of subject merchandise and that the record supported the determination that Vandewater's products fell within the China BWPFs Order.  See Remand Results at 45–96.  Specifically, Commerce found that:

(i) steel branch outlets possess physical characteristics that are similar to other subject merchandise because they are formed or forged, made of carbon steel, have a diameter of less than 14 inches, and are designed to have at least one end with a beveled edge for permanent attachment to a pipe or fitting (id. at 45–54);

(ii) the expectations of ultimate purchasers of steel branch outlets and other subject merchandise are similar because they expect both to be welded into permanent, fixed piping systems for gases or liquids, and fire sprinkler systems are a contemplated application for subject merchandise (id. at 54–57);

(iii) the ultimate uses of steel branch outlets and other subject merchandise are similar because both are permanently welded to piping systems to change or divide the flow of liquids, e.g., redirecting water in an automatic fire sprinkler system (id. at 58–60);

      (iv) steel branch outlets and other subject merchandise are sold in similar channels of trade because they are both sold through distributors and to fabricators and contractors (id. at 60); and

      (v) steel branch outlets and other subject merchandise are similarly advertised and displayed in online catalogs (id. at 60–62).

Plaintiffs challenge Commerce's findings on each of the (k)(2) criteria as unreasonable. See Vandewater Comments; SIGMA Comments; SCI Comments.

### 1. Physical Characteristics

Commerce found that "the physical characteristics of outlets and BWPFs subject to the China BWPFs Order are similar." Remand Results at 45. Specifically, Commerce concluded that the scope language in the China BWPFs Order "indicates that subject merchandise must be formed or forged, made of carbon steel, and have a diameter of less than 14 inches." Id. Commerce further found that "to be an in-scope 'butt-weld pipe fitting,' the merchandise must be designed to have at least one end with a beveled edge, whether contoured or not, for permanent attachment to at least one pipe or fitting and may have a temporary connection on another end." Id. Based on the record, Commerce determined that Vandewater's outlets meet these criteria. Id. at 46 ("the record demonstrates that Vandewater's outlets are consistent with BWPFs in terms of manufacturing method (i.e., formed/forged), material (i.e., carbon steel forged steel bars or welded pipe), and size requirements (i.e., less than 14 inches in inside diameter). Like all BWPFs, the outlets feature a beveled edge for permanent attachment to a pipe or fitting.")).

Plaintiffs argue that the physical characteristics of subject BWPFs are distinct from Vandewater's outlets.  Plaintiffs focus much of their argument, both in the proceeding below and in this action, on the differences between the physical characteristics of their outlets and the subject BWPFs, as this prong of the (k)(2) analysis is critical.  See 19 C.F.R. § 351.225(k)(2)(ii) (providing that "[i]n the event of a conflict between the factors under paragraph (k)(2)(i) of this section, [the physical characteristics factor] will normally be allotted greater weight than the other factors").

### a. End-to-End Connection

Plaintiffs first contend that a "butt weld is—by definition—an end-to-end welded connection," and maintain that Commerce cannot reasonably defend its finding that "contoured edges that connect to the midsection of a pipe [constitute] butt-weld pipe fittings."  See Vandewater Comments at 3, 11.  Plaintiffs further maintain that Commerce disregarded evidence supporting the conclusion that a BWPF is "intended to be an end-to-end connection."  See id. at 9–11.  They emphasize that information in the Petition, as well as the ITC's 2016 Sunset Review of the China BWPFs Order, supports their position.  Id.; see also Vandewater I, 44 CIT at ___, 476 F. Supp. 3d at 1362 (agreeing with Plaintiffs that product descriptions of covered merchandise from 2016 ITC Sunset Review and Petition, particularly as to "beveling on both parts of the assembled piping," did not reasonably support Commerce's conclusion that (k)(1) sources dispositively demonstrated that steel branch outlets are covered by China BWPFs Order).  With respect to the product catalogs and specification sheets relied on by Commerce, Plaintiffs argue that this "out-of-context" information cannot serve as a reasonable basis for

Commerce's conclusion that BWPFs do not require end-to-end connections. Id. at 11–15. Plaintiffs stress that various distinctions in the wording and description of outlets as compared to BWPFs demonstrate that the sources relied upon by Commerce cannot reasonably provide a "sufficient basis for determining the meaning of a 'butt-welded' pipe fitting, as found within the scope." Id. at 12.

Plaintiffs also dispute Commerce's reading of the term "butt-weld" in those sources, maintaining that off-hand references to the term "butt-weld" is not indicative of industry recognition that outlets are BWPFs that would fall under the scope of the China BWPFs Order. Id. at 12–14. Ultimately, Plaintiffs ask the court to hold that Commerce erred in determining the meaning of "butt-weld" (i.e., that BWPF may have a "contoured edge that connects [the product] to the midsection of the header or run pipe") on the basis of an inference from the use of that term in product catalogs and specification sheets found in the record. Instead, Plaintiffs would have Commerce determine that a BWPF may only involve an "end-to-end connection" on the basis of a reasonable inference from other information on the record, including the offered opinion of an expert submitted by Vandewater and the findings by the ITC in its 2016 Sunset Review. Id.

In rejecting Plaintiffs' arguments, Commerce found that "the record evidence establishes that products with a contoured edge that are designed to connect to the mid-section of a pipe can be BWPFs." Remand Results at 47. Specifically, Commerce found that "[i]n its product specification sheets, Aleum USA, a U.S.-based distributor of outlets, describes its female threaded outlet and grooved outlet as having "[b]utt welding ends." Id. (further noting that "[l]ike Vandewater's outlets, Aleum USA's outlets have one

threaded or grooved end and a contoured edge on the other end that is connected to the middle of another pipe.").  Commerce also highlighted that "[t]he exhibits accompanying the Petition included a product catalog from a U.S. producer of the domestic like product with illustrations of basic shapes of BWPFs (under the heading 'seamless welded fittings') and among them is a product that is referred to as a saddle, which, like Vandewater's outlets, has a contoured edge and is connected to the midsection of a pipe."  Id. (adding that "the current version of the same U.S. producer's product catalog continues to include saddles as a type of 'seamless welded fitting,' and the product is displayed side-by-side with a full range of other BWPFs" and that "the product catalog for a major U.S. distributor of pipes and fittings also includes a saddle as one of the various 'standard butt weld fitting types.'").  Consequently, Commerce determined that "the contoured edge that connects Vandewater's outlets to the midsection of the header or run pipe is not a physical characteristic that distinguishes the outlets from BWPFs that are subject to the scope of the China BWPFs Order, such as saddles."  Id. at 48.  Given the record, the court cannot agree with Plaintiffs that Commerce's determination here was unreasonable.

Plaintiffs further contend that Commerce failed to appreciate the importance of the angle of the beveled edges in analyzing the physical characteristics of subject outlets and BWPFs.  See Vandewater Comments at 11 (arguing that BWPFs are required to have end-to-end connections that "impact[ ] the very shape of the fitting itself, requiring ends that are beveled at a 37.5 degree angle").  To the contrary, Commerce found that the China BWPFs Order contains no specifications as to any particular bevel angle for subject BWPFs.  Remand Results at 48.

Plaintiffs now argue that Commerce's reasoning is "detached from reality and the record evidence." Vandewater Comments at 11. The court disagrees. While Commerce agreed that the "Petition and prior ITC determinations state that the beveled edges of BWPFs distinguish BWPFs from other pipe fittings," Commerce highlighted that "none of these sources indicate that the edge must be beveled at a particular angle for the fitting to be considered a BWPF." Remand Results at 48. Commerce explained that adopting Plaintiffs' suggestion that a BWPF requires a specific bevel angle for proper installation would result in an "end-use requirement for subject merchandise" that would inappropriately be based on the "physical characteristics of the recipient pipe, rather than on the physical characteristics of the outlets in question." Id. at 49. Since Plaintiffs ultimately fail to demonstrate that Commerce's determination is unreasonable, the court rejects their arguments that Commerce did not reasonably account for the importance of the bevel angle in analyzing the subject outlets and BWPFs.

### b. Forged Steel Fittings Comparison

Plaintiffs further maintain that Commerce's finding that a BWPF need not have an end-to-end connection is unreasonable in light of Commerce's finding in a prior proceeding that "butt weld fittings can only have butt welded end connections." See Vandewater Comments at 15–16 (quoting final scope decision memorandum from investigations of Forged Steel Fittings from China, Italy, and Taiwan, PR[3] 21 at Tab 8 (Dep't of Commerce July 13, 2018)). As Commerce explained, to qualify as "butt weld

---

[3] "PR ___" refers to a document contained in the public administrative record, which is found in ECF No. 131-1 unless otherwise noted.

outlets" or "butt weld fittings" that would be excluded from the scope of the <u>Forged Steel Fittings</u> investigations, "butt weld outlets must be butt welded at both end connections to be excluded from the scope of the investigations." <u>Id.</u> at 15 (further quoting with emphasis Commerce's statement that "<u>[o]utlets with a socket-weld or threaded end connection, or with only one butt weld end connection, are not considered a butt weld fitting and, therefore, are not excluded from the scope of the investigations</u>"). Plaintiffs maintain that Commerce's "detailed discussion" of the nature of butt weld fittings in that prior scope memorandum "should be the end of the matter" as "Vandewater's grooved and threaded welded outlets are not butt-weld pipe fittings because their end connections on the run side are grooved or welded, not butt-weld end connections." <u>Id.</u> at 16.

Plaintiffs' argument falls short, however, because the scope exclusion guidelines Commerce determined in the <u>Forged Steel Fittings</u> investigation do not neatly correspond to the scope of products covered under the <u>China BWPFs Order</u>. <u>See</u> <u>Remand Results</u> at 85 n.539 (noting that "construction of an exclusion in a separate proceeding is not determinative here" and further finding "that Vandewater's outlets do, in fact, feature a butt-welded connection to the run pipe."). As Plaintiffs acknowledge, Commerce found that products such as caps and lap joint stub ends, which would not meet the narrow definition of BWPFs under the <u>Forged Steel Fittings</u> exclusion guidelines, nevertheless are plainly within the scope of the <u>China BWPFs Order</u>. <u>See</u> Vandewater Comments at 16–17.

Plaintiffs argue that Commerce may not differ in defining what constitutes BWPFs in its <u>Forged Steel Fittings</u> analysis versus the (k)(2) analysis here. However, that

argument ignores the different purposes and records undergirding the two analyses. As Commerce noted, accepting Plaintiffs' narrow definition of BWPFs and strictly abiding by the Forged Steel Fittings analysis would require it to ignore the product catalogs on the record that plainly support the finding that there is broader understanding of the term "butt-weld" and BWPFs intended to be covered by the China BWPFs Order.  See Remand Results at 85.  Accordingly, Commerce's analysis of butt weld fittings in the Forged Steel Fittings investigations does not control here, nor did Commerce act unreasonably in determining a broader definition for BWPFs in this matter than was used to determine scope exclusions in the Forged Steel Fittings investigations.

### c. Product Comparisons

Much of the parties' disagreement about physical characteristics stems from Commerce's comparison of the subject outlets to other products described in the record that appear to be covered as BWPFs by the China BWPFs Order, including caps, lap joint stub ends, and saddles.  See Remand Results at 83–89 ("We also find that outlets have a variety of characteristics in common with other common BWPFs, such as having one butt-welded end (similar to caps and lap joint stub ends) and also attach to a header pipe via a butt-weld (similar to saddles).").  Though Plaintiffs maintain that various physical characteristics of outlets make them unique from BWPFs, Commerce addressed each potentially distinguishable physical characteristic raised and found that other products covered by the China BWPFs Order also had the physical characteristics that Plaintiffs claimed were exclusive to outlets and not found in BWPFs.  Commerce explained why it rejected Plaintiffs' preferred findings, noting that:

> this line of argument, downplaying the similarity between
> outlets and caps, for instance, reflects a broader flaw in the
> importers' arguments throughout their comments – they
> continue to attempt to artificially narrow the scope of the <u>China
> BWPFs Order</u> by pointing to subsets of subject merchandise
> (or subsets of uses/expectation, as discussed below) in their
> analysis.  This is incorrect.  In our (k)(2) analysis, we must
> assess physical similarities between outlets and other
> in-scope merchandise; this includes cap, lap joint stub ends,
> elbows, and the variety of fittings that fall within the greater
> heading of BWPFs.

<u>Remand Results</u> at 88.

In their remand comments, Plaintiffs continue to attempt to distinguish subject

outlets from caps, lap joint stub ends, saddles, and other similar products considered to

be BWPFs based on their physical characteristics, <u>see</u> Vandewater Comments at 16–17,

while maintaining that Commerce erred in assuming saddles to be BWPFs.  <u>Id.</u> at 17–18

("While it is dispositive that Vandewater's threaded and grooved outlets have zero

connections capable of being butt welded, it merits emphasis that a saddle is <u>not</u> a

butt-weld pipe fitting.").[4]  In arguing that saddles are not a type of BWPF, Vandewater

focuses on the distinct "function" of saddles from other BWPFs.  In so doing, Vandewater

fails to engage with evidence on the record plainly supporting Commerce's finding that

saddles are a type of BWPF.  <u>See, e.g.</u>, <u>Remand Results</u> at 47 n.335 (noting that Petition

identifies that "Butt-weld fittings come in several basic shapes: 'elbows', 'tees', 'caps', and

---

[4] Notably, here there appears to be some disagreement between Vandewater and SIGMA
that saddles may constitute BWPFs.  Vandewater maintains that saddles are not BWPFs,
while SIGMA acknowledges that saddles are BWPFs, but does not agree that any
physical similarities between outlets and saddles reasonably justifies a finding that outlets
share the same physical characteristics as BWPFs.  <u>See</u> Vandewater Comments
at 17–18; SIGMA Comments at 7–8.

'reducers'… Illustrations of the various types of butt-weld fittings are attached at Appendix B," and that Appendix B includes "an illustration of 'saddles' as a type of BWPF"). Commerce specifically explained that it disagreed with "Vandewater['s assertion] that saddles are not BWPF, and that it was merely coincidence that the image of a saddle was included among BWPFs in the petition." Id. (explaining that "[t]he catalog page in the Petition displays numerous products that are unambiguously BWPFs, including products shown before and after saddles, e.g., elbows," and further noting that "the subsection of the image containing the saddle illustration also contains an image of a cap, which is clearly an in-scope BWPF."). In light of the record, the court concludes that Commerce reasonably identified saddles as a type of BWPF that has physical characteristics comparable to the subject outlets.

### d. Sperko Report

Plaintiffs also contend that Commerce failed to fully consider the report of Walter Sperko, President of Sperko Engineering Services, Inc., who provided his expert opinion in support of Plaintiffs' position that the subject outlets are not BWPFs. See Vandewater Comments at 3–9; Remand Results at 27 n.185 (identifying Mr. Sperko). Plaintiffs maintain that "Commerce's disregard of the substance and sources relied on in the Sperko Declaration, except for … two offhand and inaccurate references … show that Commerce's conclusion was not based on substantial evidence." Vandewater Comments at 9; see also SIGMA Comments at 7 ("the Redetermination contains no meaningful discussion of the expert report of Walter Sperko, P.E. – to which SIGMA, Vandewater, and SCI all cited in their comments prior to Commerce's issuance of the remand.").

Plaintiffs' arguments, however, do not address other evidence on the record that supports

Commerce's determination.  As Commerce explained:

> Ultimately, the importers ask us to ignore the product catalog of Aleum USA and Bonney Forge (the latter of which was placed on the record by Vandewater) and to place greater weight on the expert affidavit provided in support of Vandewater's scope request and an affidavit placed on the record for the purpose of this litigation.  We decline to do so, and we note that Commerce regularly considers whether documents are prepared in the ordinary course of business— or prepared specifically for the administrative proceeding—in determining the appropriate weight to accord to record evidence.  Moreover, as discussed elsewhere in these final results, we find that portions of the affidavits support our conclusion regarding the scope status of Vandewater's outlets.

Remand Results at 85–86.  While Plaintiffs criticize Commerce for failing to adopt the

position recommended by Mr. Sperko, the court does not agree that Commerce

"disregarded" or otherwise failed to consider the information in the Sperko report.  See

Vandewater Comments at 4 n.2 (arguing that "Commerce addresses the Sperko

Declaration only superficially in footnote 542…").  Rather, it appears that Commerce

repeatedly referenced the Sperko report, highlighting that various aspects of the report

actually supported Commerce's ultimate findings on the factors.  See, e.g., Remand

Results at 49, 86, 88, 91.

As noted above, Commerce refused to afford dispositive weight to Mr. Sperko's

views, explaining that the agency would not "place greater weight on the expert affidavit

provided in support of Vandewater's scope request and an affidavit placed on the record

for the purpose of this litigation" than on the other evidence on the record.  Id. at 85–86.

Plaintiffs maintain that Commerce unreasonably failed to credit Mr. Sperko's affidavit, despite its preparation in anticipation of litigation, as such a rationale is "inconsistent with Federal Rule of Evidence 702." <u>See</u> Vandewater Comments at 4–6. Plaintiffs offer no explanation, however, for why or how the Federal Rules of Evidence apply to Commerce's administrative determinations or its discretionary decision-making in determining the appropriate weight to accord the evidence on the record. <u>See</u> <u>id.</u> at 5 n.3 ("Although F.R.E. 702 is not binding on the factfinder here (Commerce), the underlying principles should guide Commerce, and this Court in its role in vetting Commerce's fact-finding for substantial evidence."). Accordingly, the court sustains Commerce's consideration of the Sperko report.

### e. Industry Standards

Vandewater argues that "[t]hroughout the administrative proceeding, Vandewater has consistently emphasized that a critical difference between outlets and butt-weld pipe fittings is that outlets meet the MSS-SP-97 industry standard, which is different from the ANSI/ASME B16.9 specification that governs butt-weld pipe fittings." Vandewater Comments at 18–19. Commerce rejected Plaintiffs' proposed distinction of outlets from in-scope BWPFs on the basis of these different industry standards, finding that adopting Plaintiffs' position would give "undue significance" to these industry standards. <u>See</u> <u>Decision Memorandum</u> at 91. Commerce further noted that "MSS SP-97 is a 'non-exclusive standard' and, in fact, several aspects of the standard incorporate by reference the standards established by ASTM and ANSI/ASME." <u>Id.</u> at 94. Commerce

emphasized that it found the two standards at issue to "reflect substantial overlap in terms of attributes, and in turn expectations, for outlets and BWPFs." Id. at 91.

Plaintiffs maintain that Commerce's conclusion that a product could conform to both ANSI/ASME B16.9 and MSS SP-97 standards "would render those standards meaningless," and is therefore unreasonable. See Vandewater Comments at 20; SIGMA Comments at 3–7 ("Industry standards exist to define distinct products; the idea that a product could conform to multiple industry standards, thereby re-categorizing that product, would effectively render those standards meaningless."). Plaintiffs also highlight that Commerce has previously relied on distinctions in industry standards for excluding products from the China BWPFs Order. See SIGMA Comments at 5 (noting that "the CAFC has affirmed Commerce's reliance on discrete industry standards in a separate scope proceeding concerning the exact same order as the one at issue in this appeal" (citing King Supply Co., LLC v. United States, 674 F.3d 1343 (Fed. Cir. 2012))).

The court again disagrees. Plaintiffs' arguments reflect an unwillingness to engage with Commerce's uncontradicted finding that the MSS SP-97 is a "non-exclusive standard" with "substantial overlap" of the ANSI/ASME B16.9 standard. Though Plaintiffs are correct that Commerce has relied on industry standards as one relevant consideration in concluding that certain products should be included under the China BWPFs Order, Plaintiffs ignore the fact that Commerce also found that the merchandise at issue to be "physically identical to the products described in the first sentence of the [China BWPFs Order]." See SIGMA Comments at 5 (quoting King Supply Co., LLC, 674 F.3d at 1347). Additionally, while King Supply supports the proposition that Commerce does consider

industry standards in reaching its determinations as to the scope of the <u>China BWPFs</u> <u>Order</u>, it does not support Plaintiffs' follow-on proposition that products that do not fall within the industry standards should automatically be excluded from the <u>China BWPFs</u> <u>Order</u>.  See <u>id.</u> at 6 (arguing that "[i]t follows that, where a product is neither physically identical to the products described in the <u>Order</u>, nor produced according to these industry standards, it will <u>not</u> fall within the scope of the <u>Order</u>.").  Ultimately, Plaintiffs urge the court to conclude that Commerce should have reached a different conclusion based on an inference that the different industry standards serve to establish distinct product categories.  Commerce refused to draw Plaintiffs' preferred inference, and instead determined that the "substantial overlap" in the similarities of those standards did not support a distinction between the subject outlets and BWPFs.  <u>Decision Memorandum</u> at 91, 94.

Plaintiffs offer what may well be a reasonable conclusion.  This issue presents a close question.  However, for Plaintiffs to establish that Commerce's analysis of the physical characteristics of BWPFs and outlets was unreasonable, they must demonstrate that their preferred outcome was the "one and only reasonable" conclusion Commerce could reach in light of the record.  See <u>Pokarna Engineered Stone Ltd. v. United States</u>, 45 CIT ___, ___ 547 F. Supp. 3d 1300, 1308 (2021) ("A party's ability to point to an alternative, reasonable finding on the agency record does not provide a basis for the court to set aside an agency's determination."); <u>see also</u> <u>Mitsubishi Heavy Indus. Ltd. v. United</u> <u>States</u>, 275 F.3d 1056, 1062 (Fed. Cir. 2001) ("the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from

being supported by substantial evidence." (quoting <u>Consolidated Edison, Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  This Plaintiffs did not do.  Accordingly, the court cannot agree that Commerce unreasonably rejected Plaintiffs' arguments seeking to distinguish outlets from BWPFs based on industry standards.

### f. HTSUS Subheadings

Plaintiffs also challenge Commerce's finding that their outlets and BWPFs have similar physical characteristics even though their outlets are imported under a separate HTSUS subheading from BWPFs.  <u>See</u> <u>Remand Results</u> at 54.  Commerce first noted that "HTSUS subheadings listed in the scope are not dispositive." <u>Id.</u> (citing <u>Smith Corona Corp. v. United States</u>, 915 F.2d 683, 687 (Fed. Cir. 1990), as well as the language of the <u>China BWPFs Order</u> stating: "Although the {HTSUS} subheadings are provided for convenience and customs purposes, our written description of the scope of this proceeding is dispositive").  Commerce further explained that it did consider this distinction in HTSUS classifications in its analysis, but ultimately found that "the mere fact that Vandewater's outlets are imported under a different subheading within the same chapter and heading of the HTSUS as the subheading listed in the scope does not necessarily require Commerce to conclude that the outlets have physical characteristics that are distinguishable from subject merchandise." <u>Id.</u>  While Commerce acknowledged that Plaintiffs' position was supported by a prior Customs Ruling, it determined that "in light of our broader analysis regarding physical characteristics of in-scope merchandise – including the characteristics of Vandewater's outlets in particular – [the] ruling does not warrant arriving at a different conclusion here." <u>Id.</u>  Plaintiffs maintain that

the HTSUS classifications are "corroborating evidence that confirms" the correctness of their position that outlets are outside of the scope of the China BWPFs Order.  See Vandewater Comments at 22.   Thus, in Plaintiffs' view, Commerce unreasonably "disregard[ed]" the different HTSUS classifications in conducting its (k)(2) analysis.  Id.

Plaintiffs' argument is not sustainable.  Commerce expressly acknowledged that it considered the relevance of the different HTSUS classifications but concluded that this distinction was insufficient in light of the totality of the record to support a determination that "the outlets have physical characteristics that are distinguishable from subject merchandise."  See Remand Results at 54.  In reaching its conclusion, Commerce explained that "with respect to physical characteristics, we find that Vandewater's outlets are formed or forged, made of carbon steel, have a diameter of less than 14 inches, and have one butt-welded end with a beveled edge suitable for permanent attachment to a piping system that conveys gas or liquid.  We also find that outlets have a variety of characteristics in common with other common BWPFs, such as having one butt-welded end (similar to caps and lap joint stub ends) and also attach to a header pipe via a butt-weld (similar to saddles)."  Remand Results at 89.  Thus, given the record, the physical characteristics factor supports the reasonableness of Commerce's scope determination.

### 2. Expectations of Ultimate Purchasers

Commerce found that "the ultimate purchaser's expectations regarding the uses of outlets and other BWPFs are similar."  Remand Results at 55.  Specifically, Commerce observed that "[b]oth outlets and BWPFs are used in fire sprinkler systems (among other

types of piping systems), are subject to similar, and in some cases overlapping, industry standards, and are sold according to standard sizes." Id. at 57. Commerce also determined that "the record does not reveal that customers would have a significantly different expectation regarding the installation costs for outlets and BWPFs." Id. During the remand, Plaintiffs challenged the reasonableness of these findings, highlighting "four main expectations of ultimate purchasers that purportedly differ across the products: (1) compliance with a particular industry standard; (2) custom vs. standard sizing; (3) whether the product can be used in fire sprinkler systems; and (4) installation costs." Id.

Contrary to Plaintiffs' argument, Commerce found consistency across the expectations of ultimate purchasers of outlets and other BWPFs. Specifically, Commerce noted that "[o]utlets and other BWPFs are, similarly, expected to be welded into permanent, fixed piping systems for gases or liquids in plumbing, heating, refrigeration, air conditioning, and fire sprinklers systems." Id. at 90. Commerce further observed that "the fact that Vandewater's outlets have a temporary connection on one end is not a feature that distinguishes outlets from other in-scope merchandise, and, therefore, does not change consumer's expectations regarding the product." Id. Commerce also rejected Vandewater's argument that Commerce should defer to the opinion of Vandewater's expert witness, Walter Sperko, "rather than the other sources on the record, such as the ITC report, to ascertain the expectations of consumers and users." Id. As noted previously, Commerce refused to afford significant weight to the expert opinion affidavit

submitted by Vandewater, explaining that Commerce did not "find that the affidavit represents more reliable evidence than other record evidence…."  Id.

Plaintiffs now challenge Commerce's finding that "[o]utlets and other BWPFs are, similarly, expected to be welded into permanent, fixed piping systems for gases or liquids," as unreasonable.  See Vandewater Comments at 23 (quoting with emphasis Remand Results at 90).   In particular, Vandewater contends that the record "demonstrates conclusively that Vandewater's outlets are used only for functions in which its customers do not want and cannot use permanent connections."  Id.  Vandewater further argues that "[t]he reason that outlets are used, and the reason that lower pressure is necessary, is because the outlets are used for functions such as sprinkler heads, which must be capable of removal and replacement.  Butt-weld pipe fittings cannot be used for those functions."  Id.

The court disagrees with Plaintiffs that Commerce's findings on this factor are unreasonable.   Commerce concluded that the record did not support Vandewater's arguments.  Rather, it found that "[a]lthough certain types of BWPFs may be designed to handle high-pressure systems, fire protection sprinkler systems are a contemplated application of BWPFs.   This is the intended application for Vandewater's product.  Therefore, we find that outlets and other BWPFs are, similarly, expected to be welded into permanent, fixed piping systems for gases or liquids in plumbing, heating, refrigeration, air conditioning, and fire sprinklers systems."  Remand Results at 56.  While Plaintiffs urged Commerce to focus on the prevalence of BWPFs in high pressure systems rather than low-pressure sprinkler systems, Commerce highlighted that

"Vandewater itself acknowledges that '[s]ome sprinkler systems may, however, use butt-weld pipe fittings for the run pipes, to which the branch connections are attached.'" Id.  As a result, Commerce reasonably found that Plaintiffs were "simply incorrect that BWPFs are used exclusively in high-pressure settings, while outlets are used in distinct, low-pressure piping systems." Id. at 56.

### 3. Ultimate Use

Commerce determined that "the uses of Vandewater's outlets and other BWPFs are similar." Id. at 58.  Specifically, Commerce noted that "Vandewater's outlets are designed to be permanently welded to a fire sprinkler system, which is a recognized application for BWPFs subject to the scope of the China BWPFs Order.  Furthermore, even though Vandewater emphasized that its outlets are designed for fire sprinkler systems, Vandewater acknowledges that other outlets with physical characteristics that are similar to its outlets are used in a range of applications, including those that the importers identify as fundamental BWPF uses, e.g., piping connections used in the oil and gas industry." Id.

Plaintiffs challenge Commerce's finding as unreasonable, highlighting that the "ultimate purchasers of Vandewater's steel branch outlets are all fabricators of fire sprinkler systems." Vandewater Comments at 24 (further adding that "Commerce does not (and cannot) deny this fact.").  Plaintiffs maintain that this detail is critical, as "no fire sprinkler uses any butt-weld pipe fittings for branch connections to sprinkler leads, because a butt-weld pipe fitting does not have the ability to accept a sprinkler head with threads." Id.  Plaintiffs also emphasize that the ITC "has explained the use and

expectation of ultimate users of butt-weld pipe fittings by stating that '[b]utt-weld pipe fittings are used to connect pipe sections where conditions require permanent, welded connections.'" Id. (citing 2016 ITC Sunset Review at I-4).

Commerce acknowledged that Vandewater's outlets are designed for a specific use within fire sprinkler systems, but found that BWPFs are also used in fire sprinkler systems and that the minor difference in specific uses within a sprinkler system did not indicate a significant difference in the ultimate use of subject outlets as compared to BWPFs. Remand Results at 58–59 ("Such use variation is found throughout the range of BWPFs"). In disagreeing with Plaintiffs that the ITC's findings support a distinction between outlets and BWPFs, Commerce highlighted that the ITC found that BWPFs are commonly found in automatic fire sprinkler systems. Despite Plaintiffs' arguments emphasizing the different in-system uses of outlets and BWPFs, Commerce determined that "[e]ven if it is the case that the outlets and other BWPFs do not have identical or complete overlap of functions, the fact remains that the uses of outlets and other BWPFs are similar because, as explained above, both are permanently welded into automatic fire sprinkler systems to change or divide the flow of water." Id. at 59. Plaintiffs' argument demonstrating that the subject outlets may have specific uses within automatic fire sprinkler systems does not undermine the reasonableness of Commerce's conclusion that the ultimate use of BWPFs and subject outlets are similar given that both BWPFs and subject outlets are used in automatic fire sprinkler systems. Accordingly, the court concludes that Commerce reasonably found that the ultimate uses of outlets and BWPFs are similar.

### 4. Channels of Trade

Commerce ultimately found that "the channels of trade for outlets and other BWPFs are similar." Remand Results at 60. Commerce noted that "both [outlets and other BWPFs are] sold through distributors and to fabricators and contractors." Id. Plaintiffs challenge Commerce's conclusion that the record, and in particular the Shyman[5] Declaration, supports a finding that the expectations of purchasers of BWPFs and outlets are similar based on the fact that both products are sold through distributors like Neill Supply. See Vandewater Comments at 24 (citing Remand Results at 93–94).

Once again, the court disagrees. Commerce rejected Vandewater's argument that the agency should rely on other parts of the Shyman Declaration, emphasizing "differences in the ultimate consumer of the products." Remand Results at 93. Commerce noted that it considered the Shyman Declaration, and highlighted that Mr. Shyman acknowledged that "welded branch outlets and butt-weld fittings are both sold to distributors like Neill Supply." Id. at 93–94. Vandewater maintains that Commerce's simplistic analysis on this issue misses the point and fails to engage with the record. See Vandewater Comments at 24–25 (noting that "Home Depot sells paint and flowers, but that says nothing about whether ultimate purchasers deem them to be the same product.").

---

[5] Vandewater submitted this declaration to Commerce as part of its remand comments, noting that "Mr. Neil Shyman was Vice President and General Manager of Neill Supply from May 1968 to January 2011.  Neill Supply is a fabricator and supplier of fire sprinkler and industrial piping and sells Vandewater's steel branch outlets." See Remand Results at 27 n.186.

Commerce acknowledged the distinction highlighted by Plaintiffs, but overall found it unpersuasive in demonstrating that outlets and BWPFs subject to the China BWPFs Order involve different channels of trade.  As Commerce explained:

> We agree that Vandewater's outlets are typically sold to a particular type of contractor given their targeted application, when compared to BWPFs more generally – which cover a wide range of products and applications.  However, this is true in any circumstance when comparing a particular product to a broad class of products.  Outlets and other BWPFs are sold to distributors and then to contractors and users involved in constructing piping systems, even if the particular type of contractor/customer for Vandewater's outlets focuses on certain types of systems, i.e., fire protection and other low-pressure applications.

Remand Results at 94.  In the court's view, Plaintiffs' arguments about the overbreadth of Commerce's analysis under this factor go to the weight that the agency should assign this factor in its overall (k)(2) analysis and not the reasonableness of its determination. While the court understands that this factor provides limited assistance in comparing BWPFs and subject outlets, it cannot agree with Plaintiffs that Commerce's findings under this factor were unreasonable.

### 5. Manner of Advertisement and Display

As to the final criterion, Commerce found that "outlets and other BWPFs are advertised in a similar manner, i.e., via online catalogs in company websites or affiliated or third-party online sources."  Remand Results at 60–61.  Commerce observed that "[t]hese sources identify the size, weight, and other technical specifications of the merchandise, including pressure resistance, materials used, and industry standard."  Id. at 61.  Commerce highlighted that "outlets (and similar products, such as saddles) and

BWPFs are displayed side by side. In some instances, outlets are explicitly referenced in advertising materials as having butt-weld ends." Remand Results at 94. Commerce disagreed with Plaintiffs, emphasizing the fact that certain advertising materials for subject merchandise referenced particular industry standards, and further noting that "simply because the advertising materials reference particular standards (i.e., ANSI/ASME B16.9 for certain products) and or references particular uses, [Commerce does not agree] that this reflects a clear dividing line between the method of advertising for each product." Id. at 95.

Plaintiffs maintain that Commerce's analysis sidesteps the critical significance of industry standards in advertising the products, which "draw a clear dividing line between butt-weld pipe fittings on one hand and steel branch outlets on the other." SIGMA Comments at 13. Plaintiffs argue that Commerce "failed to give this evidence due regard," and contend that Commerce's finding that Plaintiffs' afforded "undue significance" to industry standards is unreasonable in light of "repetition and centrality of these standards in the advertisements." Id. Again, Plaintiffs' arguments focusing on the importance of industry standards in advertising ignores contrary evidence in the record, namely that "the record supports Island's proffered explanation: [namely, that] the term 'butt-weld' itself is not a standard term nor commonly used, and, therefore, Island does not use it in its advertising." See Remand Results at 61.

Plaintiffs also contend that Commerce's finding that outlets and BWPFs are "displayed side by side" was unreasonable. Vandewater Comments at 25 (quoting Remand Results at 95 & n.577). Plaintiffs maintain that the sources relied on by

Commerce to support such a finding do not actually include "traditional butt-weld pipe fittings." Id. at 26. Plaintiffs' arguments here again focus on a narrow subset of BWPFs, discounting the variety of BWPFs covered by the China BWPFs Order that Commerce found to be advertised in the same product catalogs along with outlets. See Remand Results at 61 ("First, the 'Fire Sprinkler Pipe Fabrication' section of the Aleum USA catalog shows outlets with a branch side that is threaded or grooved along with 'butt welding ends.' Second, product catalogs on the record show outlets and similar products and other BWPFs advertised side by side. For instance, the Petition shows 'elbows,' 'reducers,' 'lap joint stub ends,' 'saddles,' and 'multiple outlet fittings' in the same product catalog; the Shin Tech catalog advertises two outlet products – one with a beveled edge that allows for a permanent connection only on the branch end, and one with such edges on both the branch and contoured ends – in a similar manner."). Given these findings, the court concludes that Commerce reasonably found that outlets and other BWPFs are advertised in a similar manner.

### C. Suspension of Liquidation Instructions

As a result of Commerce's new analysis on remand, the parties disputed whether Commerce was required to revise its instructions to U.S. Customs and Border Protection regarding suspension of liquidation and cash deposits. See Remand Results at 96–103. This issue was resolved with respect to Vandewater after the conclusion of briefing on the merits of the Remand Results. See Letter, ECF No. 151 (seeking clarification about potential mootness given that existing statutory injunctions already suspend liquidation of unliquidated entries of subject merchandise dating back to 1992 and requesting additional

information as to this issue); Def.'s Initial Resp. to Letter, ECF No. 152; Conference Call,

ECF No. 157; Def.'s Second Resp. to Letter, ECF No. 159; Second Conference Call, ECF

No. 164; Order Amending Statutory Injunction, ECF No. 166.  As to SIGMA, this was not

an issue.

        SCI, though, maintains that this is a live issue.   While SCI initially presented

arguments challenging the legal basis for Commerce's instructions to "continue"

suspension of liquidation, SCI's arguments appear to have evolved significantly after

conferencing with the court.   Specifically, SCI maintains that this issue is not moot

because certain of its entries contain both subject merchandise and non-subject

merchandise ("mixed entries"), and argues that these mixed entries may be

inappropriately subject to duties as a result of Commerce's instructions as applied to a

suspension of liquidation covering the non-subject merchandise.   SCI now attempts to

formally raise these arguments for the first time in the context of "responding" to

Vandewater's consent motion to amend its statutory injunction.   <u>Compare</u> SCI Resp. to

Vandewater's Mot. for Amended Order for Statutory Injunction, ECF No. 166 (noting that

SCI has no objection to Vandewater's revision of the statutory injunction covering its

entries, but adding that "SCI files this response to state that it does not agree with the

statement in this motion that the Government should be able to apply antidumping duties

to welded outlets contained in entries 'that were previously suspended' for reasons

unrelated to the underlying proceeding at issue in this appeal (<u>i.e.</u>, entries that were

previously suspended because they contained unrelated products subject to suspension

pursuant to an unrelated AD/CVD order as of the effective date of Commerce's scope

determination on Vandewater's welded outlets (September 10, 2018))."), with SCI

Comments & Remand Results (discussing parties' disagreement as to Commerce's

authority to "continue" suspension of liquidation under the regulatory framework, but

making no reference to particular mixed entries, or any issues involving inappropriately

assessed duties).  As noted previously, these arguments regarding "mixed entries" do not

appear in SCI's remand comments nor do they appear to have been raised before

Commerce in the course of the remand.  See SCI Resp. to Vandewater's Mot. for

Amended Order for Statutory Injunction, ECF No. 166 (noting that SCI's arguments in the

response reflect SCI's arguments "stated during [the August 10, 2022] conference call").

        Given these circumstances and its discussions with the parties, the court

concludes that SCI's additional arguments on this issue are not properly before the court

and are deemed forfeited.  See United States v. Great Am. Ins. Co., 738 F.3d 1320, 1328

(Fed. Cir. 2013) ("It is well established that arguments that are not appropriately

developed in a party's briefing may be deemed waived."); Dorbest Ltd, v. United States,

604 F.3d 1363, 1375–77 (Fed. Cir. 2010) (affirming waiver of arguments not raised until

after remand); see also In re Google Tech. Holdings LLC, 980 F.3d 858, 862 (Fed. Cir.

2020) (explaining the distinction between "forfeiture" and "waiver" and acknowledging that

"[b]y and large, in reviewing this court's precedent, it is evident that the court mainly uses

the term 'waiver' when applying the doctrine of 'forfeiture.'"); Saha Thai Steel Pipe Pub.

Co. v. United States, 46 CIT ___, Slip Op. 22-99, 2022 WL 3681263 at *4 (Aug. 25, 2022)

(exploring precedent addressing forfeiture and waiver, and explaining that "[f]ailing to

raise an argument in a previous proceeding thus forfeits the argument after the matter

has been remanded and is back on appeal.").  The court also notes that SCI's additional arguments on this issue may well be moot in light of the existing statutory injunction that enjoins liquidation of SCI's imports of unliquidated entries of subject merchandise dating back to July 6, 1992.  <u>See</u> Order Entering Form 24 Statutory Injunction, Court No. 19-00011, ECF No. 17 (Jan. 28, 2019).

### III. Conclusion

Despite their arguments supporting an alternative reasonable conclusion, Plaintiffs have failed to demonstrate that the record supports Plaintiffs' preferred outcome as the one and only reasonable determination Commerce could have made.  <u>See, e.g.</u>, <u>supra</u> p. 20.  Although Plaintiffs have demonstrated that information on the record <u>could</u> reasonably support a finding that outlets are excluded from the scope of the <u>China BWPFs Order</u>, the court cannot agree that Commerce acted unreasonably in reaching its findings to the contrary under each of the (k)(2) factors.  The court therefore sustains Commerce's determination that outlets and other BWPFs are sufficiently similar such that the subject outlets should be included under the scope of the <u>China BWPFs Order</u>.  Judgment will enter accordingly.

      /s/ Leo M. Gordon      
Judge Leo M. Gordon

Dated: September 8, 2022
      New York, New York